SCOTT C. CIFRESE, ISB #4965
DANIEL W. SHORT, *pro hac vice*
**PAINE HAMBLEN LLP**
717 W. Sprague Ave., Suite 1200
Spokane, WA 99201-3505
Telephone: (509) 455-6000
Facsimile: (509) 838-0007

Attorneys for Defendant
Idaho County Light & Power

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 3:17-cv-00391-CWD |
| Plaintiff, | ) | |
| | ) | **DEFENDANT'S MEMORANDUM OF** |
| vs. | ) | **AUTHORITIES IN SUPPORT OF** |
| | ) | **MOTION IN LIMINE TO EXCLUDE** |
| IDAHO COUNTY LIGHT AND POWER | ) | **OPINIONS OF UNITED STATES'** |
| COOPERATIVE ASSOCIATION, INC., | ) | **EXPERTS RE: FIRE CAUSE AND** |
| | ) | **ORIGIN** |
| Defendant. | ) | |

Defendant, Idaho County Light and Power Cooperative Association, Inc., ("ICLP") through its attorneys, Scott C. Cifrese and Daniel W. Short, submits this Memorandum of Authorities in Support of its Motion in Limine to Exclude Opinions of United States' Experts re: Fire Cause and Origin.

## I.  INTRODUCTION

The cause and origin of the Sheep Fire are questions that have remained unanswered for over seven years. The task of figuring out the cause and origin of the Fire first fell to United States Forest Service (USFS) Officer Jill Forth. Forth, a seasoned fire investigator near the end of her career, arrived at the property where the Fire started within an hour of it starting. In

conducting her investigation, Forth professed to follow NFPA (National Fire Protection Association) 921, the "gold standard" of methodologies for investigating the cause and origin of fires. But nothing could be further from the truth.

Forth departed from NFPA 921 at every step of her investigation. She failed to preserve, collect, and document all available data. She almost immediately concluded that ICLP's equipment was the cause of the Fire, but she could not critically analyze the data that led her to this conclusion because she did not have expertise in electricity or electrical engineering. From there, Forth developed one, and only one, hypothesis: ICLP's equipment was the cause of the Fire. Forth did not test her theory, and did not develop or test additional hypotheses. Forth instead succumbed to expectation and confirmation bias. Forth reached her conclusion first and worked backwards to support it. Forth's investigation of the Sheep Fire is deeply flawed, inadequate, and her lack of documentation makes it so other investigators cannot confirm Forth's opinions or reach their own opinions. Yet, Forth's investigation is the foundation of the United States' theory that ICLP is responsible for the Sheep Fire.

In an attempt to rehabilitate Forth's investigation and corroborate her theory that ICLP's equipment caused the Sheep Fire, the United States retained a cadre of experts, including experts in fire cause and origin investigation, electrical and mechanical engineering, and ignition dynamics. These additional experts, however, cannot cure Forth's deficient investigation. Instead, these experts perpetuate Forth's errors by starting with a foregone conclusion and then generating opinions to support it. These experts do nothing more than add layers of opinion to conclusions that are not based in fact or sound reasoning. The United States' experts do not, and cannot, cure Forth's failure to adhere to a reliable methodology to reach her opinions.

The district court serves as the gatekeeper to prevent the jury from hearing expert opinions that are unreliable. The opinions of Forth and the United States' retained experts concerning the cause and origin of the Sheep Fire are unreliable because they are not based in fact and were reached without adhering to an accepted scientific methodology. ICLP respectfully requests that the Court exclude the opinions of Forth and the United States' retained experts concerning the cause and origin of the Sheep Fire.

## II.  FACTS

**A.      The Hegvets, the Ice Plant, ICLP, Cook & Sons' Construction, and the Sheep Fire.**

Since the summer of 2001, Gary and Carolyn Hegvet have operated an ice-making facility, "the Ice Plant" or "Ice Man," on their property in Lucile, Idaho. *See* Def.'s Statement of Material Facts in Supp. of Mot. for Summ. Judg. (hereinafter, "DSOMF") at ¶ 2. ICLP has supplied electricity to the Ice Plant since its construction. *Id.* at ¶ 3. On certain occasions, the Ice Plant experienced power issues when the Hegvets installed additional motors without informing ICLP.  *Id.* at ¶ 4.  Over the course of providing service to the Ice Plant, ICLP increased the size of its transformers and power lines servicing the Ice Plant in an effort to keep up with the Ice Plant's increasing demand it placed on ICLP's system. *Id.* at ¶ 5.  In 2012, the Ice Plant was serviced with three 50 kV transformers.  *Id.* at ¶ 6.  Two of the transformers were connected with an insulated, aluminum wire known as a "jumper wire." *Id.* By connecting two of the transformers with a jumper wire (known as an "open wye" or "open delta" configuration), ICLP was able to provide three-phase, industrial-level power to the Ice Plant. *Id.*

On September 6, 2012, the Sheep Fire started somewhere on the Hegvets' property.  Dkt. No. 1 at ¶ 10.  On that same day, Cook & Sons' Construction was operating heavy machinery at

a nearby jobsite on Highway 95. DSOMF at ¶¶ 9-10. Sometime before the Sheep Fire ignited, a Cook & Sons' excavator contacted ICLP's power line(s) at the jobsite. *Id.* at ¶ 10. The excavator, operated by Edd Murphy, broke the neutral wire, which fell to the ground. *Id.*

After ICLP was informed of the line contact, ICLP linemen Scott Anderson de-energized the line and secured the downed wire. Decl. of D. Short at ¶ 18, Ex. O (Anderson Dep.) at 24:15 – 25:5. ICLP did not re-energize the line until after Cook & Sons' completed its work on the highway because the line fed only an Idaho Department of Transportation traffic counter, which was not needed at the time. *Id.* at ¶ 19, Ex. P (Hill Dep.) at 83:9-22, 387:2 – 388:5.

**B.     USFS Officer Jill Forth investigates cause and origin of the Sheep Fire.**

The USFS dispatched Officer Jill Forth to investigate the Sheep Fire at approximately 11:30 a.m. on September 6, 2012. Decl. of D. Short at ¶ 2, Ex. A (Forth Dep.) at 17:10 – 18:10. Forth asked fellow USFS Officer Patrick Finnegan to assist her. *Id.* at 18:23 – 19:3. Forth then drove her patrol vehicle from the USFS station in Grangeville, Idaho to the Hegvets' property (outside of Lucile, Idaho). *Id.* at 18:14-23. She arrived at the Hegvets' property around 12:30 p.m. *Id.* at 19:5-7. Finnegan, driving separately, arrived five to 10 minutes after Forth. Decl. of D. Short at ¶ 2, Ex B. (Finnegan Dep.) at 21:17-21, 46:9-12. Driving up to the Hegvets' property, Forth noticed a V burn pattern on the hillside, and saw a boom truck with people in the bucket working on power equipment near the Ice Plant. *Id.* at 19:21 – 20:5. Forth took some photographs of what she saw as she approached the Ice Plant. *Id.* at 20:3-5, 36:20-25; *see also id.* at ¶ 4, Ex. C (Incident Rpt.) at 433-50 (photographs).

