BART M. DAVIS, IDAHO STATE BAR NO. 2696
UNITED STATES ATTORNEY
**JAMES P. SCHAEFER, CALIFORNIA STATE BAR NO. 250417**
**ASSISTANT UNITED STATES ATTORNEY**
DISTRICT OF IDAHO
WASHINGTON GROUP PLAZA IV
800 EAST PARK BOULEVARD, SUITE 600
BOISE, ID 83712-7788
TELEPHONE: (208) 334-1211
FACSIMILE: (208) 334-1414
Email: James.Schaefer@usdoj.gov

Attorneys for Plaintiff United States of America

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>IDAHO COUNTY LIGHT AND POWER COOPERATIVE ASSOCIATION, INC. and GARY L. HEGVET and CAROLYN HEGVET, doing business as THE ICE MAN,<br><br>Defendants. | Case No. 3:17-cv-00391-CWD<br><br>**UNITED STATES OF AMERICA'S OPPOSITION TO DEFENDANT'S MOTION IN LIMINE (ECF NO. 63)** |

The United States submits this opposition to Defendant Idaho County Light and Power Cooperative Association, Inc.'s ("ICLP") Motion in Limine (ECF No. 63) ("Motion") and requests that the Court deny ICLP's Motion in its entirety.

## I.   INTRODUCTION

The United States seeks damages related to a wildfire known as the Sheep Fire. The cause of the Sheep Fire was electrical arcing that occurred due to ICLP's negligent installation and maintenance of a jumper wire connecting two transformers. This arcing ejected molten and/or burning aluminum fragments from the jumper wire, igniting the Sheep Fire.

The task of investigating the origin and cause of the Sheep Fire initially fell to United States Forest Service ("USFS") Patrol Captain/Fire Investigator Jill Forth. Captain Forth interviewed witnesses, examined the fire scene, analyzed burn patterns and indicators, collected

**OPPOSITION TO DEFENDANT'S MOTION IN LIMINE - 1**

physical evidence (*i.e.*, a jumper wire and wire fragment), and considered and eliminated numerous potential ignition sources. Based on the evidence and her training and experience, Captain Forth concluded that: (1) the Sheep Fire started at the base of a transformer pole owned by ICLP; and (2) the cause of the fire was a "[l]oose jumper wire between two transformers, [which] shorted, sparked and burned, dropping a hot wire piece onto the ground at the base of the power pole."[1] Based on false statements by two ICLP employees, Captain Forth also concluded that a power surge hit the transformer pole when ICLP restored power after repairing a power line that Cook & Sons Construction knocked down that morning. Schaefer Decl. Ex. A at 3.

ICLP argues that Captain Forth's opinions should be excluded as unreliable and not based on fact. ICLP is wrong. Captain Forth's reliable opinions are based on the facts she gathered during her investigation. In reaching her opinions, Captain Forth reliably applied the scientific method; the systematic approach for determining the origin and cause of a fire recommended by both *NFPA 921: Guide for Fire & Explosion Investigations* (2011 ed.) ("NFPA 921") and the *National Wildfire Coordinating Group Wildland Origin and Cause Determination Handbook* (2005 ed.) ("NWCG Handbook"). Contrary to ICLP's argument, strict adherence to the non-mandatory recommendations in NFPA 921 and the NWCG Handbook is not required for Captain Forth's opinions to be admissible. *See, e.g., Argonaut Ins. Co. v. Samsung Heavy Industries Co. Ltd.*, 929 F.Supp.2d 159 (N.D.N.Y. 2019). All of ICLP's arguments go to the weight, not the admissibility of Captain Forth's testimony.

In addition to Captain Forth, the United States intends to call four retained experts to testify regarding different aspects of origin and cause of the Sheep Fire:

Dr. Glen Stevick. Based on a non-destructive metallurgical analysis, Dr. Stevick, a mechanical engineer, will testify that: (1) the jumper wire and wire fragment recovered by

---

[1] Declaration of James P. Schaefer in Support of the United States of America's Opposition to Defendant's Motion in Limine ("Schaefer Decl.") at Ex. A (Captain Forth's Report) at 1; *see also* Schaefer Decl. Ex. B (Captain Forth's Transcript) at 31:11-21; 32:11-35:24; 38:17-25; 39:12-45:25; 58:11-61:22; 63:20-65:1; 70:18-71:1; 74:3-21; 75:1-21; 84:14-25; 87:12-88:1; 88:17-89:4; 93:17-20; 95:19-96:17 (describing investigation).

Captain Forth were damaged by electrical arcing; (2) the wire fragment found by Captain Forth separated from the jumper wire in a catastrophic thermal event, almost certainly electrical arcing due to an inadequately tightened connection; and (3) as a result of this arcing, portions of several strands of the jumper wire broke off into small pieces, one of which Captain Forth recovered. Schaefer Decl. Ex. C (Dr. Stevick's Expert Report). Dr. Stevick will also rebut opinions offered by ICLP's experts. Schaefer Decl. Ex. D (Dr. Stevick's Rebuttal Report).

Dr. John Palmer. Dr. Palmer, an electrical engineer, will testify that: (1) the cause of the Sheep Fire was electrical arcing that occurred due to ICLP's improper installation of the jumper wire; (2) a contributing factor was ICLP's use of undersized equipment; and (3) the conditions that led to the fire were foreseeable and preventable by ICLP. Dr. Palmer will also testify that the alternative causation theories hypothesized by ICLP's experts—including ICLP's theory that Cook & Sons breaking a neutral wire caused the Sheep Fire—are inconsistent with the facts, physical evidence, and well-understood scientific principles. Schaefer Decl. Ex. E (Dr. Palmer's Expert Report) & Ex. F (Dr. Palmer's Transcript) & Ex. G (Dr. Palmer's Rebuttal Report).

Dr. Christopher Lautenberger. Dr. Lautenberger, a fire ignition expert, will testify based on the weather, available fuels, and numerical modeling that: (1) molten or burning aluminum wire fragments ejected from the jumper wire were a competent ignition source; and (2) the Sheep Fire was ignited by one or more molten or burning metallic particles generated by arcing of the jumper wire. Dr. Lautenberger will also testify regarding the spread of the Sheep Fire. Schaefer Decl. Ex. H (Dr. Lautenberger's Expert Report) & Ex. I (Dr. Lautenberger's Transcript).

Mike Cole. Mr. Cole is a fire origin and cause investigator. Mr. Cole visited the scene of the Sheep Fire and reviewed: (1) Captain Forth's investigation; (2) the jumper wire and wire fragment recovered by Captain Forth; (3) the testimony of numerous fact witnesses; and (4) the expert reports and testimony of the United States' and ICLP's other retained experts in this case. Although he took issue with some aspects of Captain Forth's investigation, Mr. Cole found that Captain Forth employed NWCG Handbook methodologies in determining the origin of the Sheep Fire and correctly identified the origin of the Sheep Fire. Mr. Cole's opinions as to the

cause of the Sheep Fire are, however, different from Captain Forth's opinions in at least two respects. First, whereas Captain Forth found the ignition source was the wire fragment that she recovered, Mr. Cole concluded that the ignition source was one or more molten or burning aluminum particles generated by the malfunction of the jumper wire. Schaefer Decl. Ex. J (Mr. Cole's Expert Report) & Ex. K (Mr. Cole's Transcript). Second, Mr. Cole does not opine that a power surge hit the transformer pole. *Id.*

ICLP argues that the testimony of these retained experts should be excluded because their opinions are: (1) somehow tainted by Captain Forth's purportedly unreliable opinions; (2) the product of expectation or confirmation bias; and/or (3) redundant. None of these arguments withstands scrutiny. (ECF No. 63-1 at 26-30.)

First, Captain Forth's opinions are reliable. Even if they were not, ICLP cannot show that any of the United States' retained experts "unblinkingly relied" on Captain Forth's conclusions such that their opinions would be inadmissible. *See*, *e.g.*, *Hoang v. Funai Corp., Inc.*, 652 F.Supp.2d 564, 569 (M.D. Pa. 2009) (denying motion to exclude origin and cause expert because "[t]here is no indication from the record . . . that [the expert] 'unblinkingly relied' on the conclusions of the city fire investigators such that [it] would invalidate his methodology").

