UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>v.<br><br>IDAHO COUNTY LIGHT AND POWER COOPERATIVE ASSOCIATION, INC.,<br><br>      Defendant. | Case No. 3:17-cv-00391-CWD<br><br>**MEMORANDUM DECISION AND ORDER**<br><br>**RE: Docket 63, Motion in Limine** |

## INTRODUCTION

Before the Court are two motions filed by Defendant Idaho County Light and Power Cooperative Association, Inc. (ICLP): a motion to exclude the opinions of the United States' experts (Dkt. 63) and a motion for summary judgment (Dkt. 65). In its motion to exclude, which the Court addresses here separately from the motion for summary judgment, ICLP asks the Court to exclude expert opinion testimony from United States Forest Service Captain Jill Forth relating to the origin and cause of the Sheep Fire. Should the Court do so, ICLP contends the Court must also exclude the

testimony and opinions of the United States' retained experts—Mike Cole, and Drs. John Palmer, Christopher Lautenberger, and Glen Stevick—regarding the cause of the Sheep Fire, arguing their opinions rely on, and are derivative of, Forth's fire origin and cause investigation.

The Court has reviewed the motion, all submissions filed in support of or in opposition thereto, the materials in the record, and the applicable law. In addition, the Court conducted a hearing on January 23, 2020, during which both parties presented argument related to these two motions. After careful consideration, the Court will deny ICLP's motion in limine.

## BACKGROUND

This action arises out of a wildland fire, known as the Sheep Fire, that started on September 6, 2012, on property owned by Carolyn and Gary Hegvet at ICLP's electric service drop to the Hegvet's commercial ice plant. The fire burned approximately 49,592 acres of land, of which 43,206 is owned by the United States. The United States alleges it incurred $17,690,293.51 in damages related to injury to its land.

The Complaint, filed on September 19, 2017, seeks damages incurred by the United States under theories of negligence, res ipsa loquitur, trespass, and nuisance against ICLP, and Gary and Carolyn Hegvet. The United States alleges ICLP's negligent design, installation, and maintenance of electrical equipment supplying power to the Hegvet's property caused the Sheep Fire. Additionally, the United States alleges that the Hegvet's negligent use and maintenance of ICLP's electrical service was a proximate cause of the Sheep Fire. Since the complaint was filed, the United States reached a

settlement with the Hegvets, and all claims asserted against them were voluntarily dismissed with prejudice. (Dkt. 16.) Trial in this matter against ICLP is set to begin on April 9, 2020.

The cause of the Sheep Fire is disputed. Although the parties do not dispute certain core facts, such as the fact the fire occurred on September 6, 2012, and where it burned, there are genuine disputes regarding the material facts concerning causation. Additionally, there is conflicting witness testimony from the individuals who have personal knowledge of the events that occurred on the day of the fire. The facts pertinent to resolution of the motion in limine follow.

Since the summer of 2001, the Hegvets have operated an ice-making facility, "the Ice Plant" or "Ice Man," on their property, which is located in Lucile, Idaho. Def. SOF ¶¶ 1, 2. (Dkt. 66.) Compl. ¶ 10.

ICLP designs, engineers, constructs, operates, inspects, uses, and maintains electrical power lines, transformers, jumper cables, and related equipment in the State of Idaho. ICLP also owns, designs, installs, and maintains electrical equipment that it uses to provide power to ICLP customers in the State of Idaho. ICLP has supplied electricity to the Hegvets and the Ice Plant since the Ice Plant's construction in 2000. Def. SOF ¶ 3. (Dkt. 66); Pl. SOF ¶ 2. (Dkt. 69-1.)

To supply power to the Ice Plant, ICLP installed: (a) Transformer Pole No. WJ219-2A-1; (b) transformers on the Transformer Pole; (c) jumper wires connecting the transformers on the Transformer Pole; (d) Meter Pole No. WJ219- 2A-1-MP; and (d) a service wire running from the Transformer Pole through the CT meters on the Meter Pole

to the ice plant's mastheads. Pl. SOF ¶ 2. *See also* Def. SOF ¶ 6 (stating that ICLP maintained a transformer pole with three 50 kV transformers to provide electrical service to the Ice Plant, and that two transformers were connected with a jumper wire allowing ICLP to provide the Ice Plant with three phase power despite only two phase lines going into the transformers).

Between 11:15 a.m. and 11:30 a.m. on September 6, 2012, the Sheep Fire ignited on the Hegvet's property. Pl. SOF ¶ 18. Def. SOF ¶ 8, 11.Gary Hegvet and his brother, Jim Law, were the only witnesses to the start of the fire. Pl. SOF ¶ 18. Hegvet attempted to put out the fire, but due to wind, was unable to do so, and he called the sheriff's department and the forest service. (Dkt. 68-3 at 9.)

USFS firefighters responded to the fire, and USFS Forestry Technician Jonathan Moore was the first USFS Incident Commander to arrive at the scene. Pl. SOF ¶ 21. Local firefighters, who had already arrived and had begun fighting the fire, reported to Moore that the fire started at the transformer pole. *Id.*

At 11:45 a.m., the sheriff's office called ICLP to report the fire. Pl. SOF ¶ 22. ICLP dispatched two linemen, Greg Schumacher and Scott Anderson, to the Hegvet's property at approximately 11:45 a.m. Pl. SOF ¶ 22. Schumacher arrived first, and Anderson arrived approximately ten minutes later. Schaefer Decl. Ex. S, Schumacher Depo. at 33. (Dkt. 68-28 at 10.)

