SCOTT C. CIFRESE, ISB #4965
DANIEL W. SHORT, *pro hac vice*
PAUL S. STEWART, *pro hac vice*
**PAINE HAMBLEN LLP**
717 W. Sprague Ave., Suite 1200
Spokane, WA  99201-3505
Telephone: (509) 455-6000
Facsimile: (509) 838-0007

Attorneys for Defendant
Idaho County Light & Power

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>IDAHO COUNTY LIGHT AND POWER COOPERATIVE ASSOCIATION, INC.,<br><br>Defendant. | Case No. 3:17-cv-00391-CWD<br><br>**DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF DANIEL WINNER (Dkt. No. 87)** |

Defendant, Idaho County Light and Power Cooperative Association, Inc., ("ICLP") through its attorneys, Scott C. Cifrese and Daniel W. Short and Paine Hamblen LLP, submits this Response to the United States' Motion in Limine to Exclude the Expert Report and Testimony of Daniel Winner (Dkt. No. 87).  This Response is supported by the Declaration of Daniel Winner, filed herewith.

**INTRODUCTION**

The United States alleges some $18 million in damages for its suppression of the Sheep Fire.  ICLP has retained Daniel Winner to challenge aspects of the United States' claimed damages. Winner worked for the USFS for three decades; much of his work involved wildland

fire suppression operations, planning, and budgeting. Through its Motion in Limine, the United States takes the position that its claimed damages are beyond reproach and seeks to prevent one its own from testifying.

The Court should not exclude Winner as an expert witness. Winner's background and professional experience qualifies him as an expert in how the USFS carries out its fire suppression activities, including how USFS responds to, pays for, and documents expenses relating to suppressing wildland fires. The United States' arguments about Winner's alleged shortcomings in qualifications and the unreliability of his opinions go to the weight, not admissibility, of Winner's opinions. Even if Winner is not allowed to testify as an expert witness, he should be able to testify as a lay witness pursuant to Rule 1006 as Winner can testify, in summary fashion, about his review of the voluminous records the United States seeks to admit to prove its damages.

## FACTS

### A. Winner's education.

Winner has a B.S. in outdoor recreation, with a minor in forest planning. While working for the USFS, Winner obtained a Master's degree in forest economics in 1982-83. Winner Dep. at 16:17-22. This degree is similar to an MBA except it is directed at the forestry industry, and provided Winner with education regarding "forest evaluation," and "how to appraise timber." *Id.* at 17:3-6. Winner's Master's-level course work included studying "economics . . . , micro economics, macro economics, [and] public policy economics." *Id.* at 17:15-17.

**B.      Winner's USFS and fire suppression work history.**

Winner worked for the USFS between 1969 and 1999 (except for September 1969-September 1971, when he was in the Army). Decl. of D. Winner at ¶ 2; *see also* Dkt. No. 87-5 (Winner Dep.) at 10:5, 11:24-25.   Early in his career, he was a firefighter on 44 fires, a Squad Boss on 7 fires, a Crew Boss on 1 fire, a Type 5 Incident Commander on 7 fires, and a Crew Representative on 1 fire. Decl. of D. Winner at ¶ 5.  All of these roles fell within the "Operations Section" of the incident command system, which is the section responsible for the actual suppression of wildland fires.[1] *Id.*

As Winner gained seniority and transitioned out of working as a fire fighter on the front lines and other operational roles, he performed various duties in the "Logistics Section" of the incident command system on 7 fires, and was a service member on 2 fires, a Service Chief on 4 fires, and a Truck Manager on 1 fire. Decl. of D. Winner at ¶ 6. The "Logistics Section" is responsible for transportation, food, water, providing equipment and supplies, and lodging of personnel involved with suppressing fires. *Id.*

Between approximately 1976 – 1982, Winner performed various duties in the "Planning Section" of the incident command system on 8 fires.  *Id.* at ¶ 7.  He was a Type 2 Planning Section Chief on 2 fires.  *Id.* He was a resource Unit Leader on 2 fires. *Id.* He was a Line Scout on 1 fire.  *Id.*  He was an Intelligence Officer on 2 fires.  *Id.* He was a Resource Advisor on 1 fire.  *Id.*  The "Planning Section" is responsible for registering incoming resources, coordinating the deployment of resources, and then terminating resources when they were no longer needed. *Id.* The responsibilities of the Planning Section are intertwined with the Finance Section. *Id.* at ¶

10. Through his work in incident command management, Winner became familiar with Finance's role in fire suppression efforts even though he did not work in the Finance Section. *Id*.

