UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>IDAHO COUNTY LIGHT AND POWER COOPERATIVE ASSOCIATION, INC.,<br><br>　　　　　Defendant. | Case No. 3:17-cv-00391-CWD<br><br>**MEMORANDUM DECISION AND ORDER**<br><br>**RE: Docket 65** |

INTRODUCTION

This action arises out of a wildland fire, known as the Sheep Fire, that started on September 6, 2012, on property owned by Carolyn and Gary Hegvet at Idaho County Light and Power Cooperative's electric service drop to the Hegvet's commercial ice plant. The fire burned approximately 49,592 acres of land, of which 43,206 is owned by the United States. The United States claims $17,690,293.51 in damages related to injury to its land.

Before the Court is ICLP's motion for summary judgment. (Dkt. 65.) The Court conducted a hearing on January 23, 2020, during which it heard argument on the motion, and a related motion in limine. The Court addressed separately ICLP's motion in limine, which sought to exclude expert opinion testimony related to the origin and cause of the Sheep Fire. (Dkt. 89.) The Court denied ICLP's motion in limine and now turns to consider ICLP's motion for summary judgment. After careful review, the Court will grant ICLP's motion for summary judgment in part.

## BACKGROUND

The Complaint, filed on September 19, 2017, seeks damages incurred by the United States under the theories of negligence, res ipsa loquitur, trespass, and nuisance against ICLP, and Gary and Carolyn Hegvet. The United States alleges ICLP's negligent design, installation, and maintenance of electrical equipment supplying power to the Hegvet's property caused the Sheep Fire. Additionally, the United States alleges that the Hegvet's negligent use and maintenance of ICLP's electrical service was a proximate cause of the Sheep Fire. Since the complaint was filed, the United States reached a settlement with the Hegvets, and all claims against them were voluntarily dismissed with prejudice. (Dkt. 16.)

The Complaint alleges the specific cause of the fire "was the failure of a jumper cable between two of the service drop transformers at the Hegvets' commercial ice plant. ICLP improperly installed this jumper cable. As a result of ICLP's negligence, the jumper cable failed, causing it to spark, burn, and discharge a piece of molten hot wire into combustible material at the base of ICLP power pole # WJ219-2A-1. A contributing

factor to the cause of the fire was ICLP's installation of undersized equipment…." (Dkt. 1 at ¶ 11.)[1]

In addition to the negligence claim, the United States alleges:

> ICLP was negligent under the doctrine of *res ipsa loquitor* [sic] because its equipment would not have malfunctioned and caused the Sheep Fire if ICLP had exercised reasonable care in the maintenance and operation of the equipment.

*Id*. at ¶ 20. The United States asserts also a claim for trespass, alleging ICLP negligently allowed the Sheep Fire to ignite and spread upon the United States' property, causing damages. Last, the United States alleges that the Sheep Fire constituted a public nuisance under Idaho Code § 38-107. Both the claim for trespass and for nuisance are based upon ICLP's alleged negligence.

ICLP denies it was negligent or at fault for the Sheep Fire in any way. (Dkt. 7.) ICLP further contends that other parties—including the Hegvets and Cook & Sons' Construction, who had a crew working on the highway nearby the Hegvet's property on the day of the fire—may be responsible for causing the Sheep Fire. Trial in this matter against ICLP is set to begin on April 9, 2020.

---

[1] The United States explains that its causation theory is that: (1) the jumper cable was loose; (2) resulting in one or more molten and/or burning pieces falling to the ground; (3) which ignited the Sheep Fire; and (4) contributing factors were ICLP's use of undersized equipment, its failure to enforce its own policies, and its failure to inspect and maintain its equipment.

**MEMORANDUM DECISION AND ORDER - 3**

# FACTS

Since the summer of 2001, the Hegvets have operated an ice-making facility, "the Ice Plant" or "Ice Man," on their property, which is located in Lucile, Idaho. Def. SOF ¶¶ 1, 2. (Dkt. 66.) Compl. ¶ 10.