Forth first spoke with USFS fire fighter and Incident Commander Josh Warden. Decl. of D. Short at ¶ 2, Ex. A (Forth Dep.) at 21:11-23. Warden was managing fire suppression efforts;

he was not involved in the investigation of the fire. *Id.* at 22:10-24, 51:23-25. Warden told Forth that he thought the fire had started in the area of the transformer pole. *Id.* at 21:17-21.

Forth and Finnegan next spoke with two ICLP linemen, Greg Schumacher and Scott Anderson, who were working on the transformer pole servicing the Ice Plant. *Id.* at ¶ 2, Ex. A (Forth Dep.) at 17:2-5, 23:21 – 24:10. The linemen told Forth that when they had arrived at the scene, the transformer bank was energized and the Ice Plant had power. *Id.* at 93:21-25. They de-energized the equipment so they could inspect ICLP's service. *Id.* at ¶ 16, Ex. M (Schumacher Dep.) at 28:22 – 29:6. Forth testified that the linemen told her that "one of the pots . . . had burned," and that they were repairing and replacing the damaged equipment, specifically a wire that connected the two "pots." *Id.* at 24:3-6, 29:3-8; *see also id.* at 25:14-16, 26:1-3 (Forth unable to describe work performed by the linemen). Forth requested the jumper wire, which Schumacher had removed from the transformers, and, from the height of the transformers, tossed into the back of his bucket truck. *Id.* at 24:6-10; *id.* at ¶ 16, Ex. M (Schumacher Dep.) at 93:16 – 94:9. The linemen gave the jumper wire to Forth. *Id.* at ¶ 2, Ex. A (Forth Dep.) at 24:8-10. According to Forth, the wire was hot, the plastic coating on the wire was melted in places, and one end of the wire was charred. *Id.* at 24:20-22.

Forth testifies that the linemen told her that because of a power surge, the jumper wire had "popped," and was not functioning, so they had to replace it. *Id.* at 29:3-8. Forth testified that the linemen told her the jumper wire was "loose." *Id.* at 38:20-25. The linemen further told Forth that a line had been cut down along the highway in a construction zone, and, when the power had been turned back on, it created a surge. *Id.* at 29:13-17. Forth did not ask whether the

linemen had helped repair the line that had been broken. *Id.* at 44:2-5. Forth spoke with the linemen for ten minutes at the most. *Id.* at 30:21-22.

After speaking to the linemen, Forth and Finnegan split up. Decl. of D. Short at ¶ 2, Ex. A (Forth Dep.) at 31:12-14. Finnegan began taking written statements and Forth started canvassing the area looking at burn patterns. *Id.* at 31:12-21. Forth looked at the equipment on the meter pole and did not see anything. *Id.* at 68:18-22. She did not look at the weather head at the top of the Ice Plant. *Id.* at 68:23 – 69:3. Forth observed fire indicators and began placing flags. *Id.* at 33:7-10. The fire indicators ultimately led Forth back to the power pole. *Id.* at 33:15-17. As she got closer to the power pole, she was able to look at micro indicators to narrow down the origin site to an area about the size of a small plate. *Id.* at 33:20 – 34:1. Within that small area Forth found a piece of wire that had white markings and ash and charring, which led Forth to believe that the metal had been burnt. *Id.* at 34:1-2, 64:4-15. *But see id.* at 64:24 – 65:2 (admitting that she could not tell whether the burn marks were caused by electricity or the fire).

The origin site identified by Forth was at the base of the transformer pole directly below the electrical equipment at the top of the pole. *Id.* at 34:1-10. She concluded that the small piece of wire had come from the jumper wire that she had retrieved from the linemen and this smaller piece of wire started the Sheep Fire. *Id.* at 34:20-23. Forth took a total of 17 photographs of her investigation of the fire scene. *Id.* at ¶ 4, Ex. C (Incident Rpt.) at 433-50. Forth did not cordon off the suspected origin scene, and did not lay down a grid to assist her in documenting the scene. *Id.* at 63:9-12, 66:10-13

Finnegan obtained written statements from Jim Law, Gary Hegvet, and Greg Schumacher. *See* Decl. of D. Short at ¶ 4, Ex. C (Incident Rpt.) at 465-67. Law, who resided in

an apartment within the Ice Plant, stated that there was a "power surge" at the Ice Plant just before the Fire. *Id.* at 465.  Hegvet stated that the Ice Plant "lost power" after he heard a "pop," at which point he saw a fire at the bottom of the transformer pole. *Id.* at 467.  ICLP lineman Schumacher's statement reads:

> When I arrived it was burnt around the pole so I pulled the bucket truck up to the transformer pole to check it out. The bank was still energized so I de-energized & ground the bank.  Then I started checking connections and I found one jumper wire that was melted[] and burnt at the x3 bushing of the high leg pot.  The connection seemed tight when I removed the wire from the lug. I also checked the other connections they were tight, and checked the rest of the wires for bubbles & heat. They all seemed good.

*Id.* at 466.

After departing from the Hegvets' property on September 6, 2012, neither Forth nor Finnegan inspected the Cook & Sons' worksite or interview Cook & Sons' employees or workers. Decl. of D. Short at ¶ 2, Ex. A (Forth Dep.) at 57:16-23, 75:2-5, 101:18-25; *id.* at ¶ 3, Ex. B (Finnegan Dep.) at 72:1-3.  Forth never requested records from ICLP regarding ICLP's response to the downed line at the Cook and Sons jobsite or whether any power outages were reported on the day of the Fire.  *Id.* at 71:10-13.  Forth never followed up with any of the people who gave written statements. *Id.* at 76:6-11, 90:1-5, 96:10-13, 105:3-17. Forth did not investigate the amount of energy the Ice Plant was drawing from the transformers. *Id.* at 100:10-15.

## C.    USFS's 2012 Fire Origin and Cause Supplemental Incident Report and 2014 Report of Investigation.

On December 20, 2012, three months after inspecting the fire scene at the Hegvets' property, and after the Fire had burned approximately 48,000 acres (including approximately 34,000 acres of Forest Service Land), the USFS issued a Wildland Fire Origin and Cause

Supplemental Incident Report authored by Forth. Decl. of D. Short at ¶ 4, Ex. C (Incident Rpt.).

In the Incident Report, Forth determined that the cause of the Fire was:

> Power pole at the end of a line was hit by a power surge. A jumper wire between two transformers on the power pole was loose causing the wire to pop, short, spark, and burn . . . dropping a hot wire piece on the ground at the base of the power pole.

*Id.* at 425; *see also id.* at 429, & 430 (substantially the same description of how Fire started).

In the Incident Report, Forth summarized her September 6, 2012 conversation with Schumacher and Anderson as follows:

> They told FORTH and FINNEGAN that Cook and Sons Construction had cut a power line during their construction on U.S. Highway 95, shutting down the power to the power pole. When the line was repaired and the power restored, a power surge hit the pole. A jumper wire between two transformers on the power pole was loose causing the wire to pop, spark and burn.

*Id.* at 427; *but see id.* at 428 (summarizing Schumacher's written statement, Forth's reiterates Schumacher's comment that the jumper wire connection "seemed tight").