Second, there is no evidence that the conclusions of the United States' retained experts suffer from expectation bias. ICLP's argument to the contrary is rank speculation based on the fact that the United States' retained experts reviewed Captain Forth's report and testimony. ICLP overlooks that NFPA 921 recommends that experts review prior investigations of the fire. *Id.* at 569; *see also* Schaefer Decl. Ex. L (NFPA 921 Excerpts) § 4.4.3.2.

Third, the opinions of the United States' retained experts are not redundant. Each expert brings a different discipline and testing to bear on the questions of the origin and cause of the Sheep Fire and will testify to different aspects of these questions. While the United States' retained experts reach the same conclusion as Captain Forth regarding the origin of the Sheep Fire, their opinions are based on evidence that was not available to Captain Forth, including the sworn testimony of two eyewitnesses that the fire started at the base of the transformer pole.

**OPPOSITION TO DEFENDANT'S MOTION IN LIMINE - 4**

Moreover, based on evidence not available to Captain Forth, the opinions of the United States' retained experts as to the cause of the Sheep Fire differ from Captain Forth's cause opinions.

Accordingly, the United States requests that the Court deny ICLP's Motion in its entirety.

## II.    BACKGROUND

### A.    Cook & Sons Construction

On the morning of September 6, 2012, Cook & Sons was working on Highway 95 near Lucile, Idaho.  Schaefer Decl. Ex. M (Edd Murphy Deposition Transcript) at 13:23-14:17; 24:25-25-10.  At or before 10:15 a.m., a Cook & Sons' employee, Edd Murphy, noticed a downed wire, which he assumed he knocked down with an excavator.  *Id.* at 16:8-17; 23:6-23; 24:9-16. Because the wire was not sparking, Murphy assumed it was not a live wire, drug it off to the side with a wooden shovel, and continued working.  *Id.* at 23:6-23; 31:9-32:25; 49:3-12.

Murphy did not immediately report the downed wire because he thought the wire was a dead line and he did not have cell phone service.  *Id.* at 31:25-34:12.  Murphy reported the downed wire to ICLP at 12:23 p.m. when he stopped in White Bird on his way to Grangeville to get a part.  *Id.* at 33:3-21; 49:3-12; 53:11-54:18 & Deposition Ex. 2 at 3 (9/6/11 Dailey Project Report); Ex. 3 (Supervisor's Incident Report); Ex. 4 (Phone Records).

The wire that Murphy assumed he broke was a neutral wire; the breaking of this neutral wire did not cause a power surge or contribute in any way to the start of the Sheep Fire. (Schaefer Decl. Ex. E at 14-17; Ex. G at 2-6; *see also* ECF No. 63-1 at 20.)

### B.    The Sheep Fire

Between 11:15 a.m. and 11:30 a.m. on September 6, 2012, the Sheep Fire ignited on private property owned by Gary Hegvet.  Schaefer Decl. Ex. N (Gary Hegvet's February 25, 2015 Transcript) at 34:22-35:2; 36:5-10; 84:7-11; *see also* Schaefer Decl. Ex. A at 3 & Ex. G at 3 (Timeline)).  Hegvet and his brother, Jim Law, were the only witnesses to the start of the fire. Schaefer Decl. Ex. N. at 51:1-5; 74:17-75:18; 79:12-22; 81:20-23.

Law testified that he "saw smoke coming up around the pole where the transformer was, so [he] went out immediately to investigate.  Saw the fire had started around the pole."  Schaefer

Decl. Ex. P (Jim Law's Transcript) at 16:23-17:3.  When asked if the fire was around the base of the transformer pole, Law responded, "Yes." *Id.* at 17:23-25.  When Law first saw the fire, the burned area was "probably 15 square feet." *Id.* at 24:13.

Hegvet testified:  "It wasn't a pop, it was a bang.  You could tell it came from the pole, even though the pole was out of our sight."  Schaefer Decl. Ex. N at 75:1-3.  Hegvet walked to where he could see the pole and saw the transformers were "popping and fizzing, sparks were flying.  And it was still dripping whatever covers the wire." *Id.* at 75:4-12.  When asked how large the fire was at the base of the transformer pole, Hegvet responded, "I'd say 15 feet diameter."  Schaefer Decl. Ex. O (Gary Hegvet's July 24, 2018 Transcript) at 41:4-42:17.  Hegvet also testified that he did not see any fires at other locations. *Id.*  Hegvet unsuccessfully attempted to extinguish the fire, and then called the sheriff's office.  Schaefer Decl. Ex. A at Hegvet's Written Statements.

### C.    The USFS's and ICLP's Response to the Sheep Fire

USFS firefighters responded to the fire.  USFS Forestry Technician Jonathan Moore was the first USFS Incident Commander at the scene.  Schaefer Decl. Ex. Q (Moore Deposition Transcript) at 32:17-33:9; 55:4-5.  When Moore arrived, local fire fighters told him the fire started at the transformer pole. *Id.* at 42:4-25.  Although not tasked with performing an investigation, Moore concluded based on witness statements and his observations of burn patterns that the fire started under the transformer pole. *Id.* at 55:25-57:4.

At 11:45 a.m., the sheriff's office called ICLP.  Schaefer Decl. Ex. R (Rule 30(b)(6) Deposition of ICLP) at 79:10-81:6 & Depo. Ex. 23.  ICLP dispatched two linemen, Greg Schumacher and Scott Anderson.  Schaefer Decl. Ex. S (Schumacher Deposition Transcript) at 22:16-23:3; 23:22-24:2; 24:24-25:11.  While driving to Hegvet's property, Schumacher learned about the downed wire where Cook & Sons Construction was working. *Id.* at 25:12-22.

Schumacher was the first ICLP employee to arrive at the scene. *Id.* at 30:24-31:2; 32:14-33:6.  Anderson arrived approximately 10 minutes later. *Id.*  Schumacher drove his bucket truck to the transformer pole to check out ICLP's electrical service. *Id.* at 28:9-29:6.  Schumacher

found that one of the jumper wires connecting the transformers was damaged. *Id.* at 35:12-36:3; 36:25-38:1.

While up in his bucket truck, Schumacher saw Captain Forth looking around. Schaefer Decl. Ex. S at 47:6-18. Schumacher decided to replace the damaged jumper wire with two wires that could carry more load. *Id.* at 44:16-45:12. After replacing the jumper wire, Schumacher saw ICLP's Engineering and Operations Manager, Chad Hill, speaking with Hegvet. *Id.*

Captain Forth and USFS Special Agent Patrick Finnegan responded to the fire, arriving at Hegvet's property at approximately 12:30 p.m. Schaefer Decl. Ex. A at 3. As they arrived, Captain Forth photographed Schumacher replacing the jumper wire. *Id.* at 31 (Photo # 5). Captain Forth spoke with the USFS Incident Commander Josh Warden, who told her the fire started at the base of the power pole that the ICLP lineman were working on. *Id.* at 3.

Captain Forth and Special Agent Finnegan contacted Schumacher and Anderson, who admitted that a jumper wire between two transformers was loose, causing the wire to pop, spark, and burn. *Id.*; Schaefer Decl. Ex. B at 99:6-12. Schumacher and Anderson then attempted to shift the blame for the fire by claiming, "Cook & Sons Construction had cut a power line during their construction on US Highway 95, shutting down the power to the power pole. When the line was repaired and power restored, a power surge hit the pole." Schaefer Decl. Ex. A at 3.

Captain Forth asked Schumacher for the damaged jumper wire, which he gave to her. *Id.* at 4. The jumper wire "was burned and melted on one end and the plastic coating was melted." *Id.* The damaged jumper wire was missing pieces of several strands. Schaefer Decl. Ex. B at 67:8-15. At approximately 1 p.m., Captain Forth started a fire scene examination:

> FORTH walked the perimeter of the area LAW identified as the area he tried to control with the hose. FORTH noted differences in the fire's intensities. The north edge was clearly less intensely burned and contained unburned areas and die out patterns. The southwest part of the fire had burned with higher intensities and had evidence of water being sprayed in the areas. The grass fuels were totally consumed on the south side of the area of examination. After determining the fire's primary forward run had spread to the southeast, FORTH followed the runs back to the general area of origin. This area had been disturbed by the ICLP linemen driving the boom truck up to the transformer pole. Continuing to follow burn indicators, FORTH found a specific origin located at the base of the transformer power pole. The specific origin area contained micro burn indicators consisting of grass stems, protected fuel around rocks and staining on the rocks. The

micro burn indicators clearly established a point of origin. Within this point of origin FORTH found a small piece of burned metal at the base of the transformer power pole. . .