USFS Captain Jill Forth was dispatched to the scene by the forest fire dispatch center and arrived at approximately 12:30 p.m., along with USFS Special Agent Patrick

Finnegan, to investigate the origin and cause of the fire. Pl. SOF ¶ 25. Schaefer Decl. Ex.

B, Forth Depo. at 17. (Dkt. 68-2, 68-4 at 6.)

Captain Forth's initial investigation consisted of interviewing several witnesses

present at the scene, collecting evidence, walking the scene, and taking photographs. Pl.

SOF ¶ 25. Schaefer Decl. Ex. A. (Dkt. 68-2.)[1] To summarize her investigation, she

prepared a supplemental incident report. *Id.* According to Captain Forth's initial

investigation summary:

> FORTH met Josh WARDEN, Fire Incident Commander. WARDEN stated that the fire started at the base of the power pole that the Idaho County Light and Power Cooperative (ICLP) linemen were working on. FORTH observed the location of the power pole and the ICLP crew upon her arrival. FORTH and FINNEGAN made contact with the ICLP linemen. They identified themselves as Greg SCHUMACHER and Scott ANDERSON. They told FORTH and FINNEGAN that Cook and Sons Construction had cut a power line during their construction on U.S. Highway 95, shutting down the power to the power pole. When the line was repaired and the power restored a power surge hit the pole. A jumper wire between two transformers on the power pole was loose causing the wire to pop, spark, and burn. FORTH asked if she could have the wire. SCHUMACHER gave FORTH the wire…FORTH received from SCHUMACHER a piece of black plastic coated eighteen (18) strand wire approximately 4 feet 3 inches long. The wire was burned and melted on one end and the plastic coating was melted.

*Id.* Captain Forth then turned toward investigating the origin of the fire.

---

[1] The written report was finalized on or about December 20, 2012. Although it is titled "supplemental report," there is only one written report.

While Forth was conducting her origin investigation, Finnegan was tasked with interviewing and obtaining written statements from witnesses at the scene. Schaefer Decl. Ex. B, Forth Depo. at 31. (Dkt. 68-4 at 9.)[2] Finnegan obtained written statements from Hegvet and Law at approximately 1:45 p.m. (Dkt. 68-2 at 5; 68-3 at 7.) Law's written statement indicated he looked outside the window, and "saw smoke…there was a power surge time was about 11:55 to 12:50 grabed [sic] a hose to put out fire around power pole about 40ft + 50ft…." (Dkt. 68-2 at 5.) Hegvet's written statement indicated that the plant "lost power [12:30 to 12:45] Heard a pop looked at transformers fire started at bottom of pole. Spread fast….Within 10-15 min I called the Sheriff Dept. and Forest Service." (Dkt. 68-3 at 9.)

At approximately 2:15 p.m., Finnegan obtained a written statement from ICLP lineman Greg Schumacher. (Dkt. 68-3 at 8.) Schumacher's written statement indicates that he "started checking the connections and found one jumper wire that was melted and burnt…the connection seemed tight when I removed the wire from the lug. I also checked the other connections they were tight and checked the rest of the wires for bubbles and heat. They all seemed good." (Dkt. 68-3 at 8.) The three written statements Finnegan obtained from Hegvet, Law and Schumacher were included as attachments with Forth's written report.

---

[2] Forth testified in her deposition that, after she and Finnegan spoke to the linemen at the base of the power pole, she and Finnegan split up. Forth began her origin and cause investigation, and Finnegan started taking written statements.

In her written report, Captain Forth reported her investigation proceeded as follows:

> FORTH walked the perimeter of the area LAW identified as the area he tried to control with the hose. FORTH noted differences in the fire's intensities. The north edge was clearly less intensely burned and contained unburned areas and die out patterns. The southwest part of the fire had burned with higher intensities and had evidence of water being sprayed in the areas. The grass fuels were totally consumed on the south side of the area of examination. After determining the fire's primary forward run had spread to the southeast, FORTH followed the runs back to the general area of origin. This area had been disturbed by the ICLP linemen driving the boom truck up to the transformer pole. Continuing to follow the burn indicators, FORTH found a specific origin located at the base of the transformer power pole. The specific origin area contained micro burn indicators consisting of grass stems, protected fuel around rocks and staining on the rocks. These micro burn indicators clearly established a point of origin. Within this point of origin FORTH found a small piece of burned metal at the base of the transformer power pole. . . .
>
> FORTH sketched and photographed the general area showing fire spread and location of evidence. Seventeen (17) digital photographs were taken of burn indicators, overviews and evidence. (See attached Sketch and Photographs). FORTH determined that the Point of Origin was at the base of the transformer power pole approximately 20 yards from the Northwest corner of a storage container. The Point of Origin was located at the base of the transformer power pole….
>
> The Sheep Fire was determined to be within the Standard Wildland fire Cause of Miscellaneous---Power Lines. The loose connection on the jump wire between two transformers caused the small piece of hot metal to fall to the ground coming into contact with dry grasses at the base of the transformer pole.
>
> The Standard Wildland Fire Causes were considered and excluded since there was no evidence or related activities found to support as other possible cause of the Sheep Fire. Lightening, Campfire, Smoking, Debris Burning, Incendiary,

Equipment Use, Railroad, and Children were all excluded as cause for ignition of the Sheep fire.