Winner became the Assistant Director of Aviation and Fire Management for the Southwestern Region (Arizona and New Mexico) in 1983. *Id*. at ¶ 8; *see also* Winner Dep. at 11:13-14. After taking that position, the USFS no longer wanted him involved in the suppression of specific fires. Decl. of D. Winner at ¶ 8. However, he was still involved in fire suppression efforts on a regional level. *Id*. He performed Interagency Resource Representative assignments 15-20 times between September 1983 and December 31, 1999. *Id*. In that role, he worked with incident management teams on fires outside of the USFS Southwestern Region to ensure the health and welfare of personnel from the Southwestern Region who were assigned to the fire. *Id*.

In his role as the Assistant Director of Aviation and Fire Management for the USFS's Southwestern Region, Winner was "responsible for budgeting and the Cooperative Fire Management Program dealing with states and the federal government agency interactions and bills back and forth, and worked in fire prevention for part of that time." Winner Dep. at 11:14-19; *see also* Decl. of Winner at ¶ 11. Winner also worked extensively with USFS accountants in carrying out this role as Assistant Director, becoming familiar with USFS accounting practices, procedures, and record keeping requirements. *Id*. at ¶ 11. During his time as Assistant Director, Winner also "worked on the Fire Planning and Analysis System, which was a program the Forest Service had been using since about 1980s to justify budgets to Congress, an elaborate computer modeling system." Winner Dep. at 11:20-23. As part of this work, Winner helped develop the

---

[1]The incident command system consists of four principle sections: Operations, Planning, Logistics, and Finance. Each of these sections report to the Incident Commander.

"P-code system" to track fire suppression expenditures, *id.* at 20-21, which system is still in use today, *see* Dkt. No. 87-2 (Decl. of L. Curillo) at ¶ 2.

In short, for decades, Winner lived and breathed USFS fire suppression operations, logistics, and planning efforts, including working with incident management teams to determine what firefighting resources (hand crews, engines, aircraft, etc.) were necessary, how they should be deployed, and the costs (and documentation of costs) for each resource. Decl. of D. Winner at ¶ 9.

**C.     Winner's review of the United States' damages documentation and opinions regarding the United States' alleged fire suppression damages regarding the Sheep Fire.**

ICLP retained Winner in this case to assist ICLP (and, ultimately, the jury) in understanding, and challenging, aspects of the United States' claimed damages, which allegedly total nearly $25 million.  In forming his opinions, Winner scrutinized and cataloged all the documentation supporting the United States' claimed damages.  Decl. of D. Winner at ¶ 12. Then, drawing on his experience in the USFS, the USFS's Service-Wide Claims Management Handbook (hereinafter, "USFS Handbook"), and relying on common sense, Winner opines that certain types of damages are not recoverable and the dollar amount of each non-recoverable category of damages. *Id.* at ¶ 13 & Ex. A; *see also* Dkt. No. 88 (ICLP's Motions in Limine) at 4-8.

First, Winner's review revealed that nearly $5,500,000 of the United States' claimed damages are not supported by "source level" documentation.[2]  Decl. of D. Winner at ¶ 2, Ex. A

---

[2]*See* Winner Dep. at 38:16-24 ("Q: . . . So what, in your opinion, constitutes a source level document? A. Well, the signed fire time reports, time and attendance reports, equipment use logs, travel vouchers, signed fire time reports, contract payment, invoices from contractors,

at 15.  That is, instead of having invoices, receipts, or other proof what was purchased, the only thing the United States has to prove certain damages is a notation in a "summary level" document, e.g., an entry on a spreadsheet.  Based on Winner's expertise, as well as guidance from the USFS's Handbook and common sense, Winner opines that, because he cannot verify the alleged damage, the United States is not entitled to recover them.