ICLP designs, engineers, constructs, operates, inspects, uses, and maintains electrical power lines, transformers, jumper cables, and related equipment in the State of Idaho. ICLP also owns, designs, installs, and maintains electrical equipment that it uses to provide power to ICLP customers in Idaho. ICLP has supplied electricity to the Hegvets and the Ice Plant since the Ice Plant's construction in 2000. Def. SOF ¶ 3. (Dkt. 66); Pl. SOF ¶ 2. (Dkt. 69-1.)

To supply power to the Ice Plant, ICLP installed: (a) Transformer Pole No. WJ219-2A-1; (b) transformers on the Transformer Pole; (c) jumper wires connecting the transformers on the Transformer Pole; (d) Meter Pole No. WJ219- 2A-1-MP; and (d) a service wire running from the Transformer Pole through the CT meters on the Meter Pole to the ice plant's mastheads. Pl. SOF ¶ 2. *See also* Def. SOF ¶ 6 (stating that ICLP maintained a transformer pole with three 50 kV transformers to provide electrical service to the Ice Plant, and that two transformers were connected with a jumper wire allowing ICLP to provide the Ice Plant with three phase power despite only two phase lines going into the transformers).

ICLP alleges the Hegvets installed additional motors for the Ice Plant's operations without informing ICLP, causing the Ice Plant to experience power issues. Def. SOF ¶ 4. The United States asserts ICLP was aware the Hegvets added ice machines and freezers

to their facility, and that ICLP's upgrades to the size of the transformers and wires triggered problems with ICLP's electrical service. Pl. SOF ¶¶ 6, 9. ICLP, however, contends it had no control over, and is not responsible for, the electrical systems on the customer's side of the "point of delivery." Def. SOF ¶ 7. In other words, there is a dispute regarding the Hegvets' contribution, if any, to the sequence of events precipitating the fire.[2]

Turning to the day of the fire, on September 6, 2012, employees of Cook & Sons Construction were working at a jobsite on Highway 95 near the Hegvet's property. Def. SOF ¶ 3. Pl. SOF ¶ 15. At or before 10:15 a.m., a Cook & Sons' employee, Edd Murphy, noticed a downed wire. Pl. SOF ¶ 15. *But see* Def. SOF ¶ 10 (the excavator operated by Edd Murphy "contacted ICLP's power lines at the jobsite. The excavator broke the neutral wire (located under the phase wire), which fell to the ground."). Murphy testified in his deposition that he assumed it was not a live wire, drug it off to the side with a wooden shovel, and continued working. Pl. SOF ¶ 15. Murphy did not immediately report the downed wire, because he thought the wire was a dead line and he did not have cell phone service at the time. Pl. SOF ¶ 16. The wire that Murphy assumed he broke was a neutral wire. Pl. SOF ¶ 17; Def. SOF ¶ 10. Murphy later reported the downed wire to ICLP at 12:23 p.m. Pl. SOF ¶ 16. ICLP contends Murphy's contact with ICLP's power lines may have contributed to the cause of the fire. (Dkt. 65-1 at 11.)

---

[2] The facts regarding causation are disputed. On summary judgment, the evidence is viewed in the light most favorable to the non-moving party.

**MEMORANDUM DECISION AND ORDER - 5**

Between 11:15 a.m. and 11:30 a.m. on September 6, 2012, the Sheep Fire ignited on the Hegvet's property. Pl. SOF ¶ 18. Def. SOF ¶ 8, 11. Gary Hegvet and his brother, Jim Law, were the only witnesses to the start of the fire. Pl. SOF ¶ 18.

Law testified during his deposition that he "saw smoke coming up around the pole where the transformer was, so [he] went out immediately to investigate. Saw the fire had started around the pole." Pl. SOF ¶ 19. Hegvet testified he walked to where he could see the pole and saw the transformers were "popping and fizzing, sparks were flying. And it was still dripping whatever covers the wire." *Id.* Hegvet attempted to put out the fire, but due to wind, was unable to do so, and he called the sheriff's department and the forest service. (Dkt. 68-3 at 9.)