On or about July 14, 2014, USFS issued its Report of Investigation concerning the Sheep Fire. *Id.* at ¶ 5, Ex. D (Rpt. of Invest.). The Report of Investigation included the same recitations and conclusions as contained in Forth's December 2012 Incident Report. *Id.*

**D.      State court litigation and Forth's deposition testimony.**

On or about September 4, 2014, private landowners damaged by the Sheep Fire sued the Hegvets, ICLP, and Cook and Sons' Construction in Idaho state district court (Idaho County). Decl. of D. Short at ¶ 6. As part of that litigation, the parties took Forth's deposition.[1] *Id.* At her deposition, Forth testified as follows:

---

[1]As part of this federal action, the parties may use depositions taken in the state court action to the same extent they could be used had they been taken in this action. Dkt. # 28.

- She adhered to the scientific methodologies promulgated by NFPA 921 in conducting her investigation. *Id.* at ¶ 2, Ex. A (Forth Dep.) at 84:22-25. Forth agreed that NFPA 921 is the "gold standard" for fire cause and origin investigations. *Id.* at 73:22-24.

- Forth does not understand electricity or power surges. *Id.* at 55:23 – 56:2, 58:3-10, 75:6-10, 93:7-16, 95:14-19, 97:21 – 98:25.

- Forth described her role in investigating the fire to determine only the cause of the fire. She did not consider what may have caused the jumper wire to burn such as the source of the power surge. *Id.* at 95:16-24, 96:5-9.

- She could only assume that the loose connection caused the jumper wire to heat up. *Id.* at 99:1-5.

- Forth did not perform any testing on the small metal piece to determine whether the metal had enough heat to ignite the ignition source. *Id.* at 70:13-17.

- She did not consult with an electrical engineer or other person with expertise in electricity in reaching her cause and origin conclusions. *Id.* at 76:20-24.

**E.   United States' disclosure of expert witnesses.**

The United States disclosed four testifying experts: (1) Mike Cole; (2) Dr. Christopher Lautenberger; (3) Dr. John Palmer; and, (4) Dr. Glen Stevick[2]. Decl. of D. Short at ¶ 7. Cole, a fire cause and origin expert, concludes that Forth correctly identified the Sheep Fire origin site and that the small metal piece of wire found by Forth, was ejected from the jumper wire, burning hot, and ignited vegetation on the ground to start the Fire. *Id.* at ¶ 8, Ex. E (Cole Rpt.) at 23.

---

[2]After Dr. Xu was charged with attempted murder and arrested, the United States substituted Dr. Stevick, who was an engineer in Dr. Xu's firm. Decl. of D. Short at ¶ 7.

Lautenberger (ignition dynamics), Palmer (electrical engineer), and Stevick (mechanical engineer), purport to provide the "science" in support of Forth's conclusion regarding the cause of the Sheep Fire. *See id.* at ¶ 9, Ex. F (Palmer Rpt.); *id.* at ¶ 10, Ex. G (Lautenberger Rpt.); *id.* at ¶ 11, Ex. H (Stevick Rpt.).

## III.  LEGAL STANDARD

"The court must decide any preliminary question about whether . . . evidence is admissible." FED. R. EVID. 104(a). In order to satisfy the burden of proof for Rule 104(a), a party must show that the requirements for admissibility are met by a preponderance of the evidence. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).

Expert testimony is admissible if its meets the standards set for in Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

District courts perform a "gatekeeping" function to ensure that expert testimony conforms to Rule 702's admissibility requirements. *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 597 (1993). When determining the admissibility of expert testimony, the Court engages in a two-part inquiry, examining the reliability and the relevance of the testimony sought to be introduced.  *Daubert*, 509 U.S. at 597.

First, the Court must determine whether a reliable methodology was used by the expert witness. *Daubert*, 509 U.S. at 595 ("The focus, of course, must be solely on principles and

methodology, not on the conclusions that they generate."). The reliability standard is "a flexible one." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). At this first step of the *Daubert* analysis, the court is concerned not with the correctness of the expert's conclusions but the soundness of the methodology. *Estate of Henry Barbain*, 740 F.3d 457, 463 (9th Cir. 2014). The court must act as a gatekeeper to exclude "junk science" that does not meet Rule 702's reliability standards. *Id.* "Any step that renders the [expert's] analysis unreliable . . . renders the expert testimony inadmissible." *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009) (internal quotation marks omitted). And "[w]here an expert's opinion is based on insufficient information, the analysis is unreliable." *Id.*

Second, the Court must determine whether the information "will assist the trier of fact," FED. R. EVID. 702. That is, the Court must determine whether the expert's "reasoning or methodology can be properly applied to the facts in issue." *Daubert*, 509 U.S. at 593.

## IV. ARGUMENT

In accordance with Rule 702 and *Daubert*, the Court should exclude the United States' experts' unreliable opinions regarding the cause and origin of the Sheep Fire.

**A.      Forth's opinions regarding the cause and origin of the Sheep Fire are not reliable and should be excluded because her opinions are not based in fact, and because she did not adhere to a reliable methodology in forming her opinions.**

Forth claims to have adhered to a reliable methodology used for investigating the cause and origin of fires, namely, NFPA 921.[3] Decl. of D. Short at ¶ 2, Ex. A (Forth Dep.) at 73:22-24,

---

[3]Additional fire cause and origin investigation protocols, specific to wildland fires, can be found in the National Wildfire Coordinating Group (NWCG) Wildland Origin and Cause Determination Handbook. *See* Decl. of D. Short at ¶ 13, Ex. J. Forth did not purport to follow the NWCG Handbook, but Cole testified that he relied on the Handbook in reviewing Forth's investigation. *See id.* at ¶ 14, Ex. K (Cole Dep.) at 13:24 – 14:9.

84:22-25. Forth's investigation of the Sheep Fire, however, departs from NFPA 921 in several material ways such that her conclusions are not based on NFPA 921's "systematic approach." Instead, Forth's opinions are based on a hunch that she tries to corroborate through a flawed and unscientific process. Forth's opinions are not reliable and should be excluded.

"NFPA 921 is promulgated by the Technical Committee of the National Fire Protection Association ('NFPA'), the largest fire protection organization in the world and is widely accepted as the standard guide in the field of fire investigation." *United States v. Hebshie*, 754 F. Supp.2d 89, 111 n.39 (D. Mass. 2010). NFPA 921 has been hailed as the "gold standard" of fire investigation protocols. *McCoy v. Whirlpool Corp.,* 214 F.R.D. 646, 653 (D. Kan. 2003); *see also Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.,* 394 F.3d 1054, 1057–1058 (8th Cir. 2005) (stating that the NFPA 921 "qualifies as a reliable method endorsed by a professional organization").

NFPA 921 provides a six step "systematic approach" in which an investigator must: (1) recognize that a need exists to determine what caused the fire; (2) define the problem; (3) collect data; (4) analyze the data; (5) develop a hypothesis based on the data; and (6) test the hypothesis. Decl. of D. Short at ¶ 12, Ex. I (NFPA 921) at §§ 4.2, 4.3. Each of these steps include specific requirements for safeguarding the investigative process to achieve a science-based conclusion. NFPA 921 strongly directs investigators not to develop specific hypotheses until all data has been collected, and to approach each investigation without presumption "as to origin, ignition sequence, cause . . . or responsibility for the incident." *Id.* at ¶ 12, Ex. I (NFPA 921) § 4.3.7.