FORTH sketched and photographed the general area showing fire spread and location of evidence. Seventeen digital photographs were taken of burn indicators, overviews and evidence.

Schaefer Decl. Ex. A at 5; Ex. B at 31:11-21; 32:11-35:24; 38:17-25; 39:12-45:25; 48:22-61:22; 63:20-65:1; 70:18-71:1; 74:3-21; 75:1-21; 84:14-25; 87:12-88:1; 88:17-89:4; 93:17-20; 95:19-96:17 (describing investigation).

Based on macro and micro burn indicators, Captain Forth determined the specific area of origin was "an area about the size of a small plate" at the base of the transformer pole. Schaefer Decl. Ex. B at 32:9-34:10; Ex. A at 5. Captain Forth searched this area visually and with a magnet, and found a small piece of burnt wire. *Id.; see also* Schaefer Decl. Ex. B at 66:17-23.



Schaefer Decl. Ex. C at 11.

The wire fragment appeared to be one of the missing pieces of the jumper wire.



Figure 25: Photograph of burned end of cable with fragment (indicated with arrow) positioned at the point from which it had apparently been ejected.

Schaefer Decl. Ex. E at 33.

After eliminating all other potential ignition sources in specific area of origin (*e.g.*,

lightning, campfire, smoking, etc.), Captain Forth concluded that the cause of the fire was a "[l]oose jumper wire between two transformers, shorted, sparked and burned, dropping a hot wire piece on the ground at the base of the power pole."  Schaefer Decl. Ex. A at 1.

ICLP's Engineering and Operations Manager, Chad Hill, was at ICLP's office when the sheriff called and decided to go to the scene.  Schaefer Decl. Ex. R at 79:10-81:6.  When Hill arrived, Hegvet confronted him and threatened to sue, causing Hill to be concerned that ICLP would be held responsible.  *Id.* at 82:17-83:15.  Hill learned that Captain Forth was investigating the fire and that she had the damaged jumper wire.  *Id.* at 90:22-92:5.  Subsequently, Hill spoke with Schumacher and Anderson.  *Id.* at 84:20-25; 87:21-88:16; Schaefer Decl. at Ex. X at 146:3-5; *but see* Ex. S at 66:6-20 (Schumacher denying he spoke with Hill).

At approximately 2:15 p.m., Special Agent Finnegan obtained a written statement from Schumacher.  Schaefer Decl. Ex. A at Schumacher's Written Statement.  Contrary to his earlier verbal admission that the jumper wire was loose, Schumacher's written statement states:

> I started checking the connections and found one jumper wire that was melted and burnt . . . *the connection seemed tight* when I removed the wire from the lug.  I also checked the other connections they *were tight* and checked the rest of the wires for bubbles and heat.  They all seemed good.

*Id.* (emphasis added).  When deposed, Schumacher and Anderson claimed they never told Captain Forth that a wire had been cut by Cook & Sons Construction, there was a power surge, or the jumper wire was loose.  Schaefer Decl. Ex. S at 90:13-92:14; Ex. X at 55:14-56:19.

On September 7, 2012, the day after the Sheep Fire started, Hill returned to Hegvet's property to investigate the cause of the Sheep Fire.  Schaefer Decl. Ex. Y (August 24, 2016 Deposition of Chad Hill) at 195:3-196:2; 197:2-9; 206:4-14.  He inspected the connections between the ICLP's service wire and the ice plant's mastheads.  *Id.*  He claims the connections were a "mess."  *Id.* at 447:5-7.  Although concerned ICLP would be blamed for the fire and aware that Captain Forth was investigating the fire, Hill did not contact Captain Forth.  Instead, Hill photographed the connections and told Hegvet he should fix them.  *Id.* at 195:8-196:2.  Hegvet called his electrician who came and replaced the connections.  *Id.*  Two linemen were

present when the connections were replaced. *Id.* at 3:19-4:20. Neither ICLP nor Hegvet retained the old connections. No witness has testified and no expert has opined that the Sheep Fire started at or below the masthead connections.

### D. Fire Origin and Cause Investigation Guidelines

NFPA 921 is "designed to assist individuals who are charged with the responsibility of investigating and analyzing fire and explosion incidents and rendering opinions as to the origin, cause, responsibility, or prevention of such incidents." NFPA 921, § 1.1. The purpose of NFPA 921 "is to establish guidelines and recommendations for the safe and systematic investigation or analysis of fire and explosion incidents." NFPA 921 § 1.2.1. The systematic approach recommended by NFPA 921 is "the scientific method, which is used in the physical sciences." NFPA 921 §§ 4.2; 4.3-4.3.6; 18.2.

NFPA 921 explains:

> The actual investigation *may* include different steps and procedures, which will be determined by the purpose of the assignment. These steps and procedures are described in detail elsewhere in this document. A fire or explosion investigation *may* include all or some of the following tasks: a scene inspection or review of previous scene documentation done by others; scene documentation through photography and diagraming; evidence recognition, documentation, and preservation; witness interviews; *review and analysis of the investigations of others*; and identification and collection of data or information from other appropriate sources.

NFPA 921 § 4.4.3.2 (emphasis added).

Chapter 26 of NFPA 921 covers wildfire investigation, but notes that "[t]his chapter is intended as a *basic introduction* and the user is *urged to consult the reference material* listed in Annex A and Annex B." NFPA 921 § 26.1.1 (emphasis added). One of the wildfire investigation resources that NFPA 921 urges investigators to consult is the NWCG Handbook. NFPA 921, Annex A at A.26.1. Like NFPA 921, the NWCG Handbook recommends that investigators use the scientific method and contains non-mandatory guidelines for conducting origin and cause investigations. Schaefer Decl. Ex. T (NWCG Handbook 2005 ed.) at 1, 33; *see also* Schaefer Decl. Ex. U (NWCG Handbook (2016 Ed.)) at 15 ("The Introduction section of the guide includes changes in language to reinforce that this guide is a consensus document and

serves as a Guideline with recommendations and does not preclude application, as appropriate, or of other procedures, practices or techniques that fit each unique fire scene. It is ultimately up to the wildland fire investigator to select the appropriate methods to apply to the investigation and to explain why those methods were adequate."); *id.* at 14 ("Further it is recognized that policy, time, assignment and resources may dictate the scope and extent to which these guidelines may be applied to a specific investigation."); *id.* ("Procedures, practices, or techniques applied during wildland fire investigation which differ from those recommended within this document are not necessarily wrong . . . .").

## III. ARGUMENT

### A. Motion in Limine Standard

"Motions in limine are highly useful in avoiding needless in-court objections, side bars, limiting instructions, and other attempts to 'unring the bell' after exposing the jury to prejudicial evidence, but they serve a limited purpose. Motions in limine afford the court and counsel the opportunity to give more deliberate consideration to *specific* objections to *specific* evidence. They will not lie to exclude broad categories of evidence." *Acad. of Motion Picture Arts and Scis. v. Godaddy.com, Inc.*, 2015 WL 12697750, at *2 (C.D. Cal. Apr. 10, 2015); *see also Kucirek v. Jared*, 2019 WL 1431231, at *2 (D. Idaho Mar. 29, 2019) ("Generally, motions in limine excluding broad categories of evidence are disfavored . . . . Additionally, it is sometimes necessary to defer ruling until trial when a better estimate of the impact of the evidence on the jury can be made by the trial judge.").

### B. Expert Witness Standard

Federal Rule of Evidence 702 ("Rule 702") governs the admissibility of expert testimony. The Supreme Court has interpreted Rule 702 to require that expert testimony: (1) be from a qualified source; (2) be reliable; and (3) assist the trier of fact. *See Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 589-91 (1993).

This test should be applied flexibly in favor of admitting expert testimony. *Id.* at 594-95. Exclusion of expert testimony is the exception because "vigorous cross-examination,

presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." FED. R. EVID. 702 (advisory committee notes) (citing *Daubert*, 509 U.S. at 595).

Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion. *Daubert*, 509 U.S. at 564. Courts do not decide the validity of the expert's opinions or whether the witness is credible; those are matters that remain reserved for the jury. *See O Bar Cattle Co. v. Owyhee Feeders, Inc.*, 2010 WL 2404306, at *4 (D. Idaho June 10, 2010). Alternative or opposing opinions or tests do not "preclude the admission of the expert's testimony—they go to the *weight*, not the admissibility." *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998).