*Id*. (Dkt. 68-2 at 6.)

Based upon her investigation, Captain Forth summarized her conclusions regarding the sequence of events that started the fire as follows:

> The cause of the fire was determined to be a power surge hit a transformer power pole owned and maintained by Idaho County Light and Power Cooperative (ICLP). A jumper wire between two transformers on the pole was loose which caused the wire to short, spark and burn. The jumper wire burned, melted and a piece of hot metal wire fell to the ground causing a fire at the base of the pole.

(Dkt. 68-2 at 7.)

When deposed later, Schumacher and Anderson both denied telling Captain Forth at the scene on the day of the fire that Cook & Sons Construction cut a power line; there was a power surge; and that the jumper wire was loose. Pl. SOF ¶ 32. Schaefer Decl. Ex. S, Schumacher Depo. at 90-92; Ex. X, Anderson Depo. at 55-56. (Dkt. 68-28 at 24, 68-33 at 15.)

The United States conceded during the hearing that it does not intend to offer Forth's opinion that a power surge hit the transformer pole and was the catalyst or cause of the fire. The United States explains that its causation theory is that: (1) the jumper cable was loose; (2) resulting in one or more molten and/or burning pieces falling to the ground; (3) which ignited the Sheep Fire; and (4) contributing factors were ICLP's use of undersized equipment, its failure to enforce its own policies, and its failure to inspect and maintain its equipment. The United States explains that its causation theory is based on

eyewitness testimony (i.e., Hegvet and Law) and the admission of ICLP linemen that the wire was loose causing it to spark, among other things. (Dkt. 69 at 2.) Thus, the conflicting testimony concerning whether the jumper cable was loose is central to resolution of the case.

In addition to Captain Forth, the United States plans to call four retained expert witnesses to testify regarding different aspects of the origin and cause of the Sheep Fire. The United States asserts that its retained experts' opinions are the result of independent analysis and testing and are based on facts beyond those available to Forth at the time she conducted her investigation and completed her report. The United States' summary of their opinions and expected testimony follows:

- Dr. Glen Stevick. Based on a non-destructive metallurgical analysis, Dr. Stevick, a mechanical engineer, will testify that: (1) the jumper wire and wire fragment recovered by Captain Forth were damaged by electrical arcing; (2) the wire fragment found by Captain Forth separated from the jumper wire in a catastrophic thermal event, almost certainly electrical arcing due to an inadequately tightened connection; and (3) as a result of this arcing, portions of several strands of the jumper wire broke off into small pieces, one of which Captain Forth recovered. (Schaefer Decl., Ex. C.) Dr. Stevick will also rebut opinions offered by ICLP's experts. (Schaefer Decl., Ex. D.)

- Dr. John Palmer. Dr. Palmer, an electrical engineer, will testify that: (1) the cause of the Sheep Fire was electrical arcing that occurred due to ICLP's improper installation of the jumper wire; (2) a contributing factor was ICLP's use of undersized

equipment; and (3) the conditions that led to the fire were foreseeable and preventable by ICLP. Dr. Palmer will also testify that the alternative causation theories hypothesized by ICLP's experts—including ICLP's theory that Cook & Sons breaking a neutral wire caused the Sheep Fire—are inconsistent with the facts, physical evidence, and well-understood scientific principles. (Schaefer Decl., Ex. E; Ex. F; & Ex. G.)

- <u>Dr. Christopher Lautenberger</u>. Dr. Lautenberger, a fire ignition expert, will testify based on the weather, available fuels, and numerical modeling that: (1) molten or burning aluminum wire fragments ejected from the jumper wire were a competent ignition source; and (2) the Sheep Fire was ignited by one or more molten or burning metallic particles generated by arcing of the jumper wire. Dr. Lautenberger will also testify regarding the spread of the Sheep Fire. (Schaefer Decl., Ex. H & Ex. I.)

- <u>Mike Cole</u>. Mr. Cole is a fire origin and cause investigator. Mr. Cole visited the scene of the Sheep Fire and reviewed: (1) Captain Forth's investigation; (2) the jumper wire and wire fragment recovered by Captain Forth; (3) the testimony of numerous fact witnesses; and (4) the expert reports and testimony of the United States' and ICLP's other retained experts in this case. Although he took issue with some aspects of Captain Forth's investigation, Mr. Cole found that Captain Forth employed NWCG Handbook methodologies in determining the origin of the Sheep Fire and correctly identified the origin of the Sheep Fire. Mr. Cole's opinions as to the cause of the Sheep Fire are, however, different from Forth's opinions in at least two respects. First, whereas Captain Forth concluded the ignition source was the small wire fragment that she recovered, Mr. Cole concluded that the ignition source was one or more molten or burning aluminum

particles generated by the malfunction of the jumper wire. (Schaefer Decl. Ex. J & Ex.