Second, Winner's review revealed that the United States employed 129 trainees on the Sheep Fire who were paid approximately $979,810.68. *Id.* at 16 & App. C.  Based on his experience as a trainee and overseeing trainees[3] in the USFS, as well guidance from the USFS Handbook, Winner opines that these costs are not recoverable as the work performed by trainees is redundant with other employees.  *E.g.*, Winner Dep. at 56:12-14, 58:13-18.  Further, the USFS benefits from trainees not so much for their contributions to the suppression effort, but by providing training necessary for certain certifications and by ensuring the pass-down of institutional knowledge. *Id.* at 57:16 – 58:12

Third, Winner's review of the United States' damages documentation revealed that over $2 million of the United States' alleged damages relate to "programmatic costs." That is, costs that the United States would have incurred regardless of whether the Sheep Fire had started.  For instance, if the Sheep Fire had not started, the United States would still have paid its fire fighters' salaries and would still have paid for aircraft availability.  Drawing on his experience, Winner opines that these are not costs necessitated by the Sheep Fire.

---

purchase receipts from stores. Basically when you go to a store and you buy something, and it tells you what it is, and what date you bought it, and how much it was.").

Fourth, Winner's review revealed that $754.16 of the United States' claimed damages were expended on resources staged, but not used to suppress the Fire. Decl. of D. Winner at ¶ 2, Ex. A, App. E. (This number may be even higher as Winner is also unable to determine what bulldozers assigned to the Fire were actually used. *Id.* at 7.) Based on his experience as a regional USFS director, as well as the USFS Handbook, Winner opines that these damages should not be charged to ICLP as the expense was not occasioned by the Sheep Fire.

Finally, Winner's review revealed that about $3,372.13 of the United States' claimed damages relate to payment of management supervision charges such as the salaries of forest supervisors, district rangers, and their deputies. Decl. of D. Winner at ¶ 2, Ex. A at App. D. Similar to the other programmatic costs described above, these employees would have been working, and being paid, regardless of whether there had been a fire.

ICLP disclosed Winner's opinions to the United States on June 20, 2019. The United States has not argued that Winner has miscalculated the dollar amounts he assigns to each category of damages that he opines are not recoverable.

## ARGUMENT

A district court's gatekeeper role under *Daubert* "is not intended to supplant the adversary system or the role of the jury." *Allison v. McGhan* 184 F.3d 1300, 1311 (11th Cir. 1999). To the contrary, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596, 113

---

[3] *See* Winner Dep. at 63:22-24 ("I have supervised trainees. I've worked on fires. I've been to lots of fires. You know, I know how that works."); *id.* at 64:1-2 ("I've been a trainee to get to my positions that I was qualified for.").

(1993); *Hemmings v. Tidyman's Inc.,* 285 F.3d 1174, 1188 (9th Cir. 2002) ("Vigorous cross-examination of a study's inadequacies allows the jury to appropriately weigh the alleged defects and reduces the possibility of prejudice.").

**A.      Winner is qualified to testify as an expert witness regarding what fire suppression costs were occasioned by a specific fire.**

The United States argues that Winner is not qualified as an expert to opine on the USFS's procedures and recoverable fire suppression costs because Winner (1) did not work in the finance section of a fire incident management team and has not worked in the USFS since 1997, (2) never prepared a transaction register, bill for collection, or negotiated a contract for aircraft suppression, and (3) has no background in accounting.  These alleged shortcomings of Winner's credentials go to the weight of Winner's testimony, not its admissibility, and do not provide grounds to exclude Winner's expert opinions. Winner's education, training, experience, and work history make him an expert in the business and economic aspects of USFS's response to wildland fires, including its recordkeeping procedures.  ICLP responds in turn to each of the United States' arguments regarding Winner's alleged lack of qualifications.

(1)      *Winner has little experience with fire suppression teams and never worked in the finance section of a fire incident management team.* Winner has significant experience with USFS fire suppression activities. Decl. of D. Winner at ¶¶ 5-7. Winner started as a fire fighter (operations), and worked up the ranks into management of fire suppression logistics and planning. *Id.*  Finally, Winner spent 17 years as a regional Assistant Director of Aircraft and Fire Management and worked as a regional representative to incident management teams. *Id.* at ¶ 8. While Winner never worked in the Finance Section of a fire management team, he has an extensive background in fire suppression planning and resource allocation/documentation, and

worked closely with the finance section of the incident management team. *Id.* at ¶ 10. It is not necessary for an individual to have experience in a particular position to qualify the individual as an expert on damages. *See Maiz v. Virani,* 253 F.3d 641, 665 (11th Cir. 2001) (economic damages expert qualified to testify on damages in real-estate industry despite lack of specific real-estate experience). This is an area that the United States can explore on cross examination, but it goes to the weight of Winner's opinions, not their admissibility.