Firefighters with the United States Forest Service (USFS) responded to the fire, and USFS Forestry Technician Jonathan Moore was the first USFS Incident Commander to arrive at the scene. Pl. SOF ¶ 21. Local firefighters, who had already arrived and had begun fighting the fire, reported to Moore that the fire started at the transformer pole. *Id.*

At 11:45 a.m., the sheriff's office called ICLP to report the fire. Pl. SOF ¶ 22. ICLP dispatched two linemen, Greg Schumacher and Scott Anderson, to the Hegvet's property at approximately 11:45 a.m. Pl. SOF ¶ 22. Schumacher arrived first, and Anderson arrived approximately ten minutes later. Schaefer Decl. Ex. S, Schumacher Depo. at 33. (Dkt. 68-28 at 10.)

USFS Captain Jill Forth was dispatched to the scene by the forest fire dispatch center and arrived at approximately 12:30 p.m., along with USFS Special Agent Patrick Finnegan, to investigate the origin and cause of the fire. Pl. SOF ¶ 25. Schaefer Decl. Ex.

B, Forth Depo. at 17. (Dkt. 68-2, 68-4 at 6.) Upon Captain Forth's arrival, she observed there was "a boom truck with people in the bucket," at the power pole. Schaefer Decl. Ex. B, Forth Depo. at 20-21. (Dkt. 68-4 at 6-7.) Captain Forth and Finnegan made their way toward the power pole, and approached the two ICLP linemen, who were no longer up in the bucket by then. Forth testified during her deposition that she "talked to them for a bit…and asked them what…had happened. And my recollection is that they said that there was a wire on the---one of the pots that had burned, and that they were repairing and replacing that." *Id.*, Forth Depo. at 23-24. She asked for the wire, and they gave it to her. *Id.*, Forth Depo. at 24.[3]

Captain Forth's initial investigation consisted of interviewing several witnesses present at the scene, collecting evidence, walking the scene, and taking photographs. *Id.* Forth then turned toward examining other physical evidence at the scene. Finnegan was tasked with interviewing and obtaining written statements from witnesses at the scene. Schaefer Decl. Ex. B, Forth Depo. at 31. (Dkt. 68-4 at 9.)[4]

At approximately 2:15 p.m., Finnegan obtained a written statement from ICLP lineman Greg Schumacher. (Dkt. 68-3 at 8.) Schumacher's written statement indicates that he "started checking the connections and found one jumper wire that was melted and

---

[3] During Captain Forth's deposition, it was not clear whether Schumacher or Anderson relayed information to Forth. The two linemen were referred to collectively.

[4] Captain Forth testified in her deposition that, after she and Finnegan spoke to the linemen at the base of the power pole, she and Finnegan split up. Forth continued her origin and cause investigation, and Finnegan started taking written statements.

**MEMORANDUM DECISION AND ORDER - 7**

burnt…the connection seemed tight when I removed the wire from the lug. I also checked the other connections they were tight and checked the rest of the wires for bubbles and heat. They all seemed good." (Dkt. 68-3 at 8.)[5]

Based upon her investigation, Captain Forth summarized her conclusions in a written report regarding the sequence of events that caused the fire:

> The cause of the fire was determined to be a power surge hit a transformer power pole owned and maintained by Idaho County Light and Power Cooperative (ICLP). A jumper wire between two transformers on the pole was loose which caused the wire to short, spark and burn. The jumper wire burned, melted and a piece of hot metal wire fell to the ground causing a fire at the base of the pole.

(Dkt. 68-2 at 7.)

When deposed later, Schumacher and Anderson both denied telling Captain Forth that Cook & Sons Construction cut a wire; there was a power surge; or that the jumper wire was loose. Pl. SOF ¶ 32. Schaefer Decl. Ex. S, Schumacher Depo. at 90-92; Ex. X, Anderson Depo. at 55-56. (Dkt. 68-28 at 24, 68-33 at 15.) During his deposition, Schumacher testified that, when he was up in the bucket truck inspecting the service, he "de-energized the open bank and tailed down the jumpers off of the primary wires….what I observed was that all the connections were tight…Other than that one jumper wire that showed the melted plastic or the insulation, it all looked good and tight." Schaefer Decl. Ex. S, Schumacher Depo. at 31-32. (Dkt. 68-28 at 9.) However, according

---

[5] Schumacher's statement was included as an attachment to Forth's written report.