An expert's failure to adhere to the investigation protocols contained in NFPA 921 is grounds to exclude the expert's testimony. *See*, *e.g.*, *Manuel v. MDOW Ins. Co.*, 791 F.3d 838,

845 (8th Cir. 2015) ("[I]f an expert purports to have followed NFPA 921, he must have followed it reliably, or his testimony may be excluded."); *Mich. Millers Mut. Ins. Corp. v. Benfield*, 140 F.3d 915, 920 (11th Cir. 1998)(finding no abuse of discretion where trial court excluded arson expert's testimony because his methodology did not support his conclusion); *State Farm Fire & Cas. Co. v. Steffen*, 948 F. Supp.2d 434, 443-44 (E.D. Pa. 2013)(excluding testimony of fire investigator who (1) "impermissibly relie[d] on . . . [an] untestable 'negative corpus,'" (2) failed to form hypotheses that could be tested by a scientific method, and (3) ran afoul of NFPA 921 § 4.3.8's stern warning against expectation bias); *Am. Family Ins. Grp. v. JVC Ams. Corp.*, No. 00-27 DSD/JMM, 2001 WL 1618454, at *3-4 (D. Minn. Apr. 30, 2001)(excluding expert testimony where expert did not apply methodology recommended by NFPA 921).

In this case, the Court should exclude Forth's testimony concerning the cause of the Sheep Fire because she did not adhere to NFPA 921 to reach a scientifically-based conclusion. Specifically, Forth failed to (1) document, collect, and preserve all available data; (2) critically analyze the data she did collection; and, (3) develop and test hypotheses that lead to a conclusion based on an analysis of the data collected.

1.  *Forth failed to preserve, collect, and document available data related to the cause and origin of the Sheep Fire.*

The third step[4] of the NFPA 921 investigative process requires investigators to "collect data" pursuant to certain protocols. NFPA 921 § 4.3.3 states: "Facts about the fire incident are . . . collected by observation, experiment, or other direct data gathering means. The data collected is called empirical data because it is based on observation or experience and is capable of being

---

[4]The first two steps of NFPA 921 - "(1) recognize that a need exists to determine what caused the fire; (2) define the problem" - are not at issue for purposes of this Motion.

verified or known to be true." *See* Decl. of D. Short at ¶ 12, Ex. I. Further, "[v]aluable physical evidence should be recognized, documented, properly collected, and preserved for further testing and evaluation or courtroom presentation." *Id.* at § 4.4.4. "Improper scene documentation can impair the opportunity of other interested parties to obtain the same evidentiary value from the data." *Id.* at § 4.4.3.4. A cause and origin investigator's failure to properly collect evidence is grounds to exclude the expert's testimony. *Ind. Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp.2d 844, 850-51 (N.D. Ohio 2004).

In collecting data concerning the cause and origin of the Sheep Fire, Forth departed from NFPA 921 (and the NWCG Handbook) in the following ways:

| Forth's failures re: collection of data | NFPA 921 (2011 ed.) and NWCG Handbook (2005 ed.) protocols |
|---|---|
| *Forth failed to cordon off origin site.* Forth testified that she did not cordon off what she thought the fire origin area was. Decl. of D. Short at ¶ 2, Ex. A (Forth Dep.) at 63:9-12. The only thing she did was "[tell] people not to go in there." *Id.* at 87:23. | "The integrity of the fire scene needs to be preserved. . . . Evidence should not be handled or removed without documentation. The area should be cordoned off by the use of flags, tape or posting personnel at the scene to restrict access." Decl. of D. Short at ¶ 12, Ex. I (NFPA 921) at § 26.7.3.1. |
| *Forth failed to investigate the origin area by using grid lines.* Forth testified "that she did not grid off the fire origin area." *Id.* at 66:10-12. Moreover, Forth performed a visual scan of the origin area and used a magnet, but did not use magnification, a metal detector, or screen any material within her identified origin area. *See id.* at 66:24-25. | "Use colored twine and four stakes to establish a grid line." NFPA § 921 § 26.7.4.2; *see also id.* at § 26.7.4.3 ("Search each [grid] lane visually and with magnification."). *See also* Decl. of D. Short at ¶ 13, Ex. J (NWCG Handbook) at pgs. 46-47 (recommending use of grid lines and search of each lane using multiple search techniques). |
| *Forth failed to document scene with photographs.* Forth took only 17 photographs of the fire scene. *Id.* at 19:11-14. Six of the photographs are of the overall area and linemen working near the transformer pole. | "Thorough and accurate documentation of the investigation is critical because it is from this compilation of factual data that |

| Forth's failures re: collection of data | NFPA 921 (2011 ed.) and NWCG Handbook (2005 ed.) protocols |
|---|---|
| Decl. of D. Short at ¶ 4, Ex. C (Incident Rpt.) at 433-38. Photographs of actual evidence are blurry or are corrupted with an ink pen. *Id.* at 442-44. Forth did not photograph any of the burn indicators or fire patterns that led her to identify her specific fire origin area. *Id.* at ¶ 2, Ex. A (Forth Dep.) at 63:5-8.

Despite identifying the jumper wire as the cause of the fire, Forth did not photograph the jumper wire at the scene. Forth did not take photographs of the transformer bank. Forth did not look for additional evidence on the ground or in the ICLP truck.

Forth did not prepare chain of custody documentation. | investigative opinions and conclusions can be supported and verified." NFPA 921 § 15.1.2; *see generally id.*, Chp. 15 ("Documentation of the Investigation").

NWCG Handbook, at pg. 49, states that the investigator, in documenting and collecting evidence, should:
- Photograph evidence prior to handling.
- Mark and measure the location of all evidence for the fire scene diagram.
- Assign an evidence number or letter.
- Record on evidence log.
- Fill out tag or label for each item of evidence. |
| *Forth failed to sketch and take measurements.* Forth also did not measure and diagram movement of fire patterns and the micro and macro fire patterns/indicators she said she found. *See* Decl. of D. Short at ¶ 4, Ex. C (Incident Rpt.) at 7. Forth did not take measurements of the transformer pole. *Id.* at ¶ 2, Ex. A (Forth Dep.) at 70:9-12. Forth did not measure the small piece of metal she found. Forth Dep. at 64:10-11. There were some measurements discussed regarding the jumper wire, but no photographic documentation was done. | NWCG Handbook, pg. 47, provides a list of "Key Documentation Elements" as follows:
- Narrative
- Photographs
- Photo Log
- **Diagram**
- **Measurements**
- Evidence Log
- Chronology |
| *Forth failed to photograph the collection of evidence.* There were no photographs taken showing the measurements as to where physical evidence was located prior to being collected and there were no measurements on the sketch showing the relationship of structures and equipment at the fire scene or | "A photographic record should be continued throughout the investigative process." NFPA 921 § 26.7.3.