### C. Captain Forth's Testimony Is Admissible Because She Reliably Applied the Scientific Method to Determine the Origin and Cause of the Sheep Fire

Captain Forth's testimony should be allowed because she adhered to the scientific method outlined in NFPA 921 and the NWCG Handbook. The scientific method entails seven steps, only 5 of which are at issue. NFPA 921 § 4.3-4.3.6; 18.2, NWCG Handbook at 33. (ECF No. 63-1 at 13 n.4.) Captain Forth, a qualified origin and cause investigator, followed each of these steps. Accordingly, her opinions should be admitted at trial.

#### 1. Recognize the Need

This step requires the investigator to recognize that a fire of unknown origin and cause has occurred and that the origin and cause should be determined. NFPA § 4.3.1. Captain Forth's report establishes that she properly recognized the need. *See* Schaefer Decl. Ex. A. Moreover, ICLP concedes this step is not at issue. (ECF No. 63-1 at 13 n.4.)

#### 2. Define the Problem

This step involves conducting an origin and cause investigation. NFPA 921 §§ 4.3.2; 17.2; 18.2. "This is done by an examination of the scene and by a combination of other data collection methods . . . ." NFPA 921 § 4.3.2; *see also* NWCG Handbook at 34. Here, Captain Forth conducted a proper origin and cause investigation. Among other things, Captain Forth:

(1) photographed and sketched the scene; (2) interviewed witnesses; (3) walked the perimeter of the area of origin; (4) identified, flagged, and analyzed burn patterns and indicators, (5) identified available fuels; and (6) collected physical evidence.  *See* Schaefer Decl. Ex. A and Ex. B at 31:11-21; 32:11-35:24; 38:17-25; 39:12-45:25; 48:22-61:22; 63:20-65:1; 70:18-71:1; 74:3-21; 75:1-21; 84:14-25; 87:12-88:1; 88:17-89:4; 93:17-20; 95:19-96:17.  Moreover, ICLP concedes this step is not at issue.  (ECF No. 63-1 at 13 n.4.)

3.      Collect Data

This step requires an investigator to collect data related to the fire.  NFPA 921 § 4.3.3 ("Facts about the fire incident are now collected by observation, experiment, or other direct data gathering means."); NWCG Handbook at 34 ("This includes an examination and processing of the scene, interviewing of witnesses or other knowledgeable persons, collection of physical evidence and the results of scientific testing.").

There is no legitimate dispute that Captain Forth collected data related to the Sheep Fire. Among other things, Captain Forth:  (1) photographed and sketched the scene, Schaefer Decl. Ex. A at 5, 7, 9-25; (2) interviewed witnesses, including the USFS Incident Commander, Schumacher, Anderson, Law, Hegvet, and Hill; *id.* at 3-4; Schaefer Decl. Ex. R at 92:2-5, (3) identified, flagged, and analyzed burn patterns and indicators, Schaefer Decl. Ex. A at 5, (5) identified available fuels; *id.* at 1; (6) collected physical evidence, *id.* at 3-5; (7) obtained weather data from the incident commander, *id.* at 1, 5; (8) obtained lighting strike information; *id.* at 5; and (9) obtained the Idaho County Dispatch Log, *id.* at 6; *see also* Schaefer Decl. Ex. B at 31:11-21; 32:11-35:24; 38:17-25; 39:12-45:25; 48:22-61:22; 63:20-65:1; 70:18-71:1; 74:3-21; 75:1-21; 84:14-25; 87:12-88:1; 88:17-89:4; 93:17-20; 95:19-96:17.

4.      Analyze Data

This step requires an investigator to apply her knowledge, training, and experience to examine the data that she has collected, including burn patterns and indicators, physical evidence, weather, fuels, and potential ignition sources.  NFPA 921 §§ 4.3.4; 17.2 (Figure 17.2); 17.4; 18.2.1 (Figure 18.2); NWCG Handbook at 34.

**OPPOSITION TO DEFENDANT'S MOTION IN LIMINE - 13**

Captain Forth's knowledge, training, and experience equipped her to analyze the evidence in this case. As ICLP acknowledges, Captain Forth was a "seasoned" fire investigator. (ECF No. 63-1 at 1.) Captain Forth served thirty-six years with the USFS. Schaefer Decl. Ex. B at 8:8-17. She was a law enforcement officer for twenty-six of those years. *Id.* at 8:18-21. Captain Forth had been a wildland fire investigator since 1986 and was certified as such by the Federal Law Enforcement Training Center in Brunswick, Georgia. *Id.* at 11:12-12:11. Captain Forth had taught wildland fire investigation for the Federal Law Enforcement Training Center since 2005. *Id.* Captain Forth had conducted over 100 fire investigations, and was familiar with NFPA 921. *Id.* at 13:10-14:13.

During her investigation, Captain Forth analyzed the data that she collected, including burn patterns and indicators, available fuels, and physical evidence. Captain Forth started by analyzing burn patterns and indicators, which allowed her to determine the fire's primary forward run, follow the runs back to a general area of origin, follow burn indicators to a specific area of origin the size of a small dinner plate, and identify a point of origin therein. Schaefer Decl. Ex. A at 5; Ex. B at 32:9-34:10.

Once Captain Forth identified the specific area of origin, she searched the area of origin visually and with a magnet. Schaefer Decl. Ex. A at 5. The only evidence of a potential ignition source found in the specific area of origin was a small piece of burned metal. *Id.* Captain Forth then analyzed the physical evidence. Ex. B at 43:7-18 ("Q. There appear to be char marks throughout the entire wire[,] different locations. Do you see that . . . ? A. Yes. Q. So, this evidence in conjunction with your investigation and what other evidence you saw and found led you to the conclusion that the jumper cable and the particular matter at the base of the pole started the fire known as the Sheep Fire, correct? A. Correct.").

5.      Develop Hypothesis

At this step an investigator "must develop *at least one* hypothesis based on the data available at the time. These initial hypotheses should be considered 'working hypotheses,' which upon testing may be discarded, revised, or expanded in detail as new data is collected

during the investigation and new analyses are applied." NFPA 921 § 18.2 (emphasis added); *see also* NFPA 921 §§ 4.3.5; 17.2 (Figure 17.2); 17.5; 18.2.1 (Figure 18.2); NWCG Handbook at 34.

Captain Forth developed the hypothesis that a "[l]oose jumper wire between two transformers, shorted, sparked and burned dropping a hot wire piece to the ground at the base of the power pole." Schaefer Decl. Ex. A at 1; Ex. B at 70:18-71:1. Captain Forth also considered other potential ignition sources, including lightning, campfire, smoking, debris burning, incendiary, equipment use, railroad, and children, but concluded there was no evidence to support these potential hypothesis. *Id.* at 1, 5 ("The Standard Wildland Fire causes were considered . . .").

### 6. Test Hypothesis

"Testing of the hypothesis is done by the principle of deductive reasoning, in which the investigator compares the hypothesis to all the known facts as well as the body of scientific knowledge associated with the phenomena relevant to the specific incident." NFPA 921 at § 18.6.2. "Hypothesis testing may include: any application of fundamental principles of science, physical experiments or testing, cognitive experiments, analytical techniques and tools, and systems analysis." *Id.* § 18.6.4. "This testing of the hypothesis may be either mental or experimental." NWCG Handbook at 34; *see also* NFPA 921 § 4.3.6 ("Testing of a hypothesis may take many different forms including cognitive experiments.").

Captain Forth tested her hypothesis that the Sheep Fire was ignited by sparks from a loose jumper wire. Schaefer Decl. at Ex. A 1, 3-6 & Ex. B at 44:7-10; 65:3-6; 65:16-66:1. This hypothesis survived cognitive testing. Schaefer Decl. Ex. B at 43:7-18. This hypothesis was also consistent with fundamental principles of science. NFPA 921, which Captain Forth referenced, Ex. B at 73:16-74:2, defines a spark as "[a] moving particle of solid material that emits radiant energy due either to its temperature or the process of combustion on its surface," and an "electrical spark" as "[a] small, incandescent particle created by some arcs." NFPA 921 at §§ 3.3.159; 3.3.47. NFPA 921 explains that "[s]parks are luminous particles that can be formed when an arc melts and spatters the particles away from the point of arcing." NFPA §

8.9.5. "When aluminum is involved in faulting, the particles may actually burn as they fly and continue to be extremely hot until they burn out or are quenched by landing on some material. Burning aluminum sparks, therefore, may have a greater ability to ignite fine fuels than do sparks of copper or steel." NFPA § 8.9.5.2.