K.) Second, Mr. Cole does not opine that a power surge hit the transformer pole. (*Id.*)

## ANALYSIS

ICLP seeks to exclude the testimony of USFS Captain Forth, the Forest Service's

fire origin and cause investigator. ICLP argues Captain Forth: (1) failed to properly

employ accepted methodology to determine the origin of the fire; and (2) lacked the

expertise to conclude the fire was caused by a power surge, a loose jumper wire between

two transformers on a power pole, and a hot metal piece falling to the ground. In turn,

ICLP challenges the opinions of the United States' retained expert witnesses, arguing

their opinions should be excluded because they are derivative of Captain Forth's origin

investigation. The motion raises challenges under Rules 401, 403, and 702 of the Federal

Rules of Evidence and the standard set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509

U.S. 579 (1993) ("*Daubert I* ").

### A. Legal Standards

Rule 401 states: "Evidence is relevant if: (a) it has any tendency to make a fact

more or less probable than it would be without the evidence; and (b) the fact is of

consequence in determining the action." Under Rule 403, however, "[t]e court may

exclude relevant evidence if its probative value is substantially outweighed by a danger

of one or more of the following: unfair prejudice, confusing the issues, misleading the

jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will

> assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

Under *Daubert*, the Court's inquiry into admissibility is a flexible one. *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) (citing *Alaska Rent–A–Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013)). In evaluating proffered expert testimony, the trial court is "a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (citation and quotation marks omitted).

"[T]he trial court must assure that the expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Id*. at 564 (quoting *Daubert*, 509 U.S. at 597). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Id*. at 565 (citation and internal quotation marks omitted). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id*. at 564 (citation omitted). The Court is "supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent–A–Car*, 738 F.3d at 969. Stated simply, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his [or her]

testimony has substance such that it would be helpful to a jury." *Id*. at 969–70. Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. *City of Pomona*, 750 F.3d at 1044. The trial court should not make credibility determinations that are reserved for the jury. *Id*.

The Court notes that ICLP has not challenged Captain Forth's (or any other expert's) opinions based upon the relevancy prong of Rule 702. In light of its review of the parties' written submissions and the record in this matter, the Court finds that Captain Forth's opinions are relevant and, if found reliable, may assist the trier of fact. Thus, the only issue presently before the Court regarding the admissibility of Captain Forth's opinion testimony, and the opinion testimony of the United States' retained experts who, in turn, relied at least in part upon Forth's investigation, is its reliability under Rule 702.

While evidentiary hearings might help the Court to conduct an adequate *Daubert* analysis, the Court is not required to hold such hearings prior to trial to discharge its gatekeeping function. *See United States v. Alatorre*, 222 F.3d 1098, 1100-02 (9th Cir. 2000) ("The trial court must have the same kind of latitude in deciding how to test an expert's reliability, and to decide whether and when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether or not that expert's relevant testimony is reliable....") (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)). What is required is that the Court allow counsel "to explore the relevance and reliability of the proposed testimony" prior to its admission. *Id.*

The Court determines that it has an adequate record before it to make its ruling without holding an evidentiary hearing. The parties provided the experts' reports,

deposition testimony, affidavits, and numerous other exhibits. *See Oddi v. Ford Motor Co.*, 234 F.3d 136, 154 (3d Cir. 2000) (finding no abuse of discretion for failure to hold an evidentiary hearing when district court had depositions and affidavits of plaintiffs' experts), *cited in In re Hanford Nuclear Reservation Litig.*, 292 F.3d 1124, 1139 (9th Cir. 2002).

### B. Forth's Methodology

Here, both parties agree Forth purported to apply the methodology set out in National Fire Protection Association 921 Guide for Fire and Explosion Investigations (NFPA 921) (2011 Edition)[3] in investigating and reaching her conclusions regarding the likely origin site and cause of the Sheep Fire. Numerous courts have found NFPA 921 to be an acceptable guide for fire investigation methodology. *See Schlesinger v. United States*, 898 F.Supp.2d 489, 504 (E.D.N.Y. 2012) (collecting cases); *Russ v. Safeco Ins. Co.*, No. 2:11cv195–KS–MTP, 2013 WL 1310501, at *24 (S.D. Miss. Mar. 26, 2013) (collecting cases). Thus, the issue before the Court is not whether NFPA 921 is a reasonable methodology. Rather, ICLP attacks Forth's implementation of the methodology outlined in NFPA 921.

"Courts frequently exclude expert testimony for failure to comply with NFPA 921 in circumstances where the expert explicitly relies on NFPA 921 in reaching his or her conclusion." *Schlesinger*, 898 F. Supp. 2d at 504. In other words, courts may exclude expert testimony concerning fire investigation methodology if the investigator purported

---

[3] Decl. of Short Ex. I; Decl. of Schaefer Ex. L. (Dkt. 64-9, 68-20 excerpts of NFPA 921.)

to follow NFPA 921 but did not reliably apply it. *Russell v. Whirlpool Corp.*, 702 F.3d 450, 455 (8th Cir. 2012). *See also Affiliated FM Ins. Co. v. LTK Consulting Servs., Inc.*, No. C06-1750JLR, 2014 WL 1494023, at *4 (W.D. Wash. Apr. 16, 2014) (explaining the court must be concerned about the soundness of the methodology, not the correctness of the expert's conclusions).