The United States also claims that Winner's experience working in USFS fire leadership positions in the 1970s and 80s is so dated that Winner belongs to a "different era." Dkt. No. 87-1 at 7. But whether an expert's experience is "dated" or "too limited" also goes to the weight of the expert's testimony, not its admissibility. *Przybysz v. City of Toledo*, 302 F. Supp.3d 915, 924 (N.D. Ohio 2017) (citations omitted), *aff'd,* 746 F. App'x 480 (6th Cir. 2018).

(2) *Winner never prepared a transaction register, bill for collection, or negotiated a contract for aircraft suppression.* Winner acknowledges that he did not personally perform these tasks. However, having worked with the Logistics and Planning Sections of the incident management team, and as an Assistant Director, Winner is familiar with USFS accounting practices, procedures, and record keeping requirements. Decl. of D. Winner at ¶¶ 10-11. Winner revolutionized the way the USFS tracks its fire suppression expenditures by helping to create the P-code system, which is still used today. The United States does not explain why it is necessary for Winner to prepare a transaction register, bill for collection, or to negotiate an aircraft contract to qualify him as an expert in what types of damages are not reasonable and necessary to suppress a fire. Winner is qualified to review and critique the USFS's transaction register even if he never personally created one.

(3)     *Winner has no background in accounting*. It is true that Winner is not an accountant.[4] But he does have training in economics, and he worked closely with accountants during his career with the USFS. Winner Dep. at 16:17-22; Decl. of D. Winner at ¶ 11. Indeed, an accountant would not be an appropriate expert for ICLP's purposes. Accountants are not typically involved in fire suppression management. Accountants are not in a position to say what suppression expense were necessarily caused by a specific fire. The breadth of Winner's expertise covers USFS resource expenditures and budgeting along with practical, hands on experience in fire suppression management (including operations, logistics, and planning).

In sum, the United States fails to meet its burden to show that Winner is unqualified as an expert about the reasonableness and necessity of the USFS's fire suppression expenditures and USFS fire suppression cost recordkeeping.

**B.      Winner's expert opinions regarding the costs that the United States can recover from the Sheep Fire are reliable and are helpful to the jury.**

The United States argues that Winner's opinions about the damages the United States can recover constitute "lay opinion[s] as to what he believes the law should be." Dkt. No. 87-1 at 9. This is a gross mischaracterization of Winner's testimony. Winner's opinions about what damages are recoverable are based on his experience in the USFS, including his experience as part as a fire suppression management team, his interpretation of the USFS Handbook, and, to some degree, common sense. Winner's expertise allows him to reliably opine on which of the

---

[4]The United States criticizes Winner's use of accounting terminology, particularly his use of the term "audit." Dkt. No. 87-1 at 8-9. This objection is well taken and ICLP will ensure that Winner will not testify in the capacity of an accountant, and will not give the impression that he performed an accounting "audit."

United States' expenses were reasonable and necessary to suppress the Sheep Fire, which will be helpful to the jury when they are considering the United States' alleged damages.

It is axiomatic that, in a negligence action, the plaintiff must prove "a causal connection between the defendant's conduct and the resulting injury." *Haight v. Idaho Dep't of Transportation*, 414 P.3d 205, 212 (Idaho 2018). Awarding damages caused by something other than the defendant's breach of duty would result in an improper windfall to the plaintiff. *E.g.*, *McGehee v. Elliott*, 849 N.E.2d 1180, 1191 (Ind. App. 2006) ("[T]he law disfavors a windfall.").

The United States argues that several of Winner's opinions are unreliable for various reasons. ICLP responds to each of the United States' arguments in turn.