to Captain Forth's deposition testimony, the linemen verbally admitted during their conversation with her that the jumper cable connection was loose. *Id.*, Forth Depo. at 38. (Dkt. 68-4 at 11.)[6]

In sum, there is conflicting testimony from the individuals who have personal knowledge of the events that occurred on the day of the fire. The United States explains that its causation theory is based on eyewitness testimony (i.e., Hegvet and Law) and the admission of ICLP linemen that the wire was loose causing it to spark, which is one of the underpinnings of Captain Forth's fire origin and cause investigation. (Dkt. 69 at 2.) Thus, conflicting testimony concerning whether the jumper cable was loose is central to resolution of the case, as is Captain Forth's opinion testimony regarding the origin and cause of the fire.

The Court separately considered ICLP's motion in limine to exclude the opinions of Captain Forth as to the origin and cause of the fire, brought pursuant to Fed. R. Evid. 702. The Court found Captain Forth's opinions meet the test for reliability under *Daubert* and are admissible at trial if an appropriate foundation is laid for the same. (Dkt. 89.) Further, the Court concluded that the retained experts' (for both parties) reliance upon Captain Forth's report is not a basis for excluding their opinions. Accordingly, ICLP's motion in limine was denied. (Dkt. 89.)

---

[6] Again, it is not clear whether Schumacher or Anderson made the statement. The deposition testimony refers to the linemen collectively.

# ANALYSIS

## A. Summary Judgment Standard

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). The moving party is entitled to summary judgment where, viewing the evidence and the inferences arising therefrom in favor of the nonmovant, there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials of the pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## B. Negligence

The United States' first claim for relief is premised upon ICLP's alleged negligence, requiring proof of: (1) a duty, recognized by law, requiring the defendant to conform to a certain standard of conduct; (2) a breach of that duty; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual loss or damage." *Haight v. Idaho Dep't of Transp.*, 414 P.3d 205, 212 (Idaho 2018). "The moving party is entitled to judgment when the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case on which

that party will bear the burden of proof at trial." *Badell v. Beeks*, 765 P.2d 126, 127 (Idaho 1988).

ICLP argues that, if the Court grants ICLP's motion in limine to exclude the opinions of the United States' experts regarding the origin and cause of the fire, the United States cannot prove causation, which is essential to the United States' negligence claim. In turn, ICLP argues that ICLP's nuisance claim and trespass claim fail because they are both premised upon ICLP's alleged negligence, which the United States cannot prove in the absence of expert testimony. (Dkt. 65-1 at 3.)

The Court found that Captain Forth's opinions meet the reliability test for admissibility, and denied the motion in limine to exclude her opinions and those of the United States' retained experts. Thus, ICLP's motion for summary judgment, insofar as it is premised on exclusion of Captain Forth's and the United States' expert witness opinions, will be denied. That leaves ICLP's alternative arguments directed at the United States' theories of res ipsa loquitur, nuisance, and trespass.

C. **Res Ipsa Loquitur**

Res ipsa loquitur is a means of proof to establish negligence. *Christensen v. Potratz*, 597 P.2d 595, 599 (1979) "The only function of res ipsa loquitur is to replace direct evidence of negligence with a permissive inference of negligence: 'It furnishes circumstantial evidence of defendant's negligence where direct evidence may be lacking.'" *Harper v. Hoffman*, 523 P.2d 536, 537-538 (Idaho 1974). "This doctrine generally applies in situations where there is no evidence, circumstantial or otherwise, or at least none of sufficient probative value, to show negligence; and under circumstances

where the fact finder concludes that the accident in question would normally not occur in the absence of negligence." *State of Idaho v. S. Refrigerated Transp., Inc.*, No. 88-1279, 1991 WL 22479, at *8 (D. Idaho Jan. 24, 1991).