NWCG Handbook, at pg. 49, states that the investigator, in documenting |

| Forth's failures re: collection of data | NFPA 921 (2011 ed.) and NWCG Handbook (2005 ed.) protocols |
|---|---|
| information as to the height of the transformer pole. Forth did not take photographs of the collection, movement, post-movement, and/or preservation of any evidence while it was at the fire scene. | and collecting evidence, should "[p]hotograph evidence prior to handling." |
| *Forth failed to take weather observations*. Forth admits that she did not do a weather kit when she arrived at the scene of the fire. Decl. of D. Short at ¶ 2, Ex. A (Forth Dep.) at 92:1-7. *See also id.* at ¶ 14, Ex. K (Cole Dep.) at 39:2-6 (critiquing Forth because she "didn't take any weather observations"). | "The investigator should document weather factors that may have influenced the fire." NFPA 921 § 17.3.3.5; *see also* NFPA 921 § 26.3 ("Weather plays a substantial role in the behavior of wildfires."). |
| *Forth failed to follow-up on inconsistent witness statements and other leads*. Forth's investigation of the cause and origin of the Sheep Fire was limited to the afternoon she spent at the Hegvets' property on the day of the Fire.<br><br>Forth did not (1) inspect or photograph the electrical equipment around the Ice Plant (such as the meter pole and whether head), Decl. of D. Short at ¶ 2, Ex. A (Forth Dep.) at 68:18 – 69:3; (2) did not inspect or photograph the transformer bank; (3) investigate the amount of energy that the Ice Plant was drawing from the transformers, *id.* at 100:10-15; or, (4) request information about power outages or electrical issues in and around the Ice Plant, *id.* at 71:10-13.<br><br>Forth did not independently verify any of the statements of the linemen. *Id.* at 96:10-13. Neither Finnegan nor Forth ever contacted ICLP in an attempt to get clarification about the jumper wire connection or any electrical issues documented by ICLP. *Id.* at 71:10-13.<br><br>Forth was informed that the Cook & Sons excavator contacted ICLP's power line, breaking the neutral wire, on the day of the Fire, which event could have | "Facts about the fire incident are . . . collected by observation, experiment, or other direct data gathering means." NFPA 921 § 4.3.3.<br><br>For fires possibly caused by power lines and equipment, the NWCG Handbook at pg. 86 recommends that investigator:<br>• "Obtain witness statements from power company."<br>• "Examine all poles, lines, fuses, transformers, insulators, splices, connectors and grounding devices in the area of origin. Take photos and collect samples as needed."<br>• "If a fuse or other mechanical malfunction, it may be necessary to obtain the services of an electrical engineer or power line expert."<br>• "Examine the scene with the power line expert and take into possession exhibits."<br>• "Obtain line data and maintenance records from the power company."<br>• "Exclude or analyze other |

| Forth's failures re: collection of data | NFPA 921 (2011 ed.) and NWCG Handbook (2005 ed.) protocols |
|---|---|
| contributed to the Fire. Forth testified that she did not inspect the Cook & Sons' worksite and did not interview any Cook & Sons' employees or workers from the jobsite. *Id.* at 57:16-23, 75:2-5, 101:18-25; *id.* at ¶ 3, Ex. B (Finnegan Dep.) at 72:1-3. | reasonable potential causes." |

Forth's failure to document, preserve, and collect data concerning the cause and origin of the Sheep Fire taints her entire investigation. Forth was the first investigator on scene, present within an hour of the start of the Fire. The fact that Forth failed to take even rudimentary steps (much less the high standards of NFPA 921) to preserve, collect, and document data is inexcusable and grounds to exclude her testimony. *See Ind. Ins. Co.*, 326 F. Supp.2d at 850-51. Significantly, Forth's cursory investigation prejudiced the ability of other investigators to be able to reach their own conclusions. *See* Decl. of D. Short at ¶ 12, Ex. I (NFPA 921) at § 4.4.3.4; *id.* at ¶ 14, Ex. K (Cole Dep.) at 44:22-45:5 (Cole testifying that Forth's investigation and report do not provide enough information for him to reach independent conclusions).

    2.    *Forth failed to analyze data that she did collect.*

The fourth step of NFPA 921's "systematic approach" requires investigators to analyze the data.

> The scientific method requires that all data collected be analyzed. This is an essential step that must take place before the formation of the final hypothesis. The identification, gathering, and cataloging of data does not equate to data analysis. Analysis of the data is based on the knowledge, training, experience, and expertise of the individual doing the analysis. If the investigator lacks expertise to properly attribute meaning to a piece of data, then assistance should be sought. Understanding the meaning of the data will enable the investigator to form hypotheses based on the evidence, rather than on speculation.

Decl. of D. Short at ¶ 12, Ex. I (NFPA 921) at § 4.3.4. Analyzing the cause of a fire requires "identifying the first fuel ignited, the ignition source, the oxidizing agent, and the circumstances that resulted in the fire." *Id.* at § 18.1.

Forth failed to adhere to NFPA 921 (and NWCG Handbook) protocols because she did not critically analyze the data she collected from the Sheep Fire.

Forth analyzed only one possible cause of the Sheep Fire, i.e., the ejection of the small metal piece from the transformer jumper wire. Forth's analysis went something like this: (1) she found a small, burned metal piece in the area she concluded to be the origin of the Fire; (2) one end of the jumper wire was burnt and missing strands similar to the small metal piece she found; and, (3) Mr. Hegvet and Law reported electrical issues with the Ice Plant and transformer equipment just prior to the Fire. Based on this "data," Forth concocted that the cause of the Fire was a "power surge" hitting the transformer pole, which, in conjunction with a "loose" jumper wire connection, caused the jumper wire to "short, spark, and burn," heating and ejecting the small metal piece with enough heat to ignite the vegetation on the ground. Decl. of D. Short at ¶ 4, Ex. C (Incident Rpt.) at 427. There are several failings in this analysis.

a.     *Forth did not possess expertise to analyze the data.*

First, Forth did not have the expertise to analyze how the small metal piece could have been ejected from the jumper wire with enough heat to start a fire. *Cf.* Decl. of D. Short at ¶ 12, Ex. I (NFPA 921) at § 4.3.4 ("Analysis of the data is based on the knowledge, training, experience, and expertise of the individual doing the analysis."). Forth admits she does "not hav[e] any specific . . . knowledge of the electrical on a power pole." *Id.* at ¶ 2, Ex. A (Forth

Dep.) at 25:14-16. *See also id.* at 93:14-16 ("I don't know electricity").[5]  Despite concluding that

the Fire was caused by a "power surge," Forth cannot define this concept.  *See id.* at 58:3-10.

Forth also did not seek the input of someone else with expertise in electrical systems. *Id.* at

76:20-24. *But see id.* at ¶ 12, Ex. I (NFPA 921) at § 4.3.4 ("If the investigator lacks expertise to

properly attribute meaning to a piece of data, then assistance should be sought."); *id.* at ¶ 13, Ex.

J (NWCG Handbook) at 86 ("If a fuse or other mechanical malfunction, it may be necessary to

obtain the services of an electrical engineer or power line expert."). Given the lack of

"knowledge, training, experience, and expertise" in the field of electricity, Forth's "analysis" is

revealed as simply her speculation that because electricity was involved, and the small metal

piece came from the jumper wire, that the separation occurred because of an electrical incident,

and the small metal piece was ejected, burning hot, onto flammable material below.

b.     *Forth's analysis is not based in fact.*

Forth's "analysis" is flawed because several of the facts underpinning her conclusion

were assumed or erroneous. *Cf.* Fed. R. of Evid. 702(b) (requiring an expert opinion to be "based

on sufficient facts or data"); *Guidroz-Brault v. Mo. Pac. R.R. Co.*, 254 F.3d 825, 831 (9th Cir.