Captain Forth also considered and rejected other potential ignition sources because there was no evidence to support these hypotheses, including that the fire was caused by lightning, campfire, smoking, debris burning, incendiary, equipment use, railroad, or children because there was no evidence to support these hypotheses. Schaefer Ex. A at 1, 5; Ex. B at 43:7-18; 44:7-10; 70:18-71:1.

### 7. Select Final Hypothesis

The final step is to "[s]elect the hypothesis that best explains all of the known facts surrounding the origin of the fire." NWCG Handbook at 34; *see also* NFPA 921 at § 4.3; 17.2 (Figure 17.2); 18.2 (Figure 18.2). "If one remaining hypothesis is tested using the 'scientific method' and is determined to be probable, then the cause of the fire is identified." *Id.* § 18.6.

Captain Forth found that the only hypothesis supported by the evidence was that a "[l]oose jumper wire between two transformers, shorted, sparked and burned dropping a hot wire piece on the ground at the base of the power pole." Schaefer Decl. Ex. A at 1, 5. Accordingly, she properly selected this final hypothesis.

### D. Courts Routinely Find the Process Used By Captain Forth Reliable

Captain Forth's process of determining the specific area of origin of the fire, identifying potential ignition sources in that area, and using a process of elimination to identify the most likely cause of the fire has repeatedly been recognized by courts as reliable methodology. *See, e.g.*, *Hickerson v. Pride Mobility Prod. Corp.*, 470 F.3d 1252, 1257-1258 (8th Cir. 2006); *Great N. Ins. Co. v. Ruiz*, 688 F. Supp. 2d 1362, 1371 (S.D. Ga. 2010).

In *Great Northern Ins. Co.*, the district court noted that determining the origin and cause of a fire "through [a] process of elimination, is not only accepted and utilized by the community of fire investigators, but also has been accepted by several courts." *Id.* at 1374. Accordingly, the

district court found a fire investigator's opinions were admissible, explaining:

> After analyzing burn patterns, identifying areas of charring and other evidence of severe burning, and reviewing the video evidence of the fire, Mr. Tijerina was able to determine the fire's *approximate origin*. Then, focusing only on the area of origin, Mr. Tijerina, *through process of elimination and the consideration of information gathered throughout the investigation*, concluded, in a comprehensive report, that the most likely cause of the fire was spontaneous combustion of oil stained rags . . . . Mr. Tijerina's testimony survives a *Daubert* reliability inquiry.

*Id*. at 1372-73 (emphasis added); *accord Argonaut Ins. Co*, 929 F. Supp. 2d 159 (N.D.N.Y. 2013); *Mut. Ben. Ins. Co. v. Kaz, Inc*., 2014 WL 671445 (M.D. Pa. Feb. 20, 2014).

**E.      ICLP's Arguments for Excluding Captain Forth Do Not Withstand Scrutiny**

"[E]xperience and knowledge as a fire investigator may qualify one to deduce the likely source of a fire based on observation of physical evidence." *Walter v. Auto-Owners Mut. Ins. Co.*, 2018 WL 3650284, at *16 (E.D. Tenn., Aug. 1, 2018) (citing *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1235 (10th Cir. 2005). Critiques of an origin and cause expert's investigation and "weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility." *Id.*; *Potts v. Martin & Bayley, Inc.*, 2011 WL 4703058, at *4 (W.D. Ky. Oct. 4, 2011) (experts alleged failure to account for factors goes to the weight of the testimony, not its admissibility); *Spears v. Cooper*, 2008 WL 5552336, at *5 (E.D. Tenn. Nov. 17, 2008) ("[C]redibility attacks, such as the use of incorrect or incomplete data in formulating an opinion, are intended for cross-examination."). Nevertheless, ICLP argues that purported weaknesses in Captain Forth's opinions should be excluded due to purported weaknesses in her investigation and the factual basis of her opinions. None of ICLP's arguments withstand scrutiny.

1.      Strict Adherence to NFPA 921 is not required.

ICLP argues that Captain Forth's opinions should be excluded because she did not strictly adhere to NFPA 921 when collecting data. (ECF No. 63-1 at 13-17.) ICLP is wrong. ICLP fails to distinguish between the scientific method, which Captain Forth followed, *see supra* § III.B, and NFPA 921's non-mandatory recommendations. Rigid adherence to NFPA 921's non-mandatory recommendations is not required for an origin and cause expert's opinions to be

admissible. *See, e.g., Argonaut Ins. Co.*, 929 F. Supp. 2d 159 at 167 ("If Daus failed to 'ardently and strictly followed each step of NFPA, these shortcomings will not be fatal to him testifying before the jury and having his opinion tested.'" (quoting *Allstate Ins. Co. v. Gonyo*, 2009 WL 1212481, at *6 (N.D.N.Y. April 30, 2009)). [2] In short, because NFPA 921 is not binding "any alleged lack of compliance with NFPA 921 would not warrant excluding [Captain Forth's] testimony." *Hudson v. State Farm Fire & Cas. Co.*, 2015 WL 12434321, at *6 (N.D. Ga. June 24, 2015); *see also Nelson v. Gen. Elec. Co*., 2006 WL 5537590, at *9 (N.D. Ga. Aug. 1, 2006).[3]

Moreover, none of Captain Forth's alleged departures from the non-mandatory recommendations contained in NFPA 921 and NWCG Handbook render her opinions unreliable. At best, they go to the weight of Captain Forth's testimony, not its admissibility.

ICLP's argument that Captain Forth did not properly protect the area of origin overlooks that "posting personnel" is a recognized means of protecting the area. NFPA 921 § 26.7.3.1 Here, there is no dispute that: (1) both Captain Forth and Special Agent Finnegan were present at the area of origin; (2) Captain Forth told people not to go into the area; and (3) after she did so, no one went into the area of origin. Schaefer Decl. Ex. B at 87:24-88:1. Accordingly, even if Captain Forth's protection of the scene somehow departed from NFPA 921, there is no evidence

---

[2] *See also Walter*, 2018 WL 3650284, at *15 ("Although following NFPA 921 indicates the reliability of an investigator's methods, a departure from the document's guidelines is not necessarily in and of itself grounds for automatic disqualification.") (quoting *Travelers Cas. Ins. Co. of Am. Ex rel. Palumbo v. Volunteers of Am. Ky., Inc.*, 2012 WL 3610250, at *3 (E.D. Ky. Aug. 21, 2012) (denying motion to exclude finding argument that expert failed to test opinions as recommended by NFPA 921 went to the weight not admissibility of the expert's opinion)); *Dalton v. McCourt Elec. LLC*, 112 F. Supp. 3d 320, 327 n.7 (E.D. Pa. 2015) (denying *Daubert* motion where expert failed to proceed in accordance with NFPA 921 because he "adequately took a 'systematic approach' and applied the 'scientific' method in his investigation"); *Am. Family Mut. Ins. Co. v. Hewlett-Packard Co.*, 2008 WL 2130217, at *4 (D. Minn. May 19, 2008) ("Hewlett-Packard has cited no case law to support the proposition that a failure to strictly adhere to NFPA 921 renders an investigation per se unreliable . . . the Court will not exclude Anderson Engineering's report simply because Anderson Engineering did not use NFPA 921 as its sole standard methodology.").

[3] *See also* NFPA 921 § 1.3 ("Deviations from these procedures, however, are not necessarily wrong or inferior but need to be justified."); § 3.2.3 ("Guide. A document that is advisory or informative in nature and that contains only nonmandatory provisions.").

that either the area of origin or Captain Forth's opinions were compromised.

ICLP's argument that Captain Forth's opinions are unreliable because she did not conduct a grid search is specious. ICLP's own origin and cause expert concedes that a grid search is not required. Schaefer Decl. Ex. V (Jody Cooper Transcript) at 84:21-23 ("Q And there's no requirement in either NFPA 921 or the NWCG handbook to conduct a grid search; correct? A There is no requirement, that is correct."). Moreover, NFPA 921's recommended use of 12 to 18 inch grids pertains solely to the specific area of origin. Schaefer Decl., Ex. V at 48:5-13; NFPA § 26.7.4.2. Here, Captain Forth's specific area of origin was the size of a small dinner plate and, therefore, would have fit into a single grid square. Under these circumstances, Captain Forth's decision not to use grid lines was logical and does not make her opinions unreliable.