Under NFPA 921, "[t]he basic methodology of the fire investigation should rely on the use of a systematic approach and attention to all relevant details….With few exceptions, the proper methodology for a fire or explosion investigation is to first determine and establish the origin(s), then investigate the cause: circumstances, conditions, or agencies that brought the ignition source, fuel, and oxidant together." NFPA § 4.1. NFPA 921 § 4.3 explains that the scientific method is applied using the following steps: (1) recognize that a need exists to determine what caused the fire; (2) define the problem; (3) collect data; (4) analyze the data; (5) develop a hypothesis based on the data; and (6) test the hypothesis. NFPA 921 §§ 4.2, 4.3.

The following provisions describe how steps three through six are applied to fire origin and cause investigations:

> 4.3.3 Collect Data. Facts about the fire incident are now collected by observation, experiment, or other direct data-gathering means....
> 4.3.4 Analyze the Data (Inductive Reasoning). All of the collected and observed information is analyzed by inductive reasoning: the process in which the total body of empirical data collected is carefully examined in the light of the investigator's knowledge, training, experience, and expertise....
> 4.3.5 Develop a Hypothesis. Based on the data analysis, the investigator should now produce a hypothesis or

group of hypotheses to explain the origin and cause of the fire or explosion incident. This hypothesis should be based solely on the empirical data….

4.3.6 Test the Hypothesis. The investigator does not have a truly provable hypothesis unless it can stand the test of careful and serious challenge. Testing of the hypothesis is done by the principle of deductive reasoning, in which the investigator compares his or her hypothesis to all known facts.... This testing of the hypothesis may be either cognitive or experimental.... This process needs to be continued until all feasible hypotheses have been tested. Otherwise the fire cause should be listed as "undetermined."

4.4.3.1 ... A typical fire or explosion investigation may include all or some of the following: a scene inspection or review of previous scene documentation done by others; scene documentation through photography and diagramming; evidence recognition, documentation and preservation; witness interviews; review and analysis of the investigation of others; and identification and collection of data or information from other appropriate sources.

Based upon NFPA 921, Captain Forth arrived at two separate conclusions that form the basis for ICLP's motion. First, she conducted a fire origin investigation to determine the point of origin of the fire, defined as the smallest location a fire investigator can define, and which contains the heat source, source of oxygen, and fuel. NFPA 921 § 17.1. Second, having determined the point of origin, Forth determined the cause of the fire, which is the process of identifying the first fuel ignited, the ignition source, the oxidizing agent, and the circumstances that resulted in the fire. NFPA 921 § 18.1. ICLP's arguments are addressed below.

### *Fire Origin*

ICLP argues Forth identified the origin site before performing an investigation. Next, ICLP claims Forth conducted a cursory investigation to support her premature

assumption that the fire started at the base of the power pole, and did not adequately collect and analyze the data to support her hypothesis. And last, ICLP contends Forth deviated from NFPA 921 during her origin investigation by failing to: cordon off the origin site; investigate the origin area using grid lines; take sufficient photographs to document the scene, the evidence collected, and the burn indicators; sketch and take measurements of the transformer pole and evidence collected; photograph the collection of the evidence; take weather observations; reconcile inconsistent witness statements with additional interviews; and consider other origin areas.

The Court is required to follow the principles applied by the Court of Appeals for the Ninth Circuit, which instructs that, "expert evidence is inadmissible where the analysis 'is the result of a faulty methodology or theory as opposed to imperfect execution of laboratory techniques whose theoretical foundation is sufficiently accepted in the scientific community to pass muster under *Daubert*.'" *City of Pomona*, 750 F.3d at 1047 (quoting *U.S. v. Chischilly*, 30 F.3d 1144, 1154 & n. 11 (9th Cir. 1994)). The rationale of this approach is that "[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method" does not render expert testimony inadmissible. *Id.* (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)). "A more measured approach to an expert's adherence to methodological protocol is consistent with the spirit of *Daubert* and the Federal Rules of Evidence: there is a strong emphasis on the role of the fact finder in assessing and weighing the evidence." *Id.* at 1048 (citing *Daubert*, 509 U.S. at 594–95).

In addition, strict adherence to NFPA 921 is not required. NFPA § 1.3 states that its provisions are intended to be guidelines, given every fire incident is unique, and it recognizes that not all techniques will be applied in a particular investigation. NFPA 921 §§ 1.3.1 – 1.3.5. Witness reports and the examination of physical evidence are listed in NFPA 921 as sufficient to make a conclusion about a fire's origin. *Occidental Fire & Cas. of N. Carolina v. Intermatic Inc.*, No. 2:09-CV-2207 JCM VCF, 2013 WL 4458769, at *2 (D. Nev. Aug. 15, 2013).