*Winner's opinions re: base pay.* Winner opines that the United States is not allowed to recover the base pay (wages) of the United States' employees who were already on the USFS's payroll when assigned to the Sheep Fire. Decl. of D. Winner at ¶ 2, Ex. A (Winner Rpt.) at 3. This is because these employees would have been paid regardless of whether the Sheep Fire happened. Said another way, the Sheep Fire did not cause this category of damages. Winner's opinion that the United States is not entitled to recover damages for wages it would have incurred regardless of the Sheep Fire is reliable and helpful to the jury, even if it is based, in part, on common sense and the policy of preventing a windfall.

In *Chesapeake & Ohio Ry. Co. v. United States*, 139 F.2d 632 (4th Cir. 1944), relied upon by the United States, Dkt. No. 87-1 at 10, the Fourth Circuit ruled that the United States was entitled to recover for the wages paid to its employees in a "reasonable effort to avert the threatened harm." This Court should take a different approach. Allowing the United States to recover expenses that it would have incurred regardless of the Sheep Fire results in a windfall to

the United States. In *Spokane Int'l Ry. Co. v. United States*, 72 F.2d 440, 443 (9th Cir. 1934), a case arising out of a fire in the Pend Oreille National Forest, this Court allowed the defendant railroad to present testimony rebutting the United States' claimed damages for "bringing men to fight the fire." In that case, the railroad was allowed to dispute whether the government could have hired fire fighters "in Spokane instead of the more distant Seattle and at what rates." *Id.* Similarly, in this case, ICLP should be allowed to present evidence, and argue, that the United States' cost of paying its employees, who were employed prior to the Sheep Fire (and not because of the Sheep Fire)[5], did not cause any form of compensable damage to the United States.

*Winner's opinions re: trainees.* The USFS Handbook states that the USFS cannot bill the cost of "crews used for training purposes." *See* Decl. of D. Winner at ¶ 2, Ex. A (Winner Rpt.), App. A at 2. The United States takes the position that this requirement only applies to *complete* "crews" of trainees. Winner, on the other hand, opines that all trainee expenses are nonrecoverable. The USFS Handbook language may be subject to interpretation. But what cannot be disputed is that trainees were not necessary to suppress the Sheep Fire. Winner has supervised trainees and has been a trainee himself. Decl. of D. Winner at ¶ 14. Winner's experience of working with trainees and firefighting crews allows him to opine that the employment of trainees was not necessitated by the Sheep Fire. Trainees, like judicial interns or externs, are not qualified to perform the job of the person supervising them. They serve as trainees to get experience. The USFS benefits from employing trainees on an institutional level – it ensures a pipeline of qualified employees and the pass-down of institutional knowledge. If

---

[5]If the Sheep Fire had required the USFS to hire new employees to fight the fire or to hire temporary employees to fill critical vacant positions, such wages would be recoverable as such wages would have been caused or occasioned by the fire.

the USFS were allowed to recover the expense of employing trainees, in addition to its institutional benefit, the United States receives a windfall. Winner's opinion that the expense of employing trainees is not an expense caused by the Sheep Fire is reliable and helpful to the jury.

*Winner's opinions re: aircraft daily availability.* Winner opines that the cost of aircraft that have been procured by contract prior to the existence of a fire is not necessitated by any one specific fire. Congress provides the USFS with budgetary appropriations to hire aircraft on contract for a term of 80-90-100 days (for example) during a fire season. Decl. of D. Winner at ¶ 15. Hiring aircraft contractors on contract results in significant savings to the government. *Id.* The cost of employing aircraft "as needed" would be approximately twice as expensive as the contracted rates. *Id.* Similar to the base pay of employees, the United States incurs the expense of contracted aircraft regardless of any specific fires; thus, it cannot be said to be an expense caused by the Sheep Fire. On the other hand, the use time of the aircraft, the cost of retardant, and other fire-specific expenditures are recoverable. Winner's review of the United States damages reveals which aircraft expenses were charged to the budget appropriations and which were charged to the Sheep Fire.

*Damages not supported by source level documentation.* Whether the United States can recover damages that are not supported by source level documentation comes down to the United States' burden to prove its damages. The United States intends to argue to the jury, "Trust us. If an expense entry was made, it was made because an invoice, receipt, or other source level document at one time existed (even if it no longer exists)." ICLP must be allowed to challenge this proposition, i.e., to argue that the United States has not met its burden to prove its damages by a preponderance of the evidence. No one from ICLP has reviewed the United States'

voluminous damages documentation. Winner is the only defense witness that can segregate what damages are supported by source level documentation and which are not.