A plaintiff seeking to invoke the doctrine must show that: (1) the agency or instrumentality causing the injury is under the exclusive control and management of the defendant; and (2) the circumstances were such that common knowledge and experience would justify the inference that the accident would not have happened in the absence of negligence. *Enriquez v. Idaho Power Co.*, 272 P.3d 534, 538 (Idaho 2012) (citations and quotations eliminated). Application of the doctrine is limited to those cases which are within the common knowledge and experience of the average layperson. *Id.* It is also necessary that the cause of the injury points to the defendant's negligence. *Id.* "Therefore, to proceed under res ipsa loquitur, a plaintiff must demonstrate that the instrumentality which caused his injury was under the exclusive control and management of the defendant and that the circumstances would permit an average layperson to infer, based upon common knowledge and experience, that the plaintiff would not have suffered those injuries in the absence of the defendant's negligence." *Id.*

The United States alleges that "ICLP was negligent under the doctrine of res ipsa loquitur because its equipment would not have malfunctioned and caused the Sheep Fire if ICLP had exercised reasonable care in the maintenance and operation of the equipment." (Dkt. 1 at 6, ¶ 20.) The United States asserts that the situation presented here "is not beyond the common knowledge and experience of a layperson," because everyone knows that "loose electrical wires can cause fires." (Dkt. 69 at 18.) ICLP argues that res

ipsa loquitur is not applicable here, because ICLP did not have exclusive control over the instrumentality that caused the fire, and the United States must rely upon technical expertise to prove causation.

First, the United States did not reconcile the inherent contradiction with the concept of exclusive control when, in the complaint, the United States asserts that the Hegvets' negligence contributed to the cause of the Sheep Fire. Further, ICLP contends it had no knowledge of the additional motors installed by the Hegvets at the ice plant, and that it did not control the customer's side of the point of delivery. Additionally, ICLP asserts the activities of Cook & Sons Construction may have contributed, in whole or in part, to the cause of the Sheep Fire. Thus, while the power pole may have been under the exclusive control and management of ICLP, the United States' allegation that the Hegvets may have also been negligent, as well as the presence of facts supporting a reasonable inference that the activities of Cook & Sons may have played a role, precludes a finding on the first element of res ipsa loquitur. *See Blackburn v. Boise Sch. Bus Co.*, 508 P.2d 553, 556 (1973) (noting that if it can be stated with any certainty that the cause of an accident was the product of third party negligence, res ipsa loquitur is not applicable).

Second, the determination of the origin and cause of a fire is frequently considered "beyond the understanding of the average lay person," and expert testimony on this issue is regularly admitted at trial. *See United States v. Santiago*, 202 Fed.Appx. 399, 401 (11th Cir. 2006) (finding district court did not abuse its discretion when it admitted testimony of experts regarding origin and cause of fire); *Lise St. Cyr v. Flying J Inc.*, No. 3:06–cv–

13, 2008 WL 2608127, at *7 (M.D. Fla. 2008) ("The cause and origin of fires as well as other scientific and technical matters that will arise in this case are neither matters of common sense nor common knowledge."); *Allstate Ins. Co. v. Hugh Cole Builder, Inc.*, 137 F.Supp.2d 1283, 1292 (M.D. Ala. 2001) (permitting testimony of expert regarding origin and cause of fire); *Great N. Ins. Co. v. Ruiz*, 688 F. Supp. 2d 1362, 1370 (S.D. Ga. 2010).

The sheer number of experts consulted by the United States regarding the origin and cause of the Sheep Fire belies its argument that the origin and cause of this fire is readily determined by laypeople. While in certain circumstances the origin and cause of a fire may be easily determined, *see, e.g., Gailbreath v. Homestead Fire Ins. Co.,* 185 F.2d 361, 363 (9th Cir. 1950),[7] the Court finds here that expert testimony is necessary for the jury to understand the evidence. In other words, the Court is unable to conclude on summary judgment that the Sheep Fire was more likely than not the result of ICLP's negligence. Therefore, the second element required for res ipsa loquitur is not established.

Put simply, based upon its review of the record, the Court cannot conclude that, based on common knowledge and experience alone, a layperson could infer that the

---

[7] In *Gailbreath*, the court was presented with a fire that originated from an oil stove. Based solely upon conflicting witness testimony regarding the installation of the stove, the court, sitting without a jury, found based upon the evidence that there was some fault with regard to the installation of the stove, and the finding of negligence was made through application of the doctrine of res ipsa loquitur. *Gailbreath*, 185 F.2d at 364. The Court of Appeals for the Ninth Circuit found that the application of res ipsa loquitur under the facts in that case was appropriate. *Id.*

**MEMORANDUM DECISION AND ORDER - 14**

Sheep Fire would not have happened without negligence on the part of ICLP. The Court finds the doctrine of res ipsa loquitur inapplicable to the facts of this case.