2001) ("[A]n expert must back up his opinion with specific facts.").

First, Forth assumed that the jumper wire was "loose."  But the only person with actual

knowledge of the connection, ICLP lineman Schumacher, has consistently sworn that the

connection was tight.[6]

---

[5]*See also* Decl. of D. Short at ¶ 15, Ex. L (Palmer Dep.) at 52:4-6 ("I did find that [Forth's] understanding of electrical issues was not reflective of somebody who has had ample experience in electrical engineering.").

[6]*See* Decl. of D. Short at ¶ 4, Ex. C (Incident Rpt.) at 466 ("the connection seemed tight"); *id.* at ¶ 16, Ex. M (Schumacher Dep.) at 92:3-25 (Q: "Did you make the statement the

Second, the electrical issue that allegedly affected the Ice Plant just prior to the Sheep Fire is not clear: Law describes a "power surge," Decl. of D. Short at ¶ 4, Ex C (Incident Rpt.) at 465; Hegvet states there was a "power outage," *id.* at 467; ICLP linemen arriving shortly after the Fire started found the electrical service to the Ice Plant "still energized," *id.* at 466. Despite these inconsistencies, Forth failed to seek clarification or try to reconcile these inconsistent statements. *See id.* at ¶ 2, Ex. A (Forth Dep.) at 89:12-15 (testifying that she did not remember speaking to either Mr. Hegvet or Law).

Finally, Forth erroneously found that the power surge occurred when the line was "repaired" at the Cook and Sons' Construction site and power was "restored." Decl. of D. Short at ¶ 4, Ex. C (Incident Rpt.) at 427, 430. This "fact" is objectively impossible. The line that was broken at the Cook and Sons' Construction worksite was the neutral wire - it was not carrying electrical current - and the breaking of the neutral wire would not ordinarily cause a power outage. Prior to arriving at the Ice Plant, ICLP lineman Anderson had, in fact, *de-energized* the line that crossed the Cook & Sons' worksite. *Id.* at ¶ 18, Ex. O (Anderson Dep.) at 24:15 – 25:5. The line remained de-energized until Cook & Sons' completed its work sometime later. *Id.* at ¶ 19, Ex. P (Hill Dep.) at 83:9-22, 387:2 – 388:5. Therefore, prior to the Sheep Fire, the power line was not "repaired," power was never "restored," and a "surge" could not have resulted from the line being repaired.

---

jumper wire between the two poles was loose?" A: "I did not." Q: "Did you ever tell anybody that the jumper wire between the two poles was loose?" A: "No, I did not." Q: "Did you ever tell anybody that the jumper wire between two transformers on the pole popped, sparked, or burnt." A: "No, no.").

    c.  *Forth's analysis did not identify the circumstances that resulted in the Fire.*

Finally, Forth's conclusory analysis did not identify "the first fuel ignited, the ignition source, the oxidizing agent, and the circumstances that resulted in the fire." Decl. of D. Short at ¶ 12, Ex. I (NFPA 921) at § 18.1; *see also id.* at § 18.1.5 ("A fuel by itself or an ignition source by itself does not create a fire."); *id.* at § 18.6.5.2 ("The identification of an ignition source and a first fuel is not sufficient to determine a cause."). As discussed above, Forth could not, and cannot, explain the circumstances that resulted in the Fire. She cannot explain how the jumper wire might have heated or how the small metal piece was ejected from the jumper wire (as opposed to merely breaking off when it was tossed from the top of the pole).

In sum, if Forth had critically analyzed the data she collected, she would have realized that the facts or "data" underlying her analysis were assumptions on her part or flat-out mischaracterizations of the data. Forth's failure to critically analyze the data she collected is grounds to exclude her opinions regarding the cause of the Fire.

    3.  *Forth failed to develop a hypothesis based on her analysis of data collected.*

The fifth step of NFPA 921's "systematic approach" requires investigators to develop a hypothesis or hypotheses based solely on the empirical data that the investigator has collected and analyzed using her knowledge, training, experience, and expertise. Decl. of D. Short at ¶ 12, Ex. I (NFPA 921) at § 4.3.5.

Forth failed to adhere to NFPA 921's mandate to develop a hypothesis based on a critical analysis of data collected. As discussed *supra*, Forth was unable to do this because she neither had the expertise to analyze the data nor did she seek the assistance of another person with the

requisite expertise. And, further, she did not have sufficient empirical data to even conduct a critical analysis. Nevertheless, Forth did develop a single hypothesis, i.e., power surge → loose jumper fire → ejection of hot metal piece from jumper wire → contact with dry vegetation on ground → Fire. But in forming this hypothesis, Forth overlooked other hypotheses supported by empirical data (that she did, or did not, collect).

For instance, Forth's investigation could not exclude the potential that the Sheep Fire was caused by:

- *Discarded smoking materials*. Given Forth's cursory scene inspection, which omitted use of a grid, Forth may have overlooked the remains of a burnt cigarette or match. *Cf.* Decl. of D. Short at ¶ 13, Ex. J (NWCG Handbook) at 70.

- *Incendiary device/arson*. Forth could not exclude the possibility that someone intentionally started the Fire with a lighter/igniter. *See id.* at ¶ 2, Ex. A (Forth Dep.) at 71:2-9; *id.* at ¶ 13, Ex. J (NWCG Handbook) at 70.

- *Equipment use*. Equipment of all sizes and small engines can produce hot carbon particles, which can be found, post-fire, by using a magnet. *See id.* at ¶ 13, Ex. J (NWCG Handbook) at 79. In this case, Forth used a magnet, but as she did not grid the origin site, it is not possible to conduct a thorough search of the area. Moreover, there is no photographic documentation of the magnet search and no information about the area searched.

- *Children*. Forth did not conduct any interviews to determine if children may have been present in the fire origin area. *Cf. id.* at ¶ 13, Ex. J (NWCG Handbook) at 83.

- *Miscellaneous (power lines associated with onsite buildings/structures)*. Forth admits she was aware of a 2008 fire at the Ice Plant that occurred on equipment/wires between

the meter pole and the Ice Plant, namely, melted plastic dripping from the power line. *Id.* at ¶ 2, Ex. A (Forth Dep.) at 81:12-25; 107:13-17; 112:23 – 113:1. Forth testifies that she visually scanned the electrical equipment on and servicing the Ice Plant. *Id.* at 68:11-25. But Forth did not take any pictures of electrical equipment on or around the Ice Plant or other structures. *Cf. id.* at ¶ 13, Ex. J (NWCG Handbook) at 85-86.

In sum, Forth failed to develop or test other hypotheses as required by the fifth step of NFPA 921's "systematic approach." *Id.* at ¶ 12, Ex. I (NFPA 921) at § 4.3.5.

4.    *Forth failed to test her hypothesis.*

The final step of NFPA 921 requires the investigator to test her hypothesis.

> The investigator does not have a valid hypothesis unless it can stand the test of careful and serious challenge. Testing of the hypothesis is done by the principle of deductive reasoning, in which the investigator compares his or her hypothesis to all the known facts as well as the body of scientific knowledge associated with the phenomena relevant to the specific incident. . . . If the hypothesis cannot be supported, it should be discarded and alternate hypotheses should be developed and tested. This may include the collection of new data or the reanalysis is of existing data. The testing process needs to be continued until all feasible hypotheses have been tested and one is determined to be uniquely consistent with the facts, and with the principles of science. If no hypothesis can withstand an examination by deductive reasoning, the issue should be considered undetermined.