ICLP's argument that Captain Forth failed to photograph where the physical evidence was located prior to it being collected is also specious. Only two pieces of physical evidence were collected: (1) the jumper wire, which ICLP moved prior to Captain Forth's arrival; and (2) the wire fragment, which Captain Forth photographed *in situ*, *id.* at 17, 18, 19, 20. Moreover, the adequacy of Captain Forth's documentation of the scene goes to the weight of her testimony, not its admissibility. *See Pekarek v. Sunbeam Prod., Inc*., 672 F.Supp.2d 1161, 1176 (D. Kan. 2008) ("Defendant is correct in asserting that Komarek could have done a better job of noting and documenting the location of certain items in the room, including the precise location of the electric blanket, a television set that was apparently in the room, and a power strip that the computer may have been plugged into. But such deficiencies, while grounds for cross-examination, are not sufficient to preclude a jury from hearing and considering his opinion testimony as to the point of origin or his opinion ruling out specific items such as the breaker panel and the candle (although not the attempt to light it) as possible.").

ICLP's argument that Captain Forth failed to take enough photographs of the scene overlooks that there is no requirement to take photographs. *See* NFPA 921 § 4.4.3.2 ("A fire or explosion investigation *may* include . . . scene documentation through photography . . . ." (emphasis added)). Moreover, the adequacy of the 17 photographs that Captain Forth took goes

to the weight not the admissibility of her opinions.  *See Torske v. Bunn-O-Matic Corp.*, 2004 WL 1717649, at *4 (D.N.D. July 28, 2004) ("With respect to the photographs or lack thereof, Bunn-O-Matic's criticisms beg the question of how many photographs should have been taken.  It seems reasonable and prudent to afford some deference to an investigator's judgment, especially when the investigator is able to view the scene in its entirety.").

ICLP suggests that the number and content of Captain Forth's photographs somehow prejudiced the ability of other investigators to determine the origin of the Sheep Fire.  This unsupported argument is belied by the fact that both Mr. Cole and ICLP's origin and cause expert, Mr. Cooper, were able to form opinions as to the origin of the Sheep Fire.  Schaefer Decl. at Ex. J at p. 23; Ex. V at 101:4-19.

ICLP argues that Captain Forth failed to diagram movement of fire patterns and to photograph the transformer bank.  These arguments are demonstrably false.  Schaefer Decl. Ex. A at 7 (diagram), 13-14 (photographs of transformer bank).  In addition to diagramming the scene, Captain Forth also photographed the locations of the burn indicators that she had found and marked with flags.  *Id.* at 21-25.

ICLP notes that Captain Forth did not measure the small piece of metal that she found.  ICLP fails, however, to explain:  (1) what purpose measuring the piece of wire would have served, particularly given that Captain Forth bagged the piece of wire as evidence, *id.* at 27; and (2) how not doing so renders Captain Forth's opinions unreliable.

ICLP notes that Captain Forth did not personally take weather measurements, but fails to explain how her reliance on the weather measurements taken by USFS Incident Commander Josh Warden impacts the reliability of her opinions.  Schaefer Decl. Ex. A at 1.  Moreover, ICLP does not and cannot argue that the weather conditions were not conducive to fire ignition.  Schaefer Decl. Ex. H & J.

ICLP's argument that Captain Forth should have photographed the meter pole and weather head connections ignores the fact that the meter pole and weather head connections were not in Captain Forth's area of origin.  *See* NWCG at 84 ("Examine all poles, lines, fuses,

transformers, insulators, splices, connectors and grounding devices *in the area of origin*." (emphasis added)).  No witness has testified and no expert has opined that the fire started at or below the meter pole or the weather head connections.

ICLP's argument that Captain Forth failed to follow up on inconsistent witness statements ignores the fact that investigators are permitted to rely on admissions.  *See Allstate Ins. Co. v. Anderson*, 2016 WL 2939506, at *5 (E.D. Pa. May 20, 2016) ("Although Klitsch failed to perform physical tests of his proposed ignition scenario, his process of elimination and his reliance on Patterson's admission of smoking a cigarette shortly before the fire are sufficient to support his conclusion.").  ICLP fails to cite any portion of NFPA 921 or the NWCG Handbook that required Captain Forth to re-interview Schumacher and Anderson.

ICLP argues that Captain Forth failed to follow up on information that Cook & Sons had broken a "neutral wire" on the morning of the fire.  This argument is disingenuous.  Captain Forth learned of a broken power line—not a broken neutral wire—from Schumacher and Anderson and took them at their word regarding the effect of the broken wire:

> FORTH and FINNEGAN made contact with the ICLP linemen.  They identified themselves as Greg SCHUMACHER and Scott ANDERSON.  They told FORTH and FINNEGAN that Cook and Sons Construction had cut a power line during their construction on U.S. Highway 95, shutting down the power to the power pole.  When the line was repaired and the power restored, a power surge hit the pole.  A jumper wire between two transformers on the power pole was loose causing the wire to pop, spark and burn.

Schaefer Decl. Ex. A at 3.  Based on Schumacher's and Anderson's statements, Captain Forth concluded that part of the cause of the Sheep Fire was "a power surge hit a power pole owned and maintained by Idaho County Light and Power Cooperative (ICLP)."  *Id.* Ex. B at 97:3-17.

Captain Forth's reliance on Schumacher's and Anderson's statements does not depart from NFPA 921.  NFPA 921 endorses reliance on witness statements, NFPA § 4.3.2; and recognizes "that the extent of the fire investigator's assignment, time and resource limitations, or existing policies may limit the degree to which the recommendations or techniques in this document will be applied in a given investigation."  NFPA 921 § 1.3.4.

2.     ICLP's argument that Captain Forth failed to adequately analyze the data she collected does not withstand scrutiny.

ICLP argues that Captain Forth failed to adequately analyze the data that she collected because she: (1) lacked the expertise to analyze the electrical aspects of the cause of the fire; (2) assumed the jumper wire was loose; and (3) failed to identify the circumstances that resulted in the fire. (ECF No. 63-1 at 17-21.) None of these arguments hold water.

ICLP's argument that Captain Forth lacked the expertise to analyze the electrical aspects of the fire and incorrectly found that a power surge hit the transformer pole is a disingenuous attempt by ICLP to capitalize on the fact that two ICLP employees, Schumacher and Anderson, lied to federal law enforcement officers in an attempt to shift blame away from ICLP. ICLP cites no case law remotely suggesting that a defendant can capitalize on the lies of its employees to exclude expert testimony.

Discovery and expert analysis in this case have established that Schumacher and Anderson lied when they told Captain Forth that "Cook & Sons Construction had cut a power line during their construction on US Highway 95, shutting down the power to the power pole. When the line was repaired and power restored, a power surge hit the pole." Schaefer Ex. A at 4; *see also* Ex. E and G. Accordingly, the United States does not intend to call Captain Forth to opine that the broken neutral wire caused a power surge.

The fact that there was no power surge does not, however, render: (1) Captain Forth's origin opinions unreliable; her opinions as to the area of origin, specific area of origin, and point of origin were based on her analysis of burn patterns and indicators, not Schumacher's and Anderson's false claim that a power surge hit the transformer pole; or (2) the balance of Captain Forth's cause opinion (*i.e.*, that a "[l]oose jumper wire between two transformers, shorted, sparked and burned dropping a hot wire piece on the ground at the base of the power pole") unreliable; that opinion is adequately supported by Hegvet's and Law's statements, the condition of the jumper wire and wire fragment, a fundamental principle of science.

ICLP's argument that Captain Forth lacked the expertise to analyze the electrical aspects of the fire also overstates the level of expertise that Captain Forth required. A degree in

electrical engineering is not required to understand that loose wires cause fires. Captain Forth is not required to be able to explain how a broken neutral wire caused a power surge. *See, e.g., Great Northern Ins. Co.*, 688 F. Supp. 2d at 1374.