Captain Forth has been a wildland fire investigator since 1986 and was certified as such by the Federal Law Enforcement Training Center in Brunswick, Georgia. She has conducted over 100 fire investigations, and is familiar with NFPA's requirements. Her report indicates she conducted witness interviews upon arriving at the scene; photographed and sketched the scene; identified, flagged, and analyzed burn patterns and indicators; identified available fuels; collected physical evidence (the jumper cable and metal fragment); obtained weather data and lighting strike information; and obtained the Idaho County dispatch log. Finnegan obtained written witness statements. Schaefer Decl. Ex. A. (Dkt. 68-2.) The Court does not find that the deficiencies identified by ICLP are sufficient to render Captain Forth's entire analysis as to the fire's point of origin unreliable.

Rather, the ways in which Forth allegedly departed from NFPA 921 during her fire origin investigation go to the weight to be accorded to her opinion regarding the point of origin of the fire, not to its admissibility in the first instance. ICLP criticizes Forth's execution of the scientific method generally applied to fire origin investigations, not the

method itself. Under *Daubert's* flexible standard, an alleged error in the application of a reliable methodology should provide the basis for exclusion of the opinion only if that error negates the basis for the reliability of the principle itself. *U.S. v. Chischilly*, 30 F.3d 1144, 1154 (9th Cir. 1994) (citing *United States v. Martinez*, 3 F.3d 1191, 1198 (8th Cir. 1993)). But the impact of imperfectly conducted investigatory procedures or techniques is approached "more properly as an issue going not to the admissibility, but to the weight" of the opinion. *Id.*

The Supreme Court has emphasized the usual tools to expose flaws in evidence remain available: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. *See also Allstate Ins. Co. v. Gonyo*, No. 07–CV–1011, 2009 WL 1212481, at *6 (N.D.N.Y. April 30, 2009) (denying *Daubert* challenge to an arson expert who did not "ardently and strictly followed each step of NFPA").

The Court concludes here that the analytical gap between the data collected and the opinion Captain Forth intends to offer regarding the point of origin of the fire is not devoid of all scientific reliability. Any methodological flaws may be considered by the jury when evaluating the weight to be given to the opinion, rather than by the Court in making the preliminary assessment concerning the admissibility of a given opinion.

### *Fire Cause*

Next, ICLP criticizes Captain Forth's conclusion regarding the cause of the fire, arguing she lacked expertise to analyze how the small metal piece could have been

ejected from the jumper wire with enough heat to start a fire. Because Captain Forth has no specific expertise or knowledge of electricity and the inner workings of power poles, ICLP argues her analysis as to the cause of the fire is mere speculation. Further, ICLP argues it was improper for Captain Forth to rely upon Schumacher's alleged verbal statement that the jumper wire was loose, or statements regarding a power surge, because the facts are not clearly established by the record and Captain Forth did not independently test her assumptions.

Once the origin determination is made, NFPA § 18.1 instructs that a fire cause determination consists of the "process of identifying the first fuel ignited, the ignition source, the oxidizing agent, and the circumstances that resulted in the fire." The ignition source is generally recognized to be "at or near the point of origin at the time of ignition." NFPA § 18.1.3. When considering data regarding causation, NFPA § 18.2.1 recognizes that, in some instances, a single item such as "a credible eyewitness to the ignition…may be the basis for a determination of cause."

Having identified and confined the area of origin to the base of the power pole, Captain Forth searched the immediate area, and obtained a second piece of physical evidence---the small metal fragment found on the ground at the base of the power pole. Captain Forth then based her conclusion regarding the likely cause of the fire on the two pieces of physical evidence she collected, and the witnesses' testimony, concluding that the jumper cable was loose; a hot metal fragment from the jumper cable was ejected; and, upon falling to the ground, the metal fragment ignited the grass.

ICLP argues the evidence Forth collected was insufficient to support her conclusion that the metal piece found on the ground at the base of the power pole was the incendiary spark that caused the fire, which in turn was based upon her conclusion the jumper cable was loose. ICLP references the fact that Schumacher's later written statement that the jumper cable's connections "seemed tight" conflicts with Captain Forth's conclusion that the jumper cable was loose. However, NFPA 921 § 17.2.1.2 allows for reliance upon witness interviews. And, it is not for the Court to resolve conflicting witness testimony and weigh the evidence. *See Strickholm v. Evangelical Lutheran Good Samaritan Soc*., No. 1:11-CV-00059-BLW, 2013 WL 788096, at *5 (D. Idaho Mar. 1, 2013) ("A motion in limine is not a 'vehicle for a party to ask the Court to weigh the sufficiency of the evidence.'") (quoting *Bowers v. Nat'l Collegiate Athletic Ass'n*, 563 F.Supp.2d 508, 532 (D.N.J.2008)). The Court's role is to determine whether sufficient facts exist to support the witness's conclusion, "not whether one party's version of the facts should be credited." *Allstate,* 137 F. Supp. 2d 1283, 1289 (M.D. Ala. 2001). "The emphasis…on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Fed. R. Evid. 702, advisory committee notes, 2000 proposed amendment.

ICLP argues Captain Forth lacked expertise---specifically, knowledge, training and expertise in the field of electricity---to conclude there was a power surge, the jumper cable overheated, and that the metal piece was ejected from the cable with enough heat to start a fire. During her deposition, Captain Forth testified that once she determined the

origin site (the base of the pole) and the likely circumstances bringing together the first

fuel ignited, the ignition source, and the oxidizing agent (the power pole, jumper cable,

metal fragment, and dry grass), her investigation ended. (Dkt. 68-4 at 25-26.) Any further

investigation was "beyond the scope of her duties." (Dkt. 68-4 at 26.) Captain Forth made

no determination as to liability, nor did she render an opinion regarding anyone's

responsibility for the sequence of events. She also did not render an opinion about the

electrical aspects of the fire's cause. She did, however, arrive at a conclusion based upon

the facts and evidence she collected.