*Assumptions that summary level notations contain errors contrary to "presumption of regularity."* The United States argues that the "presumption of regularity" "attaches" to its damages calculations in this case that makes it so it can recover expenses for which it can provide no proof other than an entry on a spreadsheet. Dkt. No. 87-1. The presumption of regularity does not apply to this case, and certainly does not operate to allow the United States to shirk its burden of proving its damages by a preponderance of the evidence.

None of the cases cited by the United States (Dkt. No. 87-1 at 15) supports that a "presumption of regularity" attaches in a civil action to relieve the United States of proving its damages by a preponderance of the evidence. *Cf. U.S. Postal Service v. Gregory*, 534 U.S. 1, 10 (2001) (presumption of regularity applied to administrative review of disciplinary proceedings of government employee); *Cleveland Assets, LLC v. United States*, 883 F.3d 1378 (Fed. Cir. 2018) (presumption of regularity applied to review of challenge to General Services Administration's procedures for soliciting request for lease proposals for situating government offices); *Butler v. Principi*, 244 F.3d 1337, 1338 (Fed. Cir. 2001) (in review of proceedings before the Board of Veterans' Appeals, presumption of regularity applied to the "mailing of a copy of a notice of appeal rights to a veteran"). The "presumption of regularity" applies in only two categories of disputes: (1) "the challenger and the government disagree about what happened during the [administrative] decisionmaking process"; and, (2) "the challenger and the government disagree about why a government action was taken." Note, *The Presumption of Regularity in Judicial Review of the Executive Branch*, 131 Harv. L. Rev. 2431, 2433 (2018); *see also id.* (observing

that courts "often invoke[] the phrase [(presumption of regularity)] without elaboration or develop[] the doctrine without invoking the phrase," and that the presumption "has never been the subject of focused academic treatment").

In this case, the presumption of regularity does not give the government a golden ticket to bypass its failure to meet an evidentiary burden. The presumption seemingly only applies when a court or appellate-level administrative tribunal is reviewing a decision of an agency adjudication. In this case, there was no administrative hearings or adjudication. The United States tallied up its expenses and presented them to ICLP for payment, even though several million dollars could not be supported with an invoice, receipt, or other source level document. ICLP is challenging the United States' damages and the United States' failure to prove them by a preponderance of the evidence. ICLP is not directly disputing the USFS's decision making process or why a government action was taken (unless the United States is claiming that it decided to suppress or discard the missing source level documents). The United States' interpretation of the presumption of regularity, to relieve it of its burden to prove its damages in a civil action, is preposterous. Winner's opinion that the United States should not be awarded damages which it cannot support with source level documentation is reliable and would be helpful to the jury.

In sum, the United States' position that all of its charges are recoverable, regardless of the charges' impact on suppressing the Sheep Fire, is untenable. Accepting the United States' position, and denying ICLP the opportunity to put forth evidence and argue that certain alleged damages are not recoverable, would bestow a windfall on the United States. Further, it would create a perverse incentive for the government to expend unlimited funds rather than a careful use of taxpayer-funded resources. The only way to rebut the United States' claimed damages is

for an expert like Winner, who has knowledge of both recordkeeping and fire suppression operations, logistics, and planning, to testify about charges were not occasioned by the Sheep Fire.

**C.      In the alternative, under Rule 1006, Winner should be allowed to summarize the voluminous documents relevant to ICLP's defenses to the United States' claimed damages.**

Even if the Court excludes Winner from testifying as an expert, he should still be permitted to testify as a lay witness under Rule 1006.  That is, Winner can testify in summary form regarding his review of the 70,000 pages of documentation supporting the United States' damages, and the dollar amount he was able to assign to certain categories of damages based on his review of the documents.