D. **Nuisance and Trespass**

The United States alleges that ICLP is liable for creation of a public nuisance under Idaho Code § 38-107. (Dkt. 1 at ¶¶ 31-33.) The statute provides that:

> Any forest or range fire burning out of control or without adequate and proper precautions having been taken to prevent its spread, is hereby declared a public nuisance, by reason of its menace to life and/or property. Any person responsible through his conduct, acts and/or control of property or operations for either the starting or the existence of such fire is hereby required to make a reasonable effort to control or extinguish it immediately, without awaiting instructions from the director of the department of lands or a fire warden. The director of the department of lands or any fire warden may summarily abate the nuisance thus constituted by controlling or extinguishing such fire and the person willfully or negligently responsible for the starting or existence of such fire shall be liable for the costs incurred by the state or its authorized agencies in controlling or extinguishing the same.[8]

---

[8] Idaho Code § 38-107 was amended effective March 12, 2013, after the occurrence of the Sheep Fire. ID LEGIS 62 (2013), 2013 Idaho Laws Ch. 62 (H.B. 132). The amendments added sections related to the recovery of damages.

The United States' complaint alleges also a claim for trespass by fire, which the United States clarified is a claim for common law trespass.[9] (Dkt. 1 at 7.) The traditional common law elements of trespass to land are: (1) an invasion, (2) which interferes with the right of exclusive possession of the land, and (3) which is a direct result of some act committed by the defendant. *Mock v. Potlatch Corp.*, 786 F. Supp. 1545, 1548 (D. Idaho 1992) (citing W. Page Keeton, et al., PROSSER AND KEETON ON THE LAW OF TORTS § 13, at 67 (5th ed. 1984)). An invasion must constitute an interference with possession to be actionable as a trespass, and applies to wrongful interference with the right of exclusive possession of real property. *Mock*, 786 F. Supp. at 1548.

"A useful differentiation between trespass and nuisance is that, '[t]respass comprehends an actual physical invasion by tangible matter. An invasion which constitutes a nuisance is usually by intangible substances, such as noises or odors.'" *Moon v. North Idaho Farmers Assn.*, 96 P.3d 637, 641 (Idaho 2004) (citing *Bormann v. Board of Supervisors*, 584 N.W.2d 309 (Iowa 1998)).

---

[9] The United States in its brief contends that its trespass claim is actionable under Idaho Code § 6-202, which provides that: "it is a civil trespass for any person to enter or remain on the real property of another." Mem. in Opp. at 19. (Dkt. 69 at 19.) Neither party addressed the fact that Idaho Code § 6-202 was amended in 2018, and applies only to causes of action accruing on or after July 1, 2018. TRESPASS—DAMAGES, 2018 Idaho Laws Ch. 350 (H.B. 658). In 2012, which is when the Sheep Fire occurred and the cause of action accrued, recovery pursuant to Idaho Code § 6-202 required proof of a willful and intentional trespass, and an assertion of treble damages. *See* ID LEGIS 62 (2013), 2013 Idaho Laws Ch. 62 (H.B. 132); *Mock v. Potlatch Corp.*, 786 F. Supp. 1545, 1548 (D. Idaho 1992). The Complaint does not contain facts alleging a willful and intentional trespass or request recovery of treble damages. Absent evidence of willful and intentional conduct and a claim for recovery of treble damages, the common law principles relating to trespass apply. At the hearing, the United States acknowledged its error in citing Idaho Code § 6-202, and indicated it was proceeding under a common law trespass theory.

ICLP argues that the United States' nuisance and trespass claims are cumulative with, and should not be considered apart from, its claim of negligence, and therefore must be dismissed, citing *Hurley v. Port Blakely Tree Farms L.P.*, 182 Wash. App. 753, 770, 332 P.3d 469, 478 (2014). Under Washington law, the court in *Hurley* held that, where the nuisance claim was grounded in the same facts and allegations as the negligence claim, the trial court did not err in dismissing the nuisance claim as cumulative. *Id.*, 332 P.3d at 478.