Decl. of D. Short at ¶ 12, Ex. I (NFPA 921) at § 4.3.6. "Any hypothesis that is incapable of being tested is an invalid hypothesis. A hypothesis developed based on the absence of data is an example of a hypothesis that is incapable of being tested. The inability to refute a hypothesis does not mean that the hypothesis is true." *Id.* at § 4.3.6.1.

Failure to test a fire cause and origin hypothesis is grounds to exclude an investigator's testing. *E.g.*, *Pride v. Bic Corp.*, 218 F.3d 566, 578 (6th Cir. 2000)(affirming exclusion of expert testimony regarding the cause and origin of a fire purportedly caused by a lighter, due to a failure

to conduct testing); *Solheim Farms, Inc. v. CNH Am., LLC*, 503 F. Supp.2d 1146, 1150 (D. Minn. 2007) (excluding expert testimony regarding cause of fire because investigator "failed to perform any tests to verify his causation theory").

Forth concluded that the fire was a single origin area at the base of the pole and that where were no other origin areas. Decl. of D. Short at ¶ 2, Ex. A (Forth Dep.) at 85:12-16. Forth did not perform any testing on the small metal piece. *Id.* at 70:13-17. Still, Forth concludes "the wire itself would have just been hot it would have combusted the materials around it." *Id.* at 100:6-7. Forth did not measure the height of the pole, which would be necessary for hypothesis testing. *Id.* at 70:9-12. Forth also ignores the possibility that the metal piece impacted the ground post-fire when Schumacher detached the wire from the transformer or when he tossed it into the back of his truck.

5.      *Forth's investigation is tainted by expectation and confirmation bias.*

Rather than follow NFPA 921's systematic approach, Forth succumbed to expectation and confirmation bias, which is contrary to the scientific method and taints her entire investigation.

> Until data have been collected, no specific hypotheses can be reasonably formed or tested. All investigations of fire and explosion incidents should be approached by the investigator without presumption as to origin, ignition sequence, cause, fire spread or responsibility for the incident until the use of the scientific method has yielded testable hypothesis, which cannot be disproved by rigorous testing.

Decl. of D. Short at ¶ 12, Ex. I (NFPA 921) § 4.3.7.

> [E]xpectation bias is a well-established phenomenon that occurs in scientific analysis when investigator(s) reach a premature conclusion without having examined or considered all of the data in a logical and unbiased manner to reach a scientifically reliable conclusion, the investigator(s) uses the premature determination to dictate investigative processes, analyses and ultimately,

conclusions in a way that is not scientifically valid. The introduction of expectation bias into the investigation results in the use of only that data that supports this previously formed conclusion and often results in the misinterpretation and/or the discarding of data that does not support the original opinion. Investigators are strongly cautioned to avoid expectation bias through proper use of the scientific method.

*Id.* at § 4.3.8.

Different hypotheses may be compatible with the same data. When using the scientific method, testing of hypotheses should be designed to disprove the hypothesis. Confirmation bias occurs when the investigator instead tries to prove the hypothesis. This can result in failure to consider alternate hypotheses. A hypothesis can be said to be valid only when rigorous testing has failed to disprove the hypothesis.

*Id.* at § 4.3.9.

In this case, upon arriving at entrance to the Hegvets' property, Forth took six photographs of ICLP linemen working on ICLP equipment. Forth testified that it was important to take these photographs because: "[T]o me [(Forth)] [the linemen] were in the area of my origin and cause." Decl. of D. Short at ¶ 2, Ex. A (Forth Dep.) at 50:18 – 51:1. *See also id.* at 51:5-8 (Forth testifying that she took pictures as she approached the Ice Plant because she "felt [the linemen] were in the area of fire origin."). Forth identified the origin site before performing any investigation. Also prior to conducting any scene investigation, Forth concluded that the jumper wire removed from the linemen was evidence. *Id.* at 31:2-3 ("In my mind [the jumper wire] was evidence."). Moreover, without any investigation, Forth concluded that the jumper wire was the cause of the fire. *Id.* at 97:8-9 ("I had that cause when they handed me the jump[er] wire.").

In sum, Forth made a premature determination of the origin and cause, and then conformed her investigation to reach that premature conclusion. Forth failed to adhere to NFPA

921's "systematic approach," but instead succumbed to confirmation and expectation bias. Forth's opinions concerning the cause and origin of the Sheep Fire are not based in fact and were not reached by adhering to an accepted scientific methodology. Forth's opinions are unreliable and should be excluded from trial. Fed. R. Evid. 702.

**B. Cole's opinions regarding the cause and origin of the Sheep Fire are not reliable and should be excluded because his opinions are limited to review of Forth's flawed investigation, and his opinions are derivative and duplicative of Forth's.**

Cole is a fire investigator. Decl. of D. Short at ¶ 8, Ex. E (Cole Rpt.) at 4. Cole opines that Forth correctly identified the Sheep Fire origin site and that the small metal piece of wire found by Forth, was ejected from the jumper wire, burning hot, and ignited vegetation on the ground to start the Fire. *Id.* at 23.[7]

Seemingly, the United States' only reason for retaining fire cause and origin expert Mike Cole is to rehabilitate Forth's flawed investigation. *See* at ¶ 14, Ex. K (Cole Dep.) at 23:6-7 ("[M]y job was to evaluate Forth's investigation process and to see if it was valid or not."); 25:1-5, 25:14-17 ("I wouldn't call what I did particularly an investigation, more . . . an evaluation."). Cole did not conduct an independent investigation of the Sheep Fire; indeed, by the time Cole

---

[7]Notably, Cole is critical of Forth's investigation in several respects, including: (1) Forth did not adequately document indicators with photographs, Decl. of D. Short at ¶ 14, Ex. K (Cole Dep.) at 38:9-12; (2) Forth should have "captured the weather observations more accurately than she did," *id.* at 39:2-3; (3) the char patterns on the transformer pole could indicate a backing fire (meaning that the Fire did not start at the base of the pole), *id.* at 42:10-18; (4) Forth's sketch is not representative of the indicators she examined, *id.* at 43:13-23; (5) simply by reviewing Forth's report, he could not exactly figure out where the origin area was and how Forth came to that conclusion due to lack of documentation, *id.* at 44:22 – 45:4, 60:11-13; (6) Forth did not look at the meter pole or other power poles and power equipment outside the area she identified as the origin site, *id.* at 50:15-19; (7) Forth should not have ruled out the possibility that the Fire was caused by sparks from the transformer equipment, *id.* at 58:16 – 59:2. Cole further admits that it is possible that the small piece of wire fell to the ground when Schumacher removed it from the transformer. *Id.* at 47:5-12.

was retained in this case (preliminarily, by plaintiffs in the state court action), there was no fire scene for him to investigate. *See id.* at ¶ 14, Ex. K (Cole Dep.) at 24:21-25. In opining that Forth reached the correct result and adhered to fire investigation protocols, all Cole did was review Forth's investigation, and materials generated in connection with this litigation. *Id.* at ¶ 8, Ex. E (Cole Rpt.) at 7-8. As Cole's opinions are derivative of Forth's unreliable investigation, Cole's opinions regarding the cause and origin of the Sheep Fire should be excluded for the same reasons Forth's opinions should be excluded. Fed. R. Evid. 702; *Daubert*, *supra*.