In *Great Northern Ins. Co.*, the court denied a motion to exclude an expert's opinion that spontaneous combustion was the most likely cause of the fire because he could not describe the exact conditions necessary for the spontaneous combustion of oil-stained rags. *Id.* The court explained:

> [The expert's] opinion was not based upon his extensive knowledge regarding spontaneous combustion, but rather is based upon his ability to determine the origin of the fire and his ability to rule out all causes of the fire except for the spontaneous combustion of oil-stained rags. This determination, through process of elimination, is not only accepted and utilized by the community of fire investigators, but also has been accepted by several courts.

*Id.* at 1374.

Like the expert in *Great N. Ins. Co.*, Captain Forth's causation opinion was not based on an extensive scientific knowledge. Rather, she identified the origin, considered other potential ignition sources, and concluded based on witness statements, the physical evidence located in the specific area of origin, and her knowledge of arcing and sparks from NFPA 921 that the cause of the fire was a loose jumper wire.

Even if Captain Forth were not qualified to testify that the loose jumper wire caused the fire, she would be permitted to testify as to the origin of the fire and the Standard Wildland Fire causes that she eliminated. *See Kansas City Fire & Marine Ins. Co. v. Long Island Power Auth.*, 2007 WL 7034284, *3-5 (E.D.N.Y. Nov. 23, 2007) (citing *Weisgram v. Marley Co.*, 169 F.3d 514 (8th Cir.1999) (allowing expert to testify about burn and smoke patterns and other physical evidence however he was unqualified to testify with respect to a possible heater malfunction); *Canning v. Broan-Nutone*, LLC., 2007 WL 1112355 (D. Me. Mar. 30, 2007) (allowing expert to testify as to point of origin of fire, but not as to possible defects within the fan that may have been responsible for the fire).

ICLP argues that Captain Forth's opinions are not based in fact because she "assumed

that the jumper wire was 'loose.'" (ECF No. 63-1 at 19). To the contrary, Captain Forth relied upon Schumacher's and Anderson's admissions that the wire was loose. Schaefer Decl. Ex. A at 3; Ex. B at 99:6-12. The fact that they recanted merely presents a fact issue for the jury to resolve. Moreover, ICLP ignores that Captain Forth was permitted to rely on circumstantial evidence, including the damage to the jumper wire and the burned wire fragment, as well as Hegvet's and Law's statements. *See, e.g., Great N. Ins. Co.*, 688 F. Supp. 2d at 1371 ("Although [an expert] lacks direct evidence of the cause of the fire, [the expert] may rely upon circumstantial evidence to support his theory." (quoting *Allstate Ins. Co. v. Hugh Cole Builder, Inc.*, 137 F. Supp. 2d 1283, 1289 (M.D. Ala. 2001)).

ICLP's assertion that Captain Forth failed to identify the circumstances that resulted in the fire is incorrect. Captain Forth identified: (1) the first fuel as Grass/Brush/Timber, Schaefer Decl. Ex. A at 1; Ex. B at 34:24-35:7; (2) the ignition source as the wire fragment, Ex. A at 1; Ex. B at 99:24-100:5; and (3) the circumstances as a "[l]oose jumper wire between two transformers, shorted, sparked and burned, dropping a hot wire piece on the ground at the base of the power pole." Ex. A at 1.

> 3. Captain Forth did not overlook other hypotheses.

ICLP argues that Captain Forth should be excluded because she could not have excluded smoking, incendiary device/arson, equipment use, and children as potential ignitions sources. (ECF No. 63-1 at 22). This argument fails as a matter of law and fact.

It fails as a matter of law because an alleged failure to eliminate alternative potential causes does not render an experts testimony inadmissible. *See Argonaut Ins. Co.*, 929 F. Supp. 2d at 167 ("If there is any question that [the expert] did not eliminate every cause for the fire, this will not be determinative as to whether he will testify; all that it suggests is that the credibility of his decision may be subject to an attack."); *Allstate Ins. Co.,* 137 F. Supp. 2d at 1291 (explaining uneliminated causes go to the weight, not admissibility); *Ambrosini v. Labarraque*, 101 F.3d 129, 133-35 (D.C. Cir.1996) (holding that "the fact that several possible causes might remain 'unelimatted'" goes to the weight, not admissibility of expert's testimony).

Moreover, contrary to ICLP's argument Captain Forth considered smoking materials, incendiary device/arson, equipment use, and children as potential ignition sources. Schaefer Ex. A at 1; 5 ("The Standard Wildland Fire Causes were considered and excluded since there was no evidence or related activities found to support as other possible cause of the Sheep Fire. Lightning, Campfire, Smoking, Debris Burning, Incendiary, Equipment Use, Railroad, and Children were all excluded as cause for ignition of the Sheep Fire.").

ICLP's argument that Captain Forth could not exclude other power lines and equipment on Hegvet's property is specious (ECF No. 63-1 at 22-23). The meter pole and weather head connections were not, however, in the area of origin identified by Captain Forth. Indeed, no witness has testified and no expert has opined that the Sheep Fire started at or near the meter pole or the mastheads. *See* Schaefer Ex. G at 7 ("None of the eyewitnesses or fire investigators associated with the fire provided any evidence of any fire origin at or in the vicinity of the weather heads on the ice plant which were a substantial distance from the reported fire origin.").

            4.        Captain Forth properly tested her hypothesis.

ICLP argues that Captain Forth failed to test her hypothesis because she did not perform some unspecified test on the wire fragment. (ECF No. 63-1 at 24.) ICLP overlooks that Captain Forth tested her opinions through cognitive testing. *See supra* § III.C.6; *see also* Schaefer Decl. Ex. B at 43:7-18. "To the extent [ICLP] contends that further testing should have been conducted, those concerns go to the weight of the testimony, not its admissibility." *Peerless Ins. Co. v. Marley Engineered Prod. LLC*, 2008 WL 7440158 at *6 (E.D.N.Y. June 12, 2008).

            5.        Captain Forth's opinions were not the result of expectation bias.

ICLP argues that Captain Forth's opinions should be excluded because they are tainted by expectation and confirmation bias. (ECF No. 63-1 at 24-26). This argument is demonstrably false. Captain Forth's testimony establishes that her opinions were not the result of expectation or confirmation bias:

        Q. Were you surprised, again, to find them at that area of origin when you arrived working on the pole that had a piece of equipment that allegedly started the fire? . . .
        A. Again, I wasn't surprised with any piece of equipment that was there at the

time because I still had not conducted an origin and cause investigation as to the cause of the fire.

Ex. B at 25:1-10.

Q. . . . but when you spoke with him you said that your first look you felt that the origin area was under the pole, right, as you were speaking with Mr. Warden? Was that correct?
A. No, no. To me it was somewhere on that flat that the boom truck and that area was, but I – without knowing and doing my investigation, I wouldn't have any way of knowing for sure where the origin was.

Id. at 52:19-53:2.

Q. He indicated to you where he thought the origin of the fire was?
A. Right.
Q. Why didn't you ask him why he thought that?
A. Uhm, mainly because I try not to get more information and people's assumptions that could possibly taint my ability to go out and look objectively at the fire. And so if – it's just I try to be very objective when I go into a fire and look at it without a lot of preconceived notions from others.
Q. To avoid bias?
A. Right.

Id. at 92:16-93:4.

That Captain Forth made an initial assessment of the area of origin upon her arrival and formed a working hypothesis when the ICLP linemen admitted the jumper wire was loose, causing it to spark, is consistent with NFPA 921.[4] Moreover, any purported expectation bias goes to the weight, not the admissibility of Captain Forth's testimony. *Johnson v. Samsung Elecs. Am., Inc.*, 277 F.R.D. 161, 167 (E.D. La. 2011) ("Defendants may cross examine Mr. Schulz with respect to alleged presumptions or expectations he had with respect to the window air conditioning unit at the time of his initial inspection of the burned premises.")

### F. Mr. Cole's Testimony Is Admissible

Consistent with NFPA 921 § 4.4.3.2, Mr. Cole inspected the scene, reviewed previous

---

[4] *See* NFPA 921 § 17.5 ("It is understood that when using the scientific method, an investigator may continuously be engaged in data collection, data analysis, hypothesis development, and hypothesis testing. An investigator may develop an origin hypothesis early in the investigative process, but when the process is completed, regardless of the order of steps followed, the investigator should be able to describe how the steps conform to the scientific method."); § 18.2 ("[T]h investigator must develop *at least one* hypothesis based on the data available at the time. These initial hypotheses should be considered 'working hypotheses,' which upon testing may be discarded, revised, or expanded in detail as new data is collected during the investigation and new analyses are applied.").