The Court's review of the record reveals both parties have experts who question

further the sequelae of events that could have caused the fire, including the electrical

aspects beyond Captain Forth's expertise. And, given the United States does not intend to

offer Captain Forth's opinion that a power surge was the precipitating event, the Court

need not determine whether that particular conclusion is reliable under *Daubert.*

The faults and questions ICLP raises malign the supportability of her ultimate

conclusion regarding the ignition source and the precise sequence of events precipitating

the fire. These questions are better addressed to the jury regarding the weight to be

afforded to Captain Forth's testimony and her credibility, rather than to the Court on the

question of reliability. Similarly, the purported flaws in Captain Forth's reasoning, such

as the alleged failure to rule out other possible causes or the failure to explain the

mechanics of the ignition sequence, go to the weight of the evidence, not its

admissibility. *Schlesinger v. United States*, 898 F. Supp. 2d 489, 505 (E.D.N.Y. 2012).

*See also Allstate Ins. Co. v. Gonyo*, No. 07–CV–1011, 2009 WL 1212481, at *6

(N.D.N.Y. April 30, 2009) (holding that "[i]f there is any question that [the arson expert] did not eliminate every cause for the fire, this will not be determinative as to whether he will testify; all that it suggests is that the credibility of his decision may be subject to an attack."). ICLP may raise any or all of the points summarized in its motion during cross examination at trial to demonstrate to the jury its position concerning the credibility of Captain Forth's conclusion regarding her fire cause determination.

Accordingly, because the methods underlying Forth's conclusions are not so unreliable as to render them inadmissible as "junk science" or mere conjecture, the Court will deny ICLP's request to exclude Forth's opinions as to the fire's origin and cause. The Court finds that Forth's opinions meet the reliability standard for admissibility. *See Wendell* 858 F.3d at 1237−38 (citing *Daubert*, 509 U.S. at 596) ("[T]he interests of justice favor leaving difficult issues in the hands of the jury and relying on the safeguards of the adversary system."). Therefore, the Court will deny the motion in limine to exclude the opinions of Captain Forth under Rule 702.

### C.    Mike Cole's Opinions

ICLP first argues Mr. Cole's opinions should be excluded because his opinions are derivative of Forth's unreliable investigation. However, having found Forth's conclusions as to the origin and cause of the fire reliable, Cole's reliance upon Forth's report is not a valid basis for excluding his testimony. Experts are permitted to rely on the reports of others. *See* Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed...."); *Columbia Grain, Inc. v. Hinrichs Trading, LLC*, No. 3:14-CV-115-BLW, 2015 WL 6675538, at *4 (D. Idaho

Oct. 30, 2015) ("an expert is permitted to rely on the opinion of another expert"); *Peerless Ins. Co. v. Marley Engineered Prods*. LLC, No. 05–CV–4848, 2008 WL 7440158, at \*6 (E.D.N.Y. June 12, 2008) ("Galler and Eagar were entitled to rely on LeBow's findings with respect to cause and origin. Experts in fire cases often rely upon the observations of other experts in reaching their conclusions.").

Alternatively, ICLP contends Cole's opinions should be excluded because they are duplicative of Captain Forth's opinions and he adds nothing new. As such, ICLP argues there is a risk that the jury could give undue weight to the United States' causation evidence if both Captain Forth's and Cole's opinions are presented to the jury.

Fed. R. Evid. 403 allows the court to exclude relevant evidence on the grounds of "undue delay, waste of time, or needless presentation of cumulative evidence." "Multiple expert witnesses expressing the same opinions on a subject is a waste of time and needlessly cumulative." *Sunstar, Inc. v. Alberto-Culver Co., Inc*., 01 C 0736, 2004 WL 1899927, at \*25 (N.D. Ill. Aug. 23, 2004).

Upon the Court's review of Cole's report, the Court cannot conclude that Cole's opinions are wholly duplicative of Captain Forth's or would unduly prejudice the jury. Cole did not simply say, "me, too." Rather, he reviewed additional evidence that Captain Forth was not privy to,[4] and arrived at an independent conclusion that differed from Forth's. Cole concluded that, "more likely than not, the only competent ignition scenario

---

[4] Cole's report indicates he reviewed the depositions of the United States' other experts (Palmer and Lautenberger) as well as those of other witnesses after he conducted his site investigation, which is proper per Fed. R. Evid. 703. (*See* Dkt. 68-18 at 4, 8.)

identified within the specific origin area and supported by evidence, was the malfunction of the energized aluminum jumper wire, where the burned/damaged end was connected to a transformer bushing on ICLP Pole #WJ2192A1. And….that the malfunction generated molten and or burning aluminum particles sufficient to ignite dry grass fuel at the base of ICLP Pole #WJ2192A1, resulting in an uncontrolled vegetation fire." (Dkt. 68-18 at 24.) Cole does not opine that a power surge hit the transformer pole. *Id*. ICLP will have an opportunity to cross-examine Cole regarding reliance on Captain Forth's report, and the methodology he employed to arrive at his opinions.

ICLP's motion in limine directed at Cole's opinions will be denied.

### D. Opinions of Drs. Palmer, Lautenberger, and Stevick

ICLP argues also that the opinions of the United States' other experts, Drs. Palmer, Lautenberger, and Stevick should be excluded because their opinions are derivative of Captain Forth's opinion as to the origin and cause of the fire. Having concluded Forth's opinions as to the origin and cause of the fire are reliable, the retained experts' reliance upon Forth's report is not a valid basis for excluding their testimony. Fed. R. Evid. 703.

ICLP offers additional reasons for the exclusion of Dr. Lautenberger's and Dr. Stevick's opinions. ICLP claims Dr. Lautenberger opined as to a mere "possibility" rather than to a degree of scientific certainty. ICLP refers to Dr. Lautenberger's statement that he cannot say "conclusively that [the metal piece] was the ignition source." However, Lautenberger, an engineer well versed in fire modeling, approached the evidence by applying fire dynamics and combustion principles to analyze the fire and combustion process. (Dkt. 68-15 at 6.) Dr. Lautenberger's analysis is based upon the theory that

multiple molten or burning fragments were ejected from the jumper wire. (*See* Dkt. 68-15 at 12, 23.) Contrary to ICLP's assertion, Dr. Lautenberger concludes that, "to a reasonable degree of engineering certainty, on a more likely than not basis, the Sheep Fire was ignited by one or more molten or burning metallic particles generated by arcing of the subject jumper at ICLP pole #J2192A1." (Dkt. 68-16 at 6.)

Similarly, ICLP argues Dr. Stevick did not express his opinion that an "arcing event," to a reasonable degree of engineering certainty, was the cause of the damage to the end of the jumper wire. However, it appears Dr. Stevick relied, in part, upon Dr. Palmer's opinion. Dr. Palmer, an electrical engineer, independently examined the jumper wire and metal fragment and, after conducting a review of the available evidence and witness testimony, concluded that the jumper wire and metal fragment bore evidence of "extreme but localized heating consistent with electrical arcing." (Dkt. 68-8 at 3.) Reliance upon other experts' opinions is permissible. Fed. R. Evid. 703.

Dr. Stevick was asked to examine the material characteristics of the jumper cable and metal fragment Captain Forth recovered from the scene of the Sheep Fire. Contrary to ICLP's assertion, Dr. Stevick developed his own hypothesis based upon his examination and analysis of the jumper wire and metal fragment, as well as the connections at the top of the power pole, before concluding to a "reasonable degree of engineering certainty" that an arcing event contributed to the cause of the fire. (Dkt. 68-5 at 13-29.) Dr. Stevick is expected to be called to address an entirely different aspect of the case, which is permissible. *See Peerless Ins. Co. v. Marley Engineered Prod. LLC*, No. CV 05-4848 (AKT), 2008 WL 7440158, at *4 (E.D.N.Y. June 12, 2008) (allowing

multiple qualified experts to testify where they each addressed different aspects of a fire's cause).[5]

ICLP's motion in limine directed at the opinions of the United States' retained experts Drs. Palmer, Lautenberger, and Stevick will be denied.

## CONCLUSION

The Court appreciates the thorough briefing filed on the motion and it has taken considerable time to review the materials relating to it. Having carefully considered the motion in limine and the supporting materials in light of its gatekeeping function, the Court finds that the best approach to evaluating the testimony of the United States' expert witnesses, with an eye specifically toward the opinion testimony of Captain Forth, is to permit them to testify, be subject to cross-examination, and confronted with contrary evidence. For the reasons stated herein, the Court will deny the motion to exclude Captain Forth's opinions as unreliable under Rule 702.

In doing so, the Court reserves rulings regarding admissibility of all of the experts' opinions based upon the foundation laid at the time they testify at trial, and objections made at that time. ICLP has presented some arguments that appear to be compelling. The United States' response, in turn, has provided support for its position. It is only with the full context of the testimony when it is presented at trial that the Court will be able to make a well informed ruling on these arguments.

---

[5] The Court acknowledges the United States moved to supplement the record and provided Dr. Stevick's supplemental deposition testimony, which deposition occurred on December 18, 2019. (Dkt. 80, 83.) The Court did not find the supplemental information relevant to its determination of ICLP's motion in limine.

This order is intended to assist the parties in their preparation for trial, and to the extent possible, to give the parties guidance in structuring their cases and presentations for the upcoming trial. The final ruling on the admissibility of any particular testimony or piece of evidence will, however, be made at trial once the Court has had the opportunity to view it in the context in which it is offered.

During the trial, the parties are directed to advise the Court in advance of any evidentiary issues they anticipate arising so that the Court can address the same outside the presence of the jury. The parties shall do so by notifying the Court's Staff Attorney regarding such issues well in advance of the evidence being offered.

## ORDER

**IT IS HEREBY ORDERED that:** Defendant's Motion in Limine (Dkt. 63) is **DENIED**.

DATED: February 7, 2020

Honorable Candy W. Dale
United States Magistrate Judge