Rule 1006 provides: "The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation." "Although [Rule 1006] does not specifically address summary witness testimony . . .  a district court does not abuse its discretion by admitting summary testimony where the evidence presented is voluminous and complex." *United States v. Porter*, No. CR 13-66, 2016 WL 740393, at *1 (E.D. La. Feb. 25, 2016) (citing *United States v. Fullwood*, 342 F.3d 409, 413 (5th Cir. 2003)). "The purpose of [Rule 1006] is to allow the use of summaries when the documents are unmanageable or when the summaries would be useful to the judge and jury." *Davis & Cox v. Summa Corp.,* 751 F.2d 1507, 1516 (9th Cir. 1985).  To the extent a witness summarizes voluminous records and materials by "identifying what he, given his background and expertise, considers to be the most salient aspects of those voluminous records," such testimony does not run afoul of Rule 702. *In re Testosterone Replacement Therapy Prods. Liab.*

*Litig. Coordinated Pretrial Proceedings*, No. 14 C 1748, 2017 WL 1836443, at \*15 (N.D. Ill. May 8, 2017).

"A proponent of summary evidence must establish that the underlying materials upon which the summary is based (1) are admissible in evidence and (2) were made available to the opposing party for inspection." *United States v. Rizk*, 660 F.3d 1125, 1130 (9th Cir. 2011). "These materials must be admissible, but need not themselves be admitted into evidence." *Id.* "The availability requirement ensures that the opposing party has an opportunity to verify the reliability and accuracy of the summary prior to trial." *Id.*

In this case, Winner can testify in the form of a summary, regarding which of the United States' damages (and the dollar amount of said damages) are not supported by source level documentation, and what amounts of the damages are attributable to certain types of expenditures (e.g., trainees, programmatic costs, durable goods, etc.). Significantly, the United States has never argued that Winner's calculations of each category of damages he considers non-recoverable are erroneous. ICLP can establish the foundational requirements of Rule 1006. The United States' documentation regarding its alleged damages is voluminous (some 70,000 pages). The United States seeks to admit such evidence. Both parties have had the opportunity to inspect that voluminous collection of documents, and Winner's calculations regarding various categories of damages have been made available to the United States.

Further, counsel for the United States has represented that it will provide "boxes" of documents supporting its damages claim to the jury, and has proposed the use of a laptop computer to aid the jury in its review of such material. The United States will not individually admit each document supporting its damages claim. Rather, the United States will likely attempt

to lay a foundation to admit all documents and then give the documentation to the jury to sort out.  It is unreasonable to expect that the jury can comprehend this voluminous information as it would require them review each and every document to tally up what damages the United States has proven (if any).

Winner has reviewed and cataloged some 70,000 pages of the United States' damages documentation, comparing source level documentation to what the United States' claims as damages.  Decl. of D. Winner at ¶ 12.  Even without offering expert opinions as to whether certain damages are recoverable, Winner can testify about categories of damages he found that lacked source level support and the dollar amount of damages attributable to certain categories of damages. Given his background in USFS budgeting and documenting expenditures, Winner can identify and segregate these categories of damages (which are "salient" to ICLP's defenses) without acting as an expert witness.  *In re Testosterone Replacement Therapy Prods. Liab. Litig. Coordinated Pretrial Proceedings*, 2017 WL 1836443, at *15. Finally, any prejudice to the United States resulting from the admission of summary evidence can be cured by the Court giving a cautionary limiting instruction.  *United States v. Bishop*, 264 F.3d 535, 547 (5th Cir. 2001).

///

///

///

///

///

///

# CONCLUSION

For the foregoing reasons, ICLP respectfully requests that the United States' Motion in Limine to Exclude the Expert Report and Testimony of Daniel Winner be denied.

DATED this 14th day of February, 2020.

**PAINE HAMBLEN LLP**


By: */s/ Scott C. Cifrese*
      Scott C. Cifrese
      Daniel W. Short
      Paul S. Stewart
      Attorneys for Defendant Idaho County
      Light and Power

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 14th day of February, 2020, I filed the foregoing **DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF DANIEL WINNER (Dkt. No. 87)** electronically through CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

- **James P. Schaefer, Peter Wucetich**
  james.schaefer@usdoj.gov, peter.wucetich@usdoj.gov, elise.foster@ogc.usda.gov, jessica.black@usdoj.gov, CaseView.ECF@usdoj.gov, usaid.ecfnotice@usdoj.gov

**Manual Notice List**

The following is the list of attorneys who are not on the list to receive e-mail notices for this case (who therefore require manual noticing).

- No manual recipients

/s/ Scott C. Cifrese
Scott C. Cifrese, Attorney for Defendant
Idaho County Light and Power

I:\SPODOCS\00068\00293\PLEAD\1884863