However, persuasive Idaho authority exists that a plaintiff may maintain simultaneously a negligence, trespass, and nuisance claim. For instance, the plaintiffs in *Moon v. North Idaho Farmers Assn.* alleged that the oppressive smoke generated by the farmers' burning activities and the particulates emitted from the smoke onto their land constituted both a nuisance and trespass, among other claims. The Idaho Supreme Court determined that, in "the plaintiffs' situation, an action could be said to lie in nuisance and in trespass, respectively, given the invasion of the thick, oppressive smoke generated by the farmers' burning and the particulates emitted from the smoke onto the plaintiffs' land." *Moon*, 96 P.3d at 642.

The Court in *State of Idaho v. Plum Creek Timber Co.* had occasion to consider the implications of *Moon* in a case where the government plaintiffs sought to recover the costs associated with the 2000 Crooked Creek Fire. *Plum Creek Timber Co.*, No. CV03-297-N-EJL, 2005 WL 2415991, at *4 (D. Idaho Sept. 30, 2005). The plaintiffs argued the fire was caused as a result of the defendant employee's negligence in failing to properly maintain

logging equipment and conduct logging operations in a safe manner. The plaintiffs asserted claims for negligence, trespass, nuisance, and res ipsa loquitur.

Upon summary judgment, the Court held that genuine issues of fact existed regarding the plaintiffs' claim for negligence, thereby precluding summary judgment. *Id.*, 2005 WL 2415991 at *4. Having so found, the Court concluded also that genuine issues of material fact precluded summary judgment on both the claim for nuisance under Idaho Code § 38-107, and the claim for trespass. *Id.* at * 4 - 5. In other words, all three claims proceeded, and the trespass and nuisance claims were not dismissed as duplicative of the negligence claim. *Id.*[10] *See also Akers v. Mortensen*, 320 P.3d 418, 427 (Idaho 2014) (allowing negligence and trespass claims to be pursued at the same time); Fed. R. Civ. P. 8(a)(3) (a claim for relief "may include relief in the alternative or different types of relief.").

The United States is required to prove ICLP negligently caused the fire which entered public lands and, thus, is liable for the consequences thereof. *Plum Creek Timber Co.*, 2005 WL 2415991 at *4. The resolution of the trespass claim requires that the question of negligence be resolved first. *Id.* Under *Plum Creek*, direct trespass is not required, and the United States needs only show that the trespass was negligent in order to be actionable. *Id.* And, the invasion of the smoke and the particulates emitted from the smoke onto the United States' land may also support a nuisance claim. *Id.*

---

[10] The Court in *Plum Creek* did not engage in an extensive discussion regarding why it determined the plaintiffs' claim under res ipsa loquitur survived summary judgment, finding only that questions of fact existed. There, however, neither party alleged that the negligence of third parties caused or contributed to the cause of the fire.

Pursuant to persuasive Idaho authority, the Court finds that the United States' claims for nuisance and trespass may be maintained together with its negligence claim, provided there is only one recovery. Because questions of fact exist with respect to causation, and the claims for trespass and nuisance are premised upon ICLP's negligence, ICLP's motion for summary judgment on these theories will be denied. *See Plum Creek*, 2005 WL 2415991 at *5 (denying motion for summary judgment on the trespass and nuisance claim upon finding disputed issues of fact related to the claim for negligence).

## CONCLUSION

ICLP's motion will be denied with respect to the United States' negligence, nuisance, and trespass claims. Having denied ICLP's motion in limine, the facts regarding causation, an essential element of the United States' negligence claim, are disputed. In turn, the United States' nuisance and trespass claims, which are based upon its negligence claim, may proceed, and are not duplicative. However, because of the extensive expert testimony anticipated regarding causation, and the claims that others may have been responsible either in whole or in part, the United States' res ipsa loquitur claim does not survive summary judgment.

# ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

Defendant's Motion for Summary Judgment (Dkt. 65) is **GRANTED IN PART AND DENIED IN PART.** Plaintiff may proceed to trial on its theories of negligence, nuisance, and trespass.

DATED: February 21, 2020

Honorable Candy W. Dale
United States Magistrate Judge