Alternatively, even if the Court does not exclude Forth's opinions, Cole's opinions should still be excluded as they are duplicative of Forth's opinions. Under Federal Rule of Evidence 403, the trial court may exclude relevant evidence on grounds of "undue delay, waste of time, or needless presentation of cumulative evidence." "Multiple expert witnesses expressing the same opinions on a subject is a waste of time and needlessly cumulative." *Sunstar, Inc. v. Alberto-Culver Co., Inc.*, 01 C 0736, 2004 WL 1899927, at *25 (N.D. Ill. Aug. 23, 2004). "It also raises the unfair possibility that jurors will resolve competing expert testimony by 'counting heads' rather than evaluating the quality and credibility of the testimony." *Id.* Experts that simply offer the refrain, "me too," as opposed to offering a "new angle" on the evidence, are cumulative and subject to exclusion. *Kendra Oil & Gas, Inc. v. Homco, Ltd.*, 879 F.2d 240, 243 (7th Cir. 1989).

Cole adds nothing new to the evidence concerning the cause and origin of the Sheep Fire. Cole's sole purpose in this case is to put his stamp of approval on Forth's inadequate investigation in an effort to convince the jury that Forth's report is reliable. At bottom, Cole's testimony is simply to say "me too," which risks the jury giving undue weight to the United

States' causation evidence simply because of the number of experts as opposed to the quality and credibility of the testimony.

### C. The opinions of United States' retained experts Drs. Palmer, Lautenberger, and Stevick should be excluded because their opinions concerning the cause of the Sheep Fire are derivative of Forth's opinions and unreliable.

The opinions of the United States retained experts - Palmer, Lautenberger, and Stevick - concerning the cause of the Sheep Fire should likewise be excluded as unreliable.

#### 1. *Dr. John Palmer*

Dr. Palmer is an electrical engineer who opines, inter alia, that the cause of the Sheep Fire was the "improper installation to the electrical cable (jumper wire) between two of the service drop transformers at the Ice Plant, specifically inadequate contact between the transformer terminal and one end of the cable." Decl. of D. Short at ¶ 9, Ex. F (Palmer Rpt.) at 1; *see also id.* at ¶ 15, Ex. L (Palmer Dep.) at 17:15-21 (admitting that he was not retained to perform a fire cause and origin analysis). Yet, when Palmer was asked whether his "opinion as to the origin of the fire is entirely based on Jill Forth's report?" Palmer responded, "Correct. I did not do an independent analysis of the origin of the fire." *Id.* at ¶ 15, Ex. L (Palmer Dep.) at 51:20-23. Palmer reached his conclusions by focusing on the one hypothesis developed by Forth, which, as discussed *supra* is factual unsupported, analytically unsound and untested, and is not consistent with the scientific method. Under NFPA 921, the cause and origin of a fire cannot be determined by focusing on one hypothesis, to the exclusion of others. Stacking Dr. Palmer's opinion on top of Forth's single hypothesis does not establish the cause of the Sheep Fire.

### 2. *Dr. Christopher Lautenberger*

Lautenberger studies "ignition dynamics." He opines that a piece of aluminum wire the size of the small metal piece found by Forth would have sufficient heat to ignite dry vegetation when ejected from the top of the transformer pole through an arcing event. Decl. of D. Short at ¶ 10, Ex. G (Lautenberger Rpt.) at 38. Lautenberger does not independently conclude that arcing occurred at the jumper wire connection. *See id.* at 16, § 4.2 ("It is my understanding that others have attributed [the damage on the jumper wire] to high resistance heating and arcing."). Further, Lautenberger candidly admits that he cannot say, to a reasonable degree of scientific certainty, that the small metal piece found by Forth caused the Fire. *See id.* at ¶ 17, Ex. N (Lautenberger Dep.) at 110:23 – 111:1 ("I don't think one can say conclusively that [the metal piece] was the ignition source because it - logically it could have fallen after the fire."); *id.* at 131:14-25 ("I can't say it's more likely than not that that piece of piece of wire was the ignition source . . . I don't think it's 51 percent. I don't think there is any way to show that it's 51 percent probable.").

Dr. Lautenberger's opinions about the cause of the Sheep Fire should be excluded because they are derivative of Forth's inadequate and flawed investigation. Further, it is inappropriate for an expert to testify as to mere possibilities (as opposed to probabilities to a reasonable degree of scientific certainty). *See, e.g.*, *Lanza v. Poretti*, 537 F. Supp. 777, 785 (E.D. Pa. 1982)(requiring the cause of fire to be proven to "a reasonable degree of scientific certainty").

### 3. *Dr. Glen Stevick.*

Dr. Stevick is a mechanical engineer. Decl. of D. Short at ¶ 11, Ex. H (Stevick Rpt.) at 1. Stevick concludes, "to a reasonable degree of engineering certainty," that the damage to the end

of the jumper wire was caused by arcing. *Id.* at 28. Dr. Stevick further comments that the arcing event "likely . . . contributed to the Sheep Fire," but does not express this opinion in terms of reasonable degree of engineering certainty. *Id.* Stevick concedes that "[t]he exact sequence of electrical events that lead [sic] to the arcing is beyond the scope of [his] report." *Id.*

Stevick's claim that "[t]he arc is likely to have contributed to the Sheep Fire," *id.*, is completely unsupported by his report, is not expressed in terms of reasonable degree of scientific certainty, and is not a reliable or competent opinion. *Cf. Lanza*, 537 F. Supp. at 785. Stevick's opinions do not establish that ICLP's negligence caused the Sheep Fire. His cursory and unsupported opinion that "[t]he arc is likely to have contributed to the Sheep Fire" should be excluded.

## V.  CONCLUSION

For the foregoing reasons, ICLP respectfully requests that its Motion in Limine to Exclude Opinions of United States' Experts re: Fire Cause and Origin be granted, and the opinions of Forth and the United States' retained experts—Cole, Palmer, Lautenberger, and Stevick—be excluded from trial.

DATED this 8th day of November, 2019.

**PAINE HAMBLEN LLP**

By: */s/ Scott C. Cifrese*
       Scott C. Cifrese
       Daniel W. Short
       Attorneys for Defendant Idaho County
       Light and Power

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on the 8th day of November, 2019, I filed the foregoing **DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE OPINIONS OF UNITED STATES' EXPERTS RE: FIRE CAUSE AND ORIGIN** electronically through CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

- **James P. Schaefer, Peter Wucetich**
  james.schaefer@usdoj.gov, peter.wucetich@usdoj.gov, elise.foster@ogc.usda.gov, jessica.black@usdoj.gov, CaseView.ECF@usdoj.gov, usaid.ecfnotice@usdoj.gov

**Manual Notice List**

The following is the list of attorneys who are not on the list to receive e-mail notices for this case (who therefore require manual noticing).

- No manual recipients

*/s/ Scott C. Cifrese*
Scott C. Cifrese, Attorney for Defendant
Idaho County Light and Power

I:\SPODOCS\00068\00293\PLEAD\1859339