**OPPOSITION TO DEFENDANT'S MOTION IN LIMINE - 26**

scene documentation done by others, witness statements, deposition testimony, and the analysis of other investigators, including Captain Forth. Schaefer Decl. Ex. J. Mr. Cole concluded that: (1) "the specific origin area of the Sheep fire, located at/near the base of ICLP Pole #WJ2192A1, was correctly identified by Investigator Forth"; (2) "the only competent ignition scenario identified within the specific origin area and supported by evidence, was the malfunction of the energized aluminum jumper wire"; and (3) "the malfunction generated molten and or burning aluminum particles . . . resulting in an uncontrolled vegetation fire." *Id.* at 23.

ICLP does not argue that Mr. Cole is unqualified to offer these opinions, that his methodology was unreliable, or that these opinions will not assist the jury. Instead, ICLP argues that Mr. Cole's opinions should be excluded because they are derivative of Captain Forth's purportedly unreliable opinions and redundant. (ECF No. 63-1 at 26-28.) Neither argument withstands scrutiny.

Even if Captain Forth's opinions were unreliable, ICLP cannot show that Mr. Cole "unblinkingly relied" on Captain Forth's conclusions such that his would be inadmissible. *See*, *e.g.*, *Hoang*, 652 F. Supp. 2d at 564 (denying motion to exclude origin and cause expert because "[t]here is no indication from the record either that [the expert] 'unblinkingly relied' on the conclusions of the city fire investigators such that [it] would invalidate his methodology"); *see also More, JC, Inc. v. Nutone Inc.*, 2007 WL 4754173 at *11 (W.D. Tex. Mar. 21, 2007) (finding expert's review of prior expert reports, even if they were inadmissible, did not render his opinions inadmissible.). To the contrary, as ICLP notes, Mr. Cole took issue with some aspects of Captain Forth's investigation. *See* ECF No. 63-1 at 26 n.7. In addition, Mr. Cole's report analyzes evidence that was both unavailable to Captain Forth and supports the conclusion that the origin of the Sheep Fire was at the base of the transformer pole.

Moreover, Mr. Cole's ignition source and cause opinions are substantively different from Captain Forth's conclusions in at least two respects. First, whereas Captain Forth found the ignition source was the wire fragment that she recovered, Mr. Cole concluded that the ignition source was one or more molten or burning aluminum particles generated by the malfunction of

the jumper wire. *See* Schaefer Decl. Ex. J at 23. Second, unlike Captain Forth, Mr. Cole does not opine that a power surge hit the transformer pole. *Id.* These differences establish that: (1) Mr. Cole did not unblinkingly rely of Captain Forth's conclusions; and (2) Mr. Cole's opinions are not redundant. Finally, if Captain Forth is excluded or her testimony is restricted, Mr. Cole's opinions would not be redundant.

### G. Drs. Palmer's, Lautenberger's, and Stevick's Testimony Is Admissible

ICLP does not argue that Drs. Palmer, Lautenberger, and Stevick are unqualified to offer their opinions, that their methodologies are unreliable, or that their opinions will not assist the jury. Instead, ICLP incorrectly argues that the testimony of Drs. Palmer, Lautenberger, and Stevick opinions should be excluded as derivative of Captain Forth's purportedly unreliable conclusions. (ECF No. 63-1 at 28-30.) As discussed above, Captain Forth's opinions are not unreliable. Even if they were, ICLP cannot show that Drs. Palmer, Lautenberger, and Stevick unblinkingly relied on Captain Forth's opinions.

#### 1. Dr. Palmer's Opinions Are Admissible

Based on Dr. Palmer's deposition in a different case, ICLP argues that Dr. Palmer's opinion as to the origin of the Sheep Fire is based entirely on Captain Forth's report. (ECF No. 63-1 at 28.) ICLP overlooks that Dr. Palmer's origin opinion in this case is not based solely on Captain Forth's report. Schaefer Decl. Ex. E & W (Declaration of John A. Palmer) at ¶ 16. Rather, it is based on Captain Forth's report, Mr. Cole's report, the statements and deposition testimony of Hegvet and Law, photographs, and examination and analysis of the physical evidence. *Id.* In short, Dr. Palmer did not unblinkingly rely of Captain Forth's origin opinion.

ICLP also incorrectly argues that Dr. Palmer improperly focused on the one hypothesis developed by Captain Forth. This argument is demonstrably false. Dr. Palmer considered and excluded other hypothesis, including that: (1) Cook & Son's hitting the neutral wire near the Fiddle Creek boat ramp caused the Sheep Fire (Schaefer Decl. Ex. E at 14-17; Ex. G at 2-6); (2) the masthead connections at the Ice Plant caused the fire (*Id.* Ex. G at 6-8); (3) a failure of electrical motor protective equipment in the ice plant caused the fire (*Id.* at 8); and (4) ground

return current caused the fire (*Id.* at 10). ICLP's also overlooks that there is nothing improper about asking an electrical engineer to focus on the electrical aspects of this case, while other experts focus on aspects related to their discipline. *See Peerless Ins. Co*, 2008 WL 7440158.

　　　　2.　　Dr. Lautenberger's Opinions Are Admissible

　　ICLP's argues that Dr. Lautenberger should be excluded because he cannot say to a reasonable degree of scientific certainty (*i.e.*, 51% or more) that the wire fragment recovered by Captain Forth ignited the Sheep Fire. This argument is specious.

　　The United States intends to prove at trial that: (1) multiple molten and/or burning aluminum fragments were ejected from the jumper wire; and (2) one or more of these fragments ignited the Sheep Fire. *See* Schaefer Decl. Exs. C, E, H, J. To prevail at trial, the United States does not have to establish that the particular fragment that Captain Forth recovered was the fragment that ignited the Sheep Fire. *See McCoy v. Whirlpool Corp.*, 2003 WL 1923016 (D. Kan. Apr. 21, 2003) ("The answer to defendants' criticism that Martin has not identified which of ten potential resistive components caused the fire is: so what? Defendants' point might be well taken if we were dealing with cross-examination or a motion for summary judgment, but the Court is at a loss to see how it implicates *Daubert*.").

　　Consistent with the United States' liability theory, Dr. Lautenbeger's analysis is based on multiple molten or burning fragments having been ejected from the jumper wire. *See, e.g.*, Ex. H at 7, 18. Dr. Lautenberger concludes that "to a reasonable degree of engineering certainty, on a more likely than not basis, that the Sheep Fire was ignited by one or more molten or burning metallic particles generated by arcing of the subject jumper at ICLP pole #J2192A1." *Id.* at 38.

　　Accordingly, contrary to ICLP's argument, Dr. Lautenberger does not intend to inappropriately testify to a mere possibility.

　　　　3.　　Dr. Stevick's Opinions are admissible.

　　ICLP argues that some of Dr. Stevick's opinions should be excluded because they are not expressed in terms of a reasonable degree of scientific certainty. ICLP overlooks the initial paragraph of Dr. Stevick's report, which states "[t]he opinions below are based on a reasonable

degree of engineering certainty and the materials reviewed." Schaefer Decl. Ex. C at 1.

ICLP also argues that Dr. Stevick should be excluded because he leaves the exact sequence of events that caused the jumper wire to arc to Dr. Palmer. ICLP does not, however, cite any authority suggesting that a single expert is required to address all aspects of a case. To the contrary, plaintiffs are routinely permitted to call different experts to address different aspects of their case. *See, e.g., Peerless Ins. Co.*, 2008 WL 7440158.

### H. The United States' Requests A Full *Daubert* Hearing If Necessary

Given the substantial damages at issue in this case (over $25 million with interest and penalties), the United States requests a full *Daubert* hearing if the Court is not persuaded that the testimony of the United States' experts is admissible.

## IV. CONCLUSION

The United States' experts are qualified, their opinions are reliable, and their opinions will assist the jury. Accordingly the United States requests that the Court deny ICLP's Motion.

Submitted November 27, 2019.

BART M. DAVIS
UNITED STATES ATTORNEY
By:


/s/ James P. Schaefer
JAMES P. SCHAEFER
Assistant United States Attorney
Attorneys for Plaintiff